1  DILLINGHAM & MURPHY, LLP
   PATRICK J. HAGAN (SBN 68264)
2  MARK J. ROGERS (SBN 173005)
3  225 Bush Street, 6th Floor
   San Francisco, California 94104-4207
   Telephone:      (415) 397-2700
4  Facsimile:      (415) 397-3300

5      Attorneys for Defendant and Counter-Complainant
       Z-MAN FISHING PRODUCTS, INC.
6

7                      UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9                           OAKLAND DIVISION

10 APPLIED ELASTOMERICS,                    Case No. C062469 CW
   INCORPORATED, a California corporation
11                                          Z-MAN FISHING PRODUCTS,
                                            INCORPORATED'S AMENDED
12                  Plaintiff,              ANSWER  AND THIRD AMENDED
                                            COUNTER-COMPLAINT
13     v.
                                            Trial Date: November 13, 2007
14 Z-MAN FISHING PRODUCTS,
   INCORPORATED, a South Carolina
15 corporation,

16                  Defendant.
   _____
17 Z-MAN FISHING PRODUCTS,
   INCORPORATED, a South Carolina
18 corporation,

19                         Counter-Complainant,

20     v.

21 APPLIED ELASTOMERICS,
   INCORPORATED, a California corporation,
22
                    Counter-Defendant
23

24                          AMENDED ANSWER

25     Defendant and Counter-Complainant Z-Man Fishing Products, Incorporated ("Z-Man")

26 hereby submits the following Amended Answer to the Complaint for Breach of Contract and

27 Breach of the Covenant of Good Faith and Fair Dealing filed on April 7, 2006 (the "Complaint")

28 by Plaintiff and Counter-Defendant Applied Elastomerics, Incorporated ("AEI") as follows:

1.      Responding to paragraph 1 of the Complaint, Z-Man lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and based thereon, denies each and every allegation contained therein.

2.      Responding to paragraph 2 of the Complaint, Z-Man admits the allegations of this paragraph.

3.      Responding to paragraph 3 of the Complaint, this paragraph does not assert any charging allegations against Z-Man.  To the extent that it could be construed to assert any such allegations, Z-Man denies each and every allegation of this paragraph.

4.      Responding to paragraph 4 of the Complaint, Z-Man denies each allegation alleged in this paragraph.

5.      Responding to paragraph 5 of the Complaint, Z-Man denies that venue is proper in this district pursuant to any statutory provision cited.  Z-Man admits only so much of paragraph 5 that alleges that, from Z-Man's office in South Carolina, it telephoned AEI at its headquarters to discuss the soft plastic lure product line that Z-Man was developing and, based upon AEI's representations, inquired as to the possibility of licensing all of AEI's relevant technology, if it would allow Z-Man to produce a revolutionary new line of durable lures.  Z-Man further admits that it executed a document captioned "Exclusive Patent License Agreement" ("License Agreement") with AEI, paid royalties to AEI, and made phone calls and sent letters from South Carolina to the Northern California District.  Z-Man admits that the License Agreement provides for negotiations in the Northern California District as described in section 9.2(b) of the License Agreement and provides that disputes arising out of or related to the License Agreement, or the performance, enforcement, breach or termination thereof, and any remedies relating thereto, shall be construed, governed, interpreted and applied in accordance with the laws of the State of California as set forth in section 10.8 of the License Agreement.  Z-Man denies that AEI has suffered harm in this district or that a substantial part of the events or omissions giving rise to this claim occurred in this district.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

6.      Responding to paragraph 6 of the Complaint, Z-Man admits only so much of

Page 2 - Z-Man's Amended Answer and Third Amended Counter-Complaint

Case No. C06-2469 CW

1    paragraph 6 that alleges that, from Z-Man's office in South Carolina, it telephoned AEI at its

2    headquarters to discuss the soft plastic lure product line that Z-Man was developing and, based

3    upon AEI's representations, inquired as to the possibility of licensing all of AEI's relevant

4    technology, if it would allow Z-Man to produce a revolutionary new line of durable lures. Z-Man

5    further admits that under the License Agreement, any royalty payments that were due were to be

6    sent to AEI at its principal place of business located at 163 West Harris Avenue, South San

7    Francisco, CA 94080. Except as expressly admitted, Z-Man denies each and every remaining

8    allegation alleged in this paragraph.

9         7.    Responding to paragraph 7 of the Complaint, paragraph 7 calls for legal

10   conclusions for which no response is required. To the extent any response is required, Z-Man

11   lacks knowledge and information sufficient to form a belief as to the truth of the allegations

12   contained in this paragraph, and based thereon, denies each and every allegation contained therein.

13        8.    Responding to paragraph 8 of the Complaint, Z-Man admits that in or about April

14   2001, Mike Shelton of Z-Man contacted John Chen of AEI by telephone at AEI's South San

15   Francisco location to discuss a potential business relationship and that he thereafter sent a

16   facsimile to Mr. Chen indicating that Z-Man was interested in the possibility of licensing all of

17   AEI's relevant technology, if it would allow Z-Man to produce a revolutionary new line of durable

18   lures. Z-Man further admits that the facsimile included the statements quoted. Z-Man craves

19   reference to the full facsimile sent by Mr. Shelton to Mr. Chen and denies any assertions

20   inconsistent therewith. Except as expressly admitted, Z-Man denies each and every remaining

21   allegation alleged in this paragraph.

22        9.    Responding to paragraph 9 of the Complaint, Z-Man admits that in July 2001, AEI

23   and Z-Man executed the document captioned as the License Agreement attached as Exhibit A to

24   the Complaint, and that AEI purported to grant Z-Man a license to the "Patent Rights" as defined

25   in the License Agreement, which included U.S. Patent No. 5,884,639. Z-Man denies that Exhibit

26   A is a true and correct copy of the parties' Agreement. Except as expressly admitted, Z-Man

27   denies each and every remaining allegation alleged in this paragraph.

28        10.    Responding to paragraph 10 of the Complaint, Z-Man admits only so much of

paragraph 10 that asserts that section 2.2(a) of the License Agreement provided for minimum royalty payments.  Z-Man further admits that the license of certain patent rights expressed in the License Agreement was to be exclusive to Z-Man and that AEI was obligated to maintain exclusivity of the license under the License Agreement.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

11.      Responding to paragraph 11 of the Complaint, Z-Man admits only so much of paragraph 9 which quotes the License Agreement but denies that any of the cited provisions are enforceable by AEI against Z-Man and further denies that it owes AEI any payments, interest, damages, or attorney's fees and/or that any false or fraudulent statements have been made by Z-Man.

12.      Responding to paragraph 12 of the Complaint, Z-Man admits that it made a total of 9 payments to AEI of approximately $420,000, and that it made its first payment on June 11, 2001 and its last on February 23, 2004.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

13.      Responding to paragraph 13 of the Complaint, Z-Man admits that it wrote to AEI and indicated that "[n]o payment is required under the license, because the reported products are not subject to royalties."  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

14.      Responding to paragraph 14 of the Complaint, Z-Man admits that AEI wrote a letter as alleged but denies that Z-Man was in default in any respect and/or that any minimum royalties were past due.

15.      Responding to paragraph 15 of the Complaint, Z-Man admits that it contests that it owes AEI royalties under the License Agreement because, among other reasons, it did not manufacture and sell products that infringe the Patent Rights as defined in the License Agreement.  Z-Man further admits that AEI has indicated that it disagrees with Z-Man's position.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

16.      Responding to paragraph 16 of the Complaint, Z-Man admits that AEI sent letters to it and its counsel beginning on June 10, 2004 indicating its belief that Z-Man was in default

1    under the License Agreement.  Z-Man denies the assertions contained in the correspondence

2    referenced.  Z-Man admits that it responded to these letters, did not make any subsequent

3    payments to AEI, and attempted good faith efforts to resolve the dispute.  Z-Man denies that it has

4    ever been in breach of the Agreement or that it owes AEI any minimum royalty payments. Except

5    as expressly admitted, Z-Man denies each and every remaining allegation alleged in this

6    paragraph.

7            17.     Responding to paragraph 17 of the Complaint, Z-Man admits that AEI sent letters

8    to its outside counsel between January 2005 and March 2005 but denies the assertions contained in

9    the correspondence referenced. Z-Man further denies that AEI maintained exclusivity of the

10   license.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged

11   in this paragraph.

12           18.     Responding to paragraph 18 of the Complaint, Z-Man admits that AEI sent a letter

13   to its outside counsel dated January 27, 2005.  Z-Man denies the assertions contained in the

14   correspondence referenced.  Z-Man further denies that any minimum royalties were past due and

15   denies that AEI maintained exclusivity of the license.  Except as expressly admitted, Z-Man denies

16   each and every remaining allegation alleged in this paragraph.

17           19.     Responding to paragraph 19 of the Complaint, Z-Man admits that AEI sent a letter

18   to its outside counsel dated January 31, 2005.  Z-Man denies the assertions contained in the

19   correspondence referenced.  Z-Man further denies that AEI maintained exclusivity of the license.

20   Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this

21   paragraph.

22           20.     Responding to paragraph 20 of the Complaint, Z-Man admits that AEI sent a letter

23   to its outside counsel dated March 1, 2005.  Z-Man denies the assertions contained in the

24   correspondence referenced.  Z-Man further denies that it had any obligation to pay minimum

25   royalties under the License Agreement and denies that the license remained exclusive. Except as

26   expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

27           21.     Responding to paragraph 21 of the Complaint, Z-Man denies that AEI had

28   maintained the exclusivity of the license and further denies that Z-Man failed to provide notice to

terminate the exclusivity of the license.  Z-Man admits that its counsel wrote to AEI on April 11, 2005 but denies that it made any erroneous assertion.  Z-Man admits that AEI wrote back to Z-Man's counsel on April 20, 2005.  Z-Man denies the assertions contained in AEI's referenced correspondence.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

22.     Responding to paragraph 22 of the Complaint, Z-Man denies each and every allegation contained therein.

23.     Responding to paragraph 23 of the Complaint, Z-Man admits AEI sent it letters during 2005. Z-Man denies the assertions contained in the correspondence referenced and denies that any minimum royalties or interest were due. Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

24.     Responding to paragraph 24 of the Complaint, Z-Man admits the allegations of this paragraph.

25.     Responding to paragraph 25 of the Complaint, Z-Man admits that it made a total of 9 payments to AEI of approximately $420,000, and that it made its first payment on June 11, 2001 and its last on February 23, 2004.  Except as expressly admitted, Z-Man denies each and every remaining allegation alleged in this paragraph.

26.     Responding to paragraph 26 of the Complaint, this paragraph does not assert any charging allegations against Z-Man.  To the extent that it could be construed to assert any such allegations, Z-Man incorporates by reference paragraphs 1 through 25 as if fully set forth herein.

27.     Responding to paragraph 27 of the Complaint, Z-Man admits that the parties executed the document referred to herein as the License Agreement which is attached as Exhibit A to the Complaint.  Z-Man denies that Exhibit A is a true and correct copy of the parties' Agreement.

28.     Responding to paragraph 28 of the Complaint, Z-Man denies each and every allegation contained therein.

29.     Responding to paragraph 29 of the Complaint, Z-Man denies each and every allegation contained therein.

1    30.    Responding to paragraph 30 of the Complaint, Z-Man denies each and every

2    allegation contained therein.

3    31.    Responding to paragraph 31 of the Complaint, this paragraph does not assert any

4    charging allegations against Z-Man.  To the extent that it could be construed to assert any such

5    allegations, Z-Man incorporates by reference paragraphs 1 through 30 as if fully set forth herein.

6    32.    Responding to paragraph 32 of the Complaint, paragraph 32 calls for a legal

7    conclusion to which no response is required.  To the extent that any response is required, Z-Man

8    admits that the parties' Agreement contained a covenant of good faith and fair dealing which was

9    breached by AEI.  Z-Man denies the remaining allegations of paragraph 32.

10   33.    Responding to paragraph 33 of the Complaint, Z-Man denies each and every

11   allegation contained therein.

12   34.    Responding to paragraph 34 of the Complaint, Z-Man denies each and every

13   allegation contained therein.

14   35.    Responding to paragraph 35 of the Complaint, Z-Man denies each and every

15   allegation contained therein.

16   36.    Responding to paragraph 36 of the Complaint, Z-Man denies each and every

17   allegation contained therein.

18                          Affirmative Defenses

19   37.    As a first affirmative defense, Z-Man alleges that AEI failed to exercise ordinary

20   care in mitigating its damages, if any there be.

21   38.    As a second affirmative defense, Z-Man alleges that any contractual recovery on

22   the Complaint is barred in whole or in part by the failure of one or more conditions precedent.

23   39.    As a third affirmative defense, Z-Man alleges that any contractual recovery on the

24   Complaint is barred in whole or in part by the failure of one or more conditions subsequent.

25   40.    As a fourth affirmative defense, Z-Man alleges that AEI's claims for breach of

26   contract are barred in whole or in part by AEI's material breach of its obligations to Z-Man

27   thereby excusing any further performance by Z-Man.

28   41.    As a fifth affirmative defense, Z-Man alleges that AEI's claims are barred in whole

1    or in part by the failure of consideration of the License Agreement.

2           42.    As a sixth affirmative defense, Z-Man alleges that the Complaint and each and

3    every claim purportedly asserted therein is barred in whole or in part by AEI's own breach of the

4    implied covenant of good faith and fair dealing.

5           43.    As a seventh affirmative defense, Z-Man alleges that the Complaint, and each and

6    every claim purportedly asserted therein, is barred in whole or in part by reason of AEI's unclean

7    hands.

8           44.    As an eighth affirmative defense, Z-Man alleges that the Complaint, and each and

9    every cause of action purportedly asserted therein, is barred because by its acts and omissions,

10   AEI has waived any right to recover relief by its Complaint.

11          45.    As a ninth affirmative defense, Z-Man alleges that any right AEI had to compel

12   mediation under the License Agreement was waived by way of their filing of the Complaint.

13          46.    As a tenth affirmative defense, Z-Man alleges that any award of damages to

14   Plaintiff must be offset by sums received by Plaintiff.

15          47.    As an eleventh affirmative defense, Z-Man reserves the right to amend its Answer

16   or to amend or add further affirmative defenses that may become known after the filing of this

17   pleading.

18          48.    As a twelve affirmative defense, Z-Man alleges that AEI engaged in the following

19   fraudulent conduct that precludes it from being able to recover against Z-Man for breach of

20   contract and breach of the covenant of good faith and fair dealing:

21                 a.    On or about April 25, 2001, Mike Shelton of Z-Man contacted John Chen of

22   AEI by telephone and the two discussed the soft plastic lure product line that Mr. Shelton was

23   developing for Z-Man.  During that call, Mr. Shelton described in detail the physical

24   characteristics of the fishing lure product that he was trying to develop (the "superworm") and

25   indicated that Z-Man was interested learning more about any of AEI's patents that were pertinent

26   to Z-Man's manufacture of a superworm.  Mr. Chen described AEI's patents to Mr. Shelton and

27   said that Z-Man needed a license to AEI's Patent 5,884,639.  He said to Mr. Shelton, "doing what

28   you want to do is covered under my patent and you would be infringing."  Mr. Chen repeatedly

Page 8 - Z-Man's Amended Answer and Third Amended Counter-Complaint

1    stated "I can provide you with exactly what you want," "I can show you how to manufacture your

2    product," and "I can show you how to reduce your costs."  Also during the April 25, 2001

3    telephone call, Mr. Shelton asked Mr. Chen about AEI's ability to help Z-Man create the

4    superworm with formulas or processes covered by AEI's patents.  Mr. Shelton asked whether AEI

5    could make the product float, whether the product would be buoyant and whether it had excellent

6    tear strength and elongation.  Mr. Chen answered "yes" to all of these questions, and stated that

7    the products created from his formulas (purportedly covered by his patents) were "excellent" in all

8    of these categories.

9            b.      On or about April 26, 2001, Mr. Chen sent Mr. Shelton a copy of AEI's

10    standard nondisclosure and license agreement for Z-Man's consideration, along with those

11    agreements, Mr. Chen's cover letter indicated that Z-Man wanted a restricted license, which

12    required a minimum royalty.  The license agreement that AEI forwarded to Z-Man listed on

13    Schedule A U.S. Patent Nos. 5,884,639, 6,117,176, 6,148,830, and 6,161,555.  Upon review, Mr.

14    Shelton called Mr. Chen in either late April 2001 or early May 2001 and discussed the additional

15    patents.  Mr. Chen at that point stated that he had listed additional patents to ensure that Z-Man

16    had complete coverage of all of AEI's patents that would be relevant to fishing lures.

17            c.      On May 19, 2001, Mr. Shelton, Myrna Wauhop, and Don Rawlings meet

18    with Mr. Chen at AEI's office in South San Francisco.  During the May 19, 2001 meeting, Mr.

19    Chen stated that there were two options that Z-Man could pursue in terms of royalties and

20    exclusivity provisions in the license agreement – (1) take a non-exclusive license for a certain

21    amount; or (2) take an exclusive license and submit a $25,000 check to AEI up front to maintain

22    that exclusivity.  Mr. Chen stated that the exclusive contract would "give Z-Man protection under

23    all of his patents" and would "block anyone else from using it."  Mr. Shelton and Ms. Wauhop

24    stated that they wanted all of AEI's relevant patents licensed to them exclusively.  Specifically,

25    Mr. Shelton stated to Mr. Chen, "We want it all."

26            d.      Mr. Chen subsequently acknowledged Z-Man's intent to license all of AEI's

27    relevant patents at the May 19, 2001 meeting in his June 16, 2004 letter to Z-Man in which he

28    states, "One of our first questions to representative of Z-man at the meeting in South San

Page 9 - Z-Man's Amended Answer and Third Amended Counter-Complaint

Case No. C06-2469 CW

1    Francisco was, what so you want?  The reply was, we want all of your patents that covers [sic]

2    fishing [lures].  We want an exclusive for all fishing [lures]."

3                    e.       At the May 19, 2001 meeting, Mr. Chen indicated he was pleased with Z-

4    Man's choice of an exclusive license and that all of AEI's relevant patents and technology that

5    could be used in developing fishing lures were covered by AEI's draft license agreement, and that

6    AEI's patents "cover what you want to do and will stop anyone from coming in behind you and

7    making a fishing lure with this."

8                    f.       Thereafter, Mr. Shelton executed the document referenced herein as the

9    License Agreement.

10                   g.       As alleged above, Mr. Chen's representation made on behalf of AEI to Z-

11   Man that the License Agreement included all of AEI's patents relevant to fishing lures was false at

12   the time it was made.

13                   h.       When Mr. Chen made that representation, he must have known it was false

14   or must have made it recklessly without knowing whether it was true or false as he drafted the

15   License Agreement.  At the time he made the statement, Mr. Chen, who had developed all of

16   AEI's patents, was fully aware as to the nature and extent of AEI's patent portfolio and what was

17   and was not included in Schedule A to the License Agreement.  He was also fully aware of the

18   characteristics of the fishing lure product that Z-Man was trying to develop.

19                   i.       The falsity of Mr. Chen's representation was demonstrated by AEI's

20   subsequent acknowledgment in late July 2002 or early August 2002 to Mr. Shelton that the patents

21   covered by the License Agreement covered only the "the Cadillac of the product" but did not

22   include the "Volkswagen."

23                   j.       Mr. Chen intended for Z-Man to rely on and act on his false representation.

24                   k.       Z-Man was unaware of the falsity of the statement at the time it was made.

25                   l.       Z-Man relied upon the truth of this representation when it signed the

26   License Agreement.  Z-Man would not have signed the License Agreement had it known that AEI

27   was not, in fact, licensing to it all of its relevant patents that could be used in the development of

28   fishing lures.  That representation was material to Z-Man in that its purpose in entering into a

1   potential license agreement with AEI was to develop a fishing lure line of products that were

2   covered by AEI's applicable patents and, by virtue of the exclusivity provisions of the license, to

3   deny these types of patents to Z-Man's competition.

4           m.      Z-Man's reliance on the truth of Mr. Chen's representation was justified in

5   that (i) AEI had a large number of patents in its patent portfolio, all of which had been developed

6   by Mr. Chen, (ii) Mr. Chen was in the best position to determine which AEI patents, if any, would

7   be appropriate to develop the fishing lure products which Z-Man had described to AEI, and (iii) Z-

8   Man's intention in entering into a license agreement with AEI was in part to deprive AEI from

9   licensing applicable patents to competitors that could use gel formulations covered by AEI's

10   patents to develop products similar to the superworm that Z-Man was trying to develop.

11           n.      Section 10.1 of the License Agreement does not preclude reasonable

12   reliance by Z-Man, inter alia, as to Mr. Chen's representation that the License Agreement included

13   all of AEI's patents relevant to fishing lures.

14           o.      Section 10.1, entitled "No Representations or Warranties," states in

15   pertinent part that:

16                     * * * NEITHER COMPANY NOR AEI MAKES ANY
                  REPRESENTATIONS * * * OF ANY KIND

17                     CONCERNING THE PATENT RIGHTS, EXPRESS OR
                  IMPLIED, INCLUDING WITHOUT LIMITATIONS

18                     WARRANTIES OF MERCHANTABILITY, FITNESS FOR
                  A PARTICULAR PURPOSE, NONINFRINGEMENT,

19                     VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER
                  ISSUED OR PENDING, AND THE ABSENCE OF

20                     LATENT OR OTHER DEFECTS, WHETHER OR NOT
                  DISCOVERABLE. Specifically, and not to limit the

21                     foregoing, AEI makes no warranty or representations (i)
                  regarding the validity or scope of the Patent Rights, * * *.

22

23           p.      "Patent Rights" is defined under the License Agreement as "the United

24   States and international patents listed on Schedule A" and patents that "read on the Licensed

25   Products"; "continuing patents (divisionals, continuations, and C-I-Ps) which are directed to the

26   subject matter of patents on Schedule A"; and "reissues, etc. of patents" described above.

27   (License Agrmt. at § 1.7.)

28           q.      Schedule A of the License Agreement lists the following four Patents which

cover crystal gels: U.S. Patent No. 5,884,639, "Crystal Gels With Improved Properties," issued March 23, 1999; U.S. Patent No. 6,117,176, "Elastic Crystal Gel," issued September 12, 2000; U.S. Patent No. 6,148,830, "Tear Resistant, Multiblock Copolymer Gels and Articles," issued November 21, 2000; and U.S. Patent No. 6,161,555, "Crystal Gels Useful As Dental Floss With Improved High Tear; High Tensile, And Resistance To High Stress Rupture Properties," issued December 19, 2000.

r.      Section 10.1 precludes reliance on representations concerning the scope of the Patent Rights, i.e., their application, operation, and effectiveness.  As the Court in this case has already determined, Section 10.1 precludes reasonable reliance on a representation that the patents that were being licensed would provide Z-Man with what it needed for its line of fishing lures, i.e., that the Patent Rights would lead directly to a viable superworm.  The representation made by Mr. Chen that he was licensing all of AEI's patents relevant to fishing lures is different than the representation that AEI was providing Z-Man with what it needed for its line of fishing lures in that that representation is a factual assertion concerning which of the patents out of AEI's large patent portfolio were licensed and not the specific ability of the four patents enumerated in the License Agreement to produce a specific product.  Mr. Chen said that his proposed License Agreement included all of AEI's patents relevant to fishing lures but he instead only licensed four specific patents, not all relevant patents, i.e., the one or more Volkswagen patents Mr. Chen described to Mr. Shelton in late July 2002 or early August 2002.

s.      Z-Man has been and continues to be damaged as a consequent and proximate result of AEI's fraudulent assertion about the extent of the patents covered by the License Agreement, including but not limited to in the form of lost profits, harm to reputation and good will.

t.      Z-Man is entitled to a rescission of any agreement entered into between the parties and a return of all money paid under the License Agreement because of AEI's fraudulent conduct as alleged herein.

49.      As a thirteenth affirmative defense, Z-Man alleges that AEI engaged in the following two separate negligent misrepresentations which preclude it from being able to recover

1   or reduce the recovery against Z-Man on its breach of contract and breach of the covenant of good

2   faith and fair dealing claims:

3        a.     Representation One – Misrepresentation Causing Inducement:

4             i.     The allegations of paragraph 48 are incorporated herein by

5                     reference.

6             ii.     Representation One: Mr. Chen made the representation noted in

7                     paragraph 48(e) above to the effect that the License Agreement

8                     included all of AEI's patents that were relevant to the development

9                     of Z-Man's superworm.

10            iii.     When he made that representation, it was false.

11            iv.     Regardless of Mr. Chen's actual belief, he made that representation

12                    without any reasonable ground for believing it to be true.

13            v.     Mr. Chen made the representation with the intent to induce Z-Man

14                    to rely upon it to execute the document referenced herein as License

15                    Agreement.

16            vi.     Z-Man was unaware of the falsity of AEI's representation as alleged

17                    in paragraph 48(e) above, acted in reliance upon the truth of that

18                    representation when it executed the document referenced herein as

19                    the License Agreement and, and was justified in relying upon that

20                    representation.

21            vii.     Z-Man has been and continues to be damaged as a proximate result

22                    of its reliance on Mr. Chen's negligent representation as alleged in

23                    paragraph 48(e) above, said damage including but not limited to

24                    payment of royalty payments that it would not otherwise have made,

25                    lost profits, harm to reputation and good will.

26       b.     Representation Two – Subsequent Technology:

27            i.     After the License Agreement was signed and before August 16,

28                    2001, Mr. Chen supplied Z-Man with AEI Technology, i.e.

1    materials in the form of additional samples and "know how" or

2    "processes" including various methods of manufacturing Licensed

3    Products.

4       ii.      Between the time the License Agreement was executed and August

5    16, 2001, Mr. Chen sent AEI Technology (sample gels) to Z-Man.

6       iii.      On or about August 20, 2001, Mr. Chen, for the first time, sent to

7    Mr. Shelton AEI Technology pursuant to the terms of the License

8    Agreement in the form of a gel "recipe" that, if followed, was

9    supposed to produce the sample gel that AEI had sent to Z-Man on

10   August 16, 2001.  Mr. Chen's cover letter enclosing the receipt

11   reads as follows: "Attached are Confidential technical information

12   related to the manufacture of Licensed Products in accordance with

13   your specifications.  The information is being provide [sic] to you in

14   accordance with the License and Confidentiality Agreements."

15   Enclosed with the cover letter was a recipe captioned "Z-Man

16   Requested Gel Formulations."

17      iv.      By way of those two documents, AEI represented to Z-Man that it

18   was providing Z-Man with AEI information related to fishing lure

19   products that could not otherwise be manufactured without

20   infringing on the Patent Rights.

21      v.      The representation alleged in paragraph 49(b)(iv) was false.

22      vi.      Regardless of AEI's actual belief, AEI made the representation

23   alleged in paragraph 49(b)(iv) without any reasonable ground for

24   believing it to be true.

25      vii.      The License Agreement provided that minimum royalty payments

26   were to be made by Z-Man to AEI according to an agreed upon

27   schedule in return for a grant to Z-Man of the exclusivity of the

28   Patent Rights (the agreed upon schedule provided that minimum

1    royalty payments would begin to accrue with the first quarter of

2    2002).  The License Agreement provided that Z-Man had the right

3    to terminate any obligation to pay minimum royalty payments at any

4    time on 90 days' notice.  Z-Man gave notice of its intent to

5    terminate the License Agreement on August 24, 2004.

6    viii.   Had Z-Man known that the gel recipe sent to it by AEI on August

7    20, 2001 would not, in fact, lead to the creation of a gel that is

8    covered by the Patent Rights, Z-Man would have given notice of its

9    intent to terminate any obligation to pay minimum royalty payments

10   as early as 2001 well in advance of August 24, 2004 and before any

11   potential obligation to pay minimum royalties would otherwise have

12   been due.

13   ix.   AEI made the representation alleged in paragraph 49(b)(iv) with the

14   intent to induce Z-Man to refrain from terminating the License

15   Agreement so that it would be potentially required to pay minimum

16   royalty payments beginning with the first quarter of 2002.

17   x.   Z-Man was unaware of the falsity of the representation alleged in

18   paragraph 49(b)(iv), acted in reliance upon the truth of that

19   representation when it refrained from terminating the License

20   Agreement at any time prior to August 24, 2004, and was justified in

21   relying upon the representation.

22   xi.   Z-Man has been and continues to be damaged as a result of the

23   representations as alleged in paragraph 49(b)(iv) by making

24   payment of royalty payments that it would not otherwise have made,

25   lost profits, and harm to reputation and good will, as a proximate

26   result of its reliance on those representations.

27   THIRD AMENDED COUNTER-COMPLAINT

28   1.   Z-Man develops and manufactures fishing lure components and fishing lures for

1   major lure manufacturers.

2       2.      Applied Elastomerics Incorporated ("AEI") develops and distributes products

3   containing gel composites, in particular, gel toys.

4       3.      Mike Shelton is the Vice President of Marketing and Sales, Director of Technology

5   for Z-Man.  Mr. Shelton has been active in developing the technology for Z-Man's products since

6   he joined the company.

7       4.      Prior to 2001, Mr. Shelton had been leading Z-Man's efforts to develop a stronger,

8   softer, and more buoyant plastic lure than those made of plastisol and related compounds that

9   formed the bulk of the "plastic" lures then on the market.

10      5.      In doing so, Mr. Shelton became aware of AEI and John Chen.  John Chen is the

11  president of AEI and the listed inventor of various patents held by AEI.  All references to Mr.

12  Chen herein are to his actions on behalf of AEI.

13      6.      On or about April 25, 2001, Mr. Shelton contacted Mr. Chen by telephone and the

14  two discussed the soft plastic lure product line that Mr. Shelton was developing for Z-Man.

15  During that call, Mr. Shelton described in detail the physical characteristics of the fishing lure

16  product that he was trying to develop (the "superworm") and indicated that Z-Man was interested

17  in learning more about all of AEI's patents that might be pertinent to Z-Man's manufacture of a

18  superworm.

19      7.      Mr. Chen described AEI's patents to Mr. Shelton and said that Z-Man needed a

20  license to AEI's Patent 5,884,639 and that what AEI intended to do would infringe that patent.

21      8.      Mr. Chen also told Mr. Shelton that he could provide Z-Man exactly what it

22  needed, that he could show Z-Man how to manufacture the product, and can show Z-Man how to

23  reduce its costs.

24      9.      Mr. Chen also told Mr. Chen that he "vigorously protects AEI's patents and goes

25  after infringers."

26      10.     Mr. Shelton inquired as to the possibility of licensing all of AEI's relevant patents

27  and technology, whereupon Mr. Chen expressed AEI's willingness to do so.

28      11.     Also during the April 25, 2001 telephone call, Mr. Chen indicated he would

Page 16 - Z-Man's Amended Answer and Third Amended Counter-Complaint

Case No. C06-2469 CW

1    provide samples of gels created from formulas covered by his patents.

2           12.     Also during the April 25, 2001 telephone call, Mr. Chen indicated that he would

3    prepare a copy of his standard license agreement and send it to Mr. Shelton for signature.  Mr.

4    Shelton stated he and Myrna Wauhop, Z-Man's Vice President at the time, would like to have a

5    meeting with Mr. Chen.  Mr. Chen scheduled the meeting and insisted that the meeting occur on

6    Saturday because AEI's "R&D lab" would be down, and there would be nobody around the office

7    to bother them.  Throughout the conversation, Mr. Chen referenced the capabilities of AEI's

8    "R&D lab" in aiding Z-Man.  Mr. Chen represented to Shelton during their April 25, 2001

9    telephone conversation that AEI had a full-fledged R&D department that could create samples for

10   Z-Man to test once AEI and Z-Man agreed on what properties were appropriate for the product

11   Mr. Shelton was developing.  It was not until after this litigation had commenced that Mr. Shelton

12   learned that AEI's sole employees were Mr. Chen and his wife.

13          13.     On or about April 26, 2001, Mr. Chen sent Mr. Shelton a copy of AEI's standard

14   nondisclosure agreement and license agreement for Z-Man's consideration, along with those

15   agreements, Mr. Chen's cover letter indicated that Z-Man wanted a restricted license, which

16   required a minimum royalty.  The license agreement that AEI forwarded listed U.S. Patent Nos.

17   5,884,639, 6,117,176, 6,148,830, and 6,161,555. Upon review, Mr. Shelton called Mr. Chen in

18   either late April 2001 or early May 2001 and discussed the additional patents.  Mr. Chen at that

19   point stated that he had listed three additional patents to ensure that Z-Man had complete coverage

20   of all of AEI's patents that would be relevant to fishing lures.

21          14.     On or about May 19, 2001, Mr. Shelton and Ms. Wauhop and Don Rawlins of

22   Color Technologies, Inc. of Brooklet, Georgia ("CTI") – a plastics manufacturer with which Z-

23   Man had worked in the past – met with Mr. Chen at AEI's facilities located in South San

24   Francisco.  At the beginning of the meeting, Ms. Wauhop and Mr. Shelton educated Mr. Chen

25   about the fishing lure industry, what Z-Man had accomplished in the industry, and Z-Man's future

26   goals in the industry.  Mr. Chen immediately waved a piece of paper he had brought into the

27   meeting.  Though he did not permit anyone to see its contents, Mr. Chen stated that the paper

28   showed a recent, favorable settlement AEI had won against a patent infringer.  Mr. Chen stated

Page 17 - Z-Man's Amended Answer and Third Amended Counter-Complaint

that he "takes care of infringers."  Mr. Chen also stated that he had been contacted by two other

lure companies wanting to license his patents for the same technology.  Mr. Shelton asked Mr.

Chen for the names of the two companies, but Mr. Chen would not provide those names.

15.     During the May 19, 2001 meeting, Mr. Chen stated that AEI owned and operated a

laboratory facility in the building where the meeting took place, but Mr. Chen would not agree to a

tour of that alleged laboratory or office space.  Mr. Chen stated that AEI employed a research and

development staff, other than Mr. Chen, who worked at AEI's laboratory facilities.

16.     During the May 19, 2001 meeting, Mr. Chen listed his professional credits, and

emphasized that he was a patent agent, with specialized knowledge of patents.

17.     During the May 19, 2001 meeting, Mr. Chen showed Mr. Shelton, Ms. Wauhop

and Mr. Rawlins products that were purportedly made with AEI's patented technology.

18.     After examining those sample products, Mr. Shelton made clear that the sample

gels which Z-Man wanted had to have the physical characteristics of the fishing lures he was

trying to develop, namely high tear resistance, soft durometer, buoyancy, and a surface that was

not too tacky.  He once more reiterated the specific characteristics of the lure line he was trying to

develop to ensure Mr. Chen understood what Z-Man was trying to create.  In response, Mr. Chen

acknowledged his understanding of Z-Man's belief that these samples had the physical

characteristics of the fishing lures it wanted to develop in his July 12, 2004 letter to Z-Man.

19.     During the May 19, 2001 meeting, Mr. Chen repeatedly assured Z-Man that he

knew how to manufacture the goods that Z-Man wanted to create.

20.     During the May 19, 2001 meeting, Mr. Chen stated that there were two options that

Z-Man could pursue in terms of royalties and exclusivity provisions in the license agreement – (1)

take a non-exclusive license for a certain amount; or (2) take an exclusive license and submit a

$25,000 check to AEI up front to maintain that exclusivity.  Mr. Chen stated that the exclusive

contract would "give Z-Man protection under all of his patents" and would "block anyone else

from using it."  Mr. Shelton and Ms. Wauhop stated that they wanted all of AEI's relevant patents

licensed to them exclusively.

21.     Mr. Chen subsequently acknowledged Z-Man's intent to license all of AEI's

1    relevant patents at the May 19, 2001 meeting in his June 16, 2004 letter to Z-Man in which he

2    states, "[o]ne of our first questions to representative of Z-man at the meeting in South San

3    Francisco was, what so you want?  The reply was, we want all of your patents that covers [sic]

4    fishing [lures].  We want an exclusive for all fishing [lures]."

5          22.    At the May 19, 2001 meeting, Mr. Chen indicated he was pleased with Z-Man's

6    choice of an exclusive license and that all of AEI's relevant patents and technology that could be

7    used in developing fishing lures were covered by AEI's draft license agreement, and that AEI's

8    patents "cover what you want to do and will stop anyone from coming in behind you and making a

9    fishing lure with this."  Mr. Chen also reiterated during the meeting, "I go after infringers" and "I

10   protect my intellectual property."

11         23.    During the May 19, 2001 meeting, Mr. Chen gave Mr. Shelton dishes of gels that

12   Mr. Chen had prepared.  Mr. Chen stated that the gels were covered by AEI's patents.  Mr. Chen

13   stated that he could not give Z-Man large quantities of the product because his staff was busy and

14   it would be difficult to provide samples exceeding a few pounds per sample.  Mr. Chen stated that

15   he would not provide Z-Man with any formulas for the compounds that comprised the samples he

16   had given until Z-Man signed a license agreement.

17         24.    After the conclusion of the May 19, 2001 meeting and before Z-Man signed the

18   License Agreement described below, AEI sent additional samples to Z-Man based on differing

19   formulas in order for Z-Man to find the best formula for the product it wanted to create.  Mr. Chen

20   told Mr. Shelton on several occasions during June and July 2001 that the samples he had sent to Z-

21   Man were covered under AEI's patents that he was planning to license to Z-Man.

22         25.    In late May 2001, Mr. Chen requested that Z-Man send AEI a check for $25,000 to

23   secure its exclusive rights to all of the AEI patents relevant to fishing lures.

24         26.    On June 11, 2001, Mr. Shelton forwarded a check for $25,000 to Mr. Chen, along

25   with a letter stating Z-Man's intent to accept of the license agreement with changes to be made to

26   Sections 3.1 and 4.6 (royalty payments) and instructing Chen to hold the $25,000 check until an

27   agreement embodying such terms was executed.

28         27.    During June and July 2001, Mr. Shelton spoke with Mr. Chen about the upcoming

Page 19 - Z-Man's Amended Answer and Third Amended Counter-Complaint

1    July 2001 American Sport Fishing Association ("ASFA") show (now called the I-CAST show), a

2    major convention in the fishing industry for Z-Man and its customers.  Mr. Shelton told Mr. Chen

3    that he would need samples to show prospective customers, and that no royalty amounts in the

4    license agreement could be settled upon (and thus no license agreement signed) until he received

5    feedback from customers at that convention.  Specifically, Mr. Shelton reiterated that the royalty

6    amounts could not be determined until Z-Man received orders from its customers which would

7    give them some basis to agree to minimum royalties and running royalties.  Mr. Chen thereafter

8    provided additional samples for use during the ASFA show.

9           28.     During the July 2001 ASFA show, Mr. Shelton, Ms. Wauhop, and Mr. Rawlins

10   showed sample products to several potential customers that it had created from the samples

11   provided by Mr. Chen.  Z-Man's customers were excited about the product.

12          29.     Mr. Shelton called Mr. Chen during the ASFA show and kept him apprised of all of

13   the developments.  Mr. Shelton informed Mr. Chen of the apparent success of the product at the

14   show, customers' base commitments, and told Mr. Chen that he would have to get details from the

15   customers about order amounts before he could sign a finalized license agreement.  Mr. Chen

16   replied that this was "fine" and that he was very excited about the venture.  Mr. Shelton also told

17   Mr. Chen about a scheduled August 17, 2001 fishing trip planned with StrikeKing to test the

18   "superworm".  Mr. Chen responded that AEI would not provide Z-Man with the needed samples

19   to test on the August 17, 2001 trip without a signed license agreement.  Mr. Shelton replied that he

20   would not sign the agreement without established order numbers as a basis for the royalty

21   provisions of the license agreement, and that he could not get customers to place orders (and thus

22   provide the order numbers for the royalty provisions) without allowing the customers to test

23   samples.  Mr. Chen reiterated that he would not provide samples for testing without a signed

24   license agreement.  Mr. Chen further stated that he was worried about potential theft or copying of

25   his intellectual property – not the actual numbers for the royalty provisions.  Mr. Chen went on to

26   state to Mr. Shelton, that he should not worry about the royalty numbers in the agreement, and

27   stated "just sign it and we can work out the royalty numbers later."   Mr. Chen then stated "once

28   you sign the agreement, I can give you all the information you need to go forward."

Page 20 - Z-Man's Amended Answer and Third Amended Counter-Complaint

LICENSE AGREEMENT

1

2          30.       On or about July 18, 2001, AEI sent a revised license agreement to Mr. Shelton for

3   his signature, which included the same four patents listed on Schedule A as the original draft

4   version, executed by Mr. Chen on July 18, 2001.  Mr. Shelton signed that document (which is

5   attached to the Complaint as Exhibit A, incorporated herein by reference, and hereinafter referred

6   to as the "License Agreement") and sent it to Mr. Chen on July 25, 2001 with the documents

7   attached hereto as Exhibit B.  He did so with the express understanding that (1) the License

8   Agreement provided Z-Man with all of AEI's relevant patents and technology that could be used

9   in fishing lures, (2) the samples that had been provided were covered by AEI's patent rights, and

10  (3) the numbers for the lower minimum royalty amounts upon which Z-Man and AEI had agreed

11  (as set forth in Exhibit B), were part of the License Agreement and would be finalized when

12  customer orders for the product were received.  Mr. Shelton's signature on the License Agreement

13  was made only with the express understanding and agreement from Mr. Chen that the minimum

14  royalty amounts (shown in Ex. B) were part of the Agreement.  In the Memorandum from Mr.

15  Shelton to Mr. Chen, sent with and attached to the License Agreement on July 25, 2001, Mr.

16  Shelton attached the sales forecast and royalty numbers to which Z-Man and AEI had agreed as

17  part of the Agreement that he had signed.  A true and correct copy of this memorandum and the

18  attached royalty and sales numbers is attached hereto as Exhibit B.  Additionally, the July 25

19  Memorandum states that it is Z-Man's understanding that the License Agreement covers "any and

20  all fishing lures made from your patented formula," and asks Mr. Chen to advise Z-Man if that

21  statement is incorrect.  For approximately two years, until Z-Man terminated the Agreement, Mr.

22  Chen accepted payment under the minimum royalty schedule agreed to by the parties (Ex. B),

23  without complaint.

24         31.       The License Agreement recites that AEI owns and has rights to license certain

25  "Patent Rights."

26         32.       "Patent Rights" is defined as "the United States and international patents listed on

27  Schedule A" and patents that "read on the Licensed Products"; "continuing patents (divisionals,

28  continuations, and C-I-Ps) which are directed to the subject matter of patents on Schedule A"; and

"reissues, etc. of patents" described above.  (License Agrmt. at § 1.7.)

33.     Schedule A of the License Agreement lists the following four Patents which cover crystal gels: U.S. Patent No. 5,884,639, "Crystal Gels With Improved Properties," issued March 23, 1999 (the "'639 Patent"); U.S. Patent No. 6,117,176, "Elastic Crystal Gel," issued September 12, 2000 (the "'176 Patent"); U.S. Patent No. 6,148,830, "Tear Resistant, Multiblock Copolymer Gels and Articles," issued November 21, 2000 (the "'830 Patent"); and U.S. Patent No. 6,161,555, "Crystal Gels Useful As Dental Floss With Improved High Tear; High Tensile, And Resistance To High Stress Rupture Properties," issued December 19, 2000 (the "'555 Patent") (collectively referred to hereinafter as "the Schedule A Patents").

34.     Additionally, AEI has alleged at various times in writing that U.S. Patent 5,633,286 (the '286 Patent") and U.S. Patent 6,552,109 (the "'109 Patent") as well as CIP U.S. Patent No. 6,420,475 (the "'475 Patent), were covered by Schedule A of the License Agreement (the patents listed in Paragraphs 11 and 12 are referred to collectively as "AEI's Non-Fishing Lure Patents").

35.     The License Agreement grants Z-Man a royalty bearing license under AEI's Patent Rights "to develop, make, have made, use, offer to sell, sell, lease, export, and import Licensed Products."  (License Agrmt. § 2.1(a).)

36.     The License Agreement further provides for exclusivity by restriction as follows: "AEI agrees not to license any third party to manufacture or sell a Licensed Products [sic]."  (License Agrmt. § 2.2(a).)

37.     The Agreement sets forth "Running Royalties" in the amount of 8% of exclusive Licensed Products and 6% of non-exclusive Licensed Products.

38.     "Licensed Products" is defined as "one or more fishing lure products in the Field which is developed, manufactured and marketed by Company under Company's specifications and trademarks as listed by product item number, described, defined, and with the designation of the type of gel composition used on Schedule B as of the Effective Date or later added as a New Licensed Product * * * that cannot be manufactured made, used, offered for sale, leased, or sold, in whole or in part, without infringing one or more of the Patent Rights."

39.     Section 1.2 of the License Agreement defines "Field" as follows: "the fishing lure

1    field limited to Licensed Products which are listed and described on Schedule B * * * ."

2    40.    Schedule B to the License Agreement lists "a fishing lure made from Crystalline

3    poly(styrene-ethylene-ethylene-propylene-styrene) gel or SEEPS gel."

4    41.    The License Agreement also grants Z-Man a license to use AEI Technology in

5    connection with the manufacture, use, and sale of Licensed Products worldwide (License Agrmt. §

6    2.1(b).)

7    42.    Section 1.13 of the License Agreement defines AEI Technology as follows: "AEI

8    Technology" shall mean "materials, any information relating to manufacturing techniques, know-

9    how, processes, developments, experimental works, works in progress, trade secrets, or any other

10    matter relating to the business of AEI or developed by AEI" [emphasis added].

11    <u>PHASE ONE DEVELOPMENT</u>

12    43.    After the License Agreement was executed and forwarded to AEI with Exhibit B

13    and before August 16, 2001, Mr. Chen supplied Z-Man with AEI Technology, i.e. materials in the

14    form of additional samples and "know how" or "processes" in various methods of manufacturing

15    Licensed Products.

16    44.    On or about August 16, 2001, Mr. Chen sent additional AEI Technology (materials

17    in the form of sample gels) by overnight mail directly to CTI.  CTI prepared the samples (with

18    color, molding, etc.) for use in Z-Man's August 17, 2001 fishing trip with StrikeKing and these

19    samples were representative of the "Phase One" lures.

20    45.    On or about August 17, 2001, Mr. Shelton and Ms. Wauhop traveled to meet with

21    representatives of StrikeKing and to test Z-Man's new superworm on a fishing trip in Stuttgart,

22    Arkansas.  The group fished for two days in Stuttgart, Arkansas with the samples, which had been

23    molded in lizard form with basic colors.

24    46.    Mr. Shelton called Mr. Chen on or about August 20, 2001, and reported back to

25    Mr. Chen that the customers liked the samples that were fished on the trip.  Mr. Shelton detailed to

26    Mr. Chen the success of the product during the fishing trip, and stated that Z-Man wanted to move

27    forward with the patented formulas under the License Agreement for the samples that Mr. Chen

28    had provided for the Stuttgart trip in order to begin large scale production.

47.     On or about August 20, 2001, Mr. Chen, for the first time, sent to Mr. Shelton additional AEI Technology, including a gel formula, purportedly covered by the Patent Rights that Mr. Chen had used to develop the samples that he had sent on August 16, 2001 and a process for converting that formula into the actual gel.  In his August 20, 2001 cover letter enclosing the gel formula and process, Mr. Chen specifically identified the enclosures to be information provided in accordance with the License Agreement, i.e., AEI Technology (materials), related to fishing lure products that could not be made without infringing on the Patent Rights.

48.     Throughout the remainder of 2001, Z-Man worked with CTI to further develop its durable stretch lure product line, which Z-Man called "CYBERFLEXXX."

49.     In late 2001, Mr. Chen told Z-Man that it would need to purchase certain products, such as hot melt pots and nitrogen blankets, in order to manufacture his formulas to achieve the results Z-Man desired.  Following Mr. Chen's requirements to purchase extra equipment to use the formulas in the manner Mr. Chen intended, and relying on Mr. Chen's instructions, Z-Man invested thousands of dollars in buying the equipment that Mr. Chen specified, and invested substantial funds (over $1 million) in machinery to manufacture the product line.

50.     By January 2002, Z-Man was in a supply agreement with StrikeKing for the bulk manufacture of CYBERFLEXXX products.  Z-Man eventually entered into similar agreements with Terminator Lures and Wahoo Fishing Products, Inc. ("Wahoo").

51.     Z-Man first began shipping CYBERFLEXXX products toward the end of the first quarter of 2002.  However, customers reported that these initially shipped products started to deform because of a heat distortion problem resulting from heat exposure.  As a result, they were pulled off the market in March 2002 to examine the "heat set" problem in the Phase One lures.

PHASE TWO REVISIONS & DISCLOSURE OF Z-MAN INFORMATION TO AEI

52.     Mr. Shelton led Z-Man's effort to fix the "heat set" problem and undertook research and development to revise the product line.  These initial revisions to the product line are referred to hereinafter as "Phase Two" revisions.  During the Phase Two revision process, Mr. Shelton worked with Mr. Chen to address issues with the product line and in doing so relied on additional AEI Technology furnished by Mr. Chen to Z-Man.

1    53.    During the collaboration with AEI on the Phase Two re-formulation of the

2  CYBERFLEXXX products, Mr. Chen asked for information from Z-Man about fishing lures.

3    54.    Z-Man responded to Mr. Chen's requests by providing him with information, for

4  example, regarding scents that could be added to fishing lures, heat distortion testing procedures

5  developed by Z-Man, data and testing samples, drawings, information on the potential use of rattle

6  pockets, education on the development and chemical formulations of lures, colorization of lures,

7  durometer of lures, proprietary market research on the lure industry, compilations of fishing

8  techniques, information on plastisol, drawings of lure bodies, and other illustrations ("Proprietary

9  Fishing Lure Information").

10    55.    Additionally, Z-Man provided some of the Proprietary Fishing Lure Information to

11  Mr. Chen for use in a potential joint Patent Application by the two parties.

12    56.    The Phase Two CYBERFLEXXX products started shipping late in the third quarter

13  of 2002.

14    57.    The Phase Two CYBERFLEXXX product line reduced the heat distortion to an

15  acceptable level, but greatly increased the surface tackiness of the lures.  After initial wetting and

16  drying, the individual lures would become tacky and undesirable, clinging to themselves and

17  making the lures more difficult to fish.  The Phase Two lures were also considered too soft by

18  some.

19    58.    In February 2003, production stopped on the CYBERFLEXXX Phase Two product

20  line in an effort to examine and fix the tackiness issues and make the product more fishable.

21              INFRINGING PRODUCTS MANUFACTURED BY THIRD PARTIES

22    59.    Beginning in or around July 2002, Z-Man became aware of third-party fishing lures

23  that it believed were infringing the Patent Rights under the License Agreement.  Mr. Shelton

24  notified Mr. Chen of these various infringing products by Gene Larew Plastic, Spro Plastics, and

25  Cabela's and sent to Mr. Chen samples of the products at issue.

26    60.    In response, Mr. Chen indicated that he would undertake to test these samples and,

27  if the results showed infringement, AEI would notify the infringers of their infringement and

28  demand they stop their infringement without delay.  Z-Man has never received test results from

Page 25 - Z-Man's Amended Answer and Third Amended Counter-Complaint

Case No. C06-2469 CW

1  Mr. Chen.

2  61.     In or about late July 2002 or early August 2002, Mr. Shelton and Mr. Chen spoke

3  again, this time specifically about Cabela's manufacture of potentially infringing products and

4  fishing lures, samples of which Z-Man had already provided to AEI by that time.  When Mr.

5  Shelton asked Mr. Chen about the infringing samples, Mr. Chen stated that AEI had given Z-Man

6  "the Cadillac of the product" and that the infringing sample sent to him "was a Volkswagen."  Mr.

7  Chen then stated to Mr. Shelton, "if Z-Man wanted the Volkswagen, it should have asked for it."

8  Mr. Chen then offered to grant Z-Man a license for additional AEI patents that would cover the

9  product being sold by Cabela's if Z-Man provided AEI with a $10,000 check.  Mr. Chen did not

10  identify with any specificity the patent or patents that he described as the Volkswagen.  AEI has

11  numerous patents.  Information about those patents is uniquely within Mr. Chen's knowledge.

12  Mr. Shelton, who had been told by Mr. Chen prior to the time that the parties executed the License

13  Agreement that the License Agreement covered all of AEI's patents pertinent to fishing lures,

14  declined.

15  62.     On August 28, 2003, Z-Man made a payment to AEI under protest due to AEI's

16  failure to perform the steps necessary to police and stop the various infringing parties such as

17  Cabela's and Spro from continuing to sell "knock off" products in competition with the

18  CYBERFLEXXX product line.  By the same letter, Z-Man notified AEI of an additional

19  infringing sample of a fishing lure which was distributed to at least one of Z-Man's customers.  Z-

20  Man advised AEI that sales of its CYBERFLEXXX product line were drastically and adversely

21  affected by the existence of the competing products and AEI's failure to maintain exclusivity.

22  63.     Despite this series of notifications and follow-up correspondence by Z-Man, AEI

23  failed to act reasonably to conduct the testing that it promised it would undertake and to stop these

24  infringing uses of the Patent Rights.

25  64.     Because AEI failed to act reasonably in terms of the testing of infringing products

26  (including of fishing lures), as promised, Z-Man's product sales declined significantly.

27  65.     Z-Man has since learned that the materials, gels, formulas and processes initially

28  provided by AEI and incorporated in Z-Man's CYBERFLEXXX  Phase One line and Phase Two

Page 26 - Z-Man's Amended Answer and Third Amended Counter-Complaint

Case No. C06-2469 CW

1    re-formulation were not covered by AEI's Patent Rights.

2         <u>CHEN'S NEW PATENT APPLICATIONS NOT NAMING CORRECT INVENTORS</u>

3         66.    In January 2003, Z-Man learned for the first time that Mr. Chen had applied for a

4    patent which was published on December 12, 2002 and was meant to encompass the products that

5    Z-Man was manufacturing (e.g., frogs, grubs, worms) (Publication 2002/0188057).  Mr. Chen also

6    applied for additional patents which were intended to encompass all of the products that Z-Man

7    was manufacturing.  (Publications 2003/0130407; 2004/0018223; and 2004/0018272).   These

8    patents were CIP Patent Applications Serial Nos. 10/199,361, 10/199,362, 10/199,363 and

9    10/199,364 (collectively, "AEI's Fishing Lure Patent Applications").

10        67.    Currently, the United States Patent and Trademark Office (the "USPTO") has

11   issued three patents to Mr. Chen directed to fishing lures:  U.S. Patent Nos. 6,794,440 (App. No.

12   10/199,364), 7,108,873 (App. No. 10/199,363), and 7,134,236 (10/199,361) (collectively, "AEI

13   Fishing Lure Patents").  Additionally, the USPTO has mailed a Notice of Allowance to Mr. Chen

14   on behalf of AEI, informing him that it is about to issue a patent on App. No. 10/199,362, and Mr.

15   Chen has paid the issue fee for this application.

16        68.    Z-Man believes that AEI will assert the AEI Fishing Lure Patents against Z-Man

17   after the present litigation is resolved.

18        69.    It was from Mr. Shelton that Mr. Chen learned that the original AEI formulation

19   provided to Z-Man ostensibly under the License Agreement was a failure due to heat distortion

20   problems and needed to be re-formulated.

21        70.    Mr. Shelton and Mr. Chen worked together collaboratively on the Phase Two

22   reformulation of the CYBERFLEXXX product line to address the heat set problems that had

23   occurred in the Phase One product line.

24        71.    During the research and development process of this Phase Two reformulation,

25   there was information sharing between AEI and Z-Man.

26        72.    Additionally, through Mr. Shelton, Mr. Chen gained Z-Man's proprietary

27   information about the fishing lure market, including such things as the advantage of adding food-

28   type attractants to the bait and drawings of popular baits, the development and chemical

Page 27 - Z-Man's Amended Answer and Third Amended Counter-Complaint

1    formulations of lures, colorization of lures, and durometer of lures

2        73.    Much of that information provided by Mr. Shelton was disclosed in the patent

3    applications.

4        74.    On January 13, 2003, Jeff Winkler, counsel for Z-Man, wrote a letter to Mr. Chen

5    regarding Mr. Chen's inclusion of Z-Man's proprietary information in the patent applications.  Mr.

6    Chen represented that he would file an amendment with the USPTO to recognize Mr. Shelton as a

7    co-inventor, and collected information from Z-Man purportedly to make such a filing.  Mr. Chen

8    never disclosed to the USPTO that Mr. Shelton was a co-inventor of AEI's Fishing Lure Patent

9    Applications.

10       75.    AEI's Fishing Lure Patents and Applications disclose and claim Phase Two

11   inventions that were developed by Z-Man jointly with Chen.

12       76.    Mr. Chen did not seek or obtain authorization for the disclosure of Z-Man's

13   proprietary information; and, Mr. Chen did not attribute Z-Man's information to Z-Man and did

14   not name Mr. Shelton as a co-inventor on any of AEI's Fishing Lure Patent Applications.

15                              PHASE THREE REVISIONS

16       77.    Because of the ongoing difficulties, which included AEI's unreasonable delays on

17   the testing of infringing products it had agreed to perform, as well as the ongoing problems with

18   the AEI Technology, supplied as gels, formulas and processes, Z-Man re-formulated its

19   CYBERFLEXXX product line through its own research and development efforts, without input or

20   collaboration with AEI.  This revision to the product line is referred hereinafter as "Phase Three"

21   revisions.

22       78.    To help support this ongoing research by Z-Man, in June 2003, Z-Man established

23   a new dedicated Research and Development facility in Ladson, South Carolina.

24       79.    A new lure formulation and colorization was developed by May 5, 2005.  The

25   Phase Three formulation is completely different from any suggestions or formulations provided by

26   AEI and has characteristics making these lures essentially heat resistant, tack free and fishable.

27       80.    The Phase Three Z-Man CYBERFLEXXX product line does not infringe on any of

28   AEI's patents and therefore is not subject in any respect whatsoever to the Licensing Agreement.

Page 28 - Z-Man's Amended Answer and Third Amended Counter-Complaint

81.     However, Mr. Chen has asserted orally and in writing that he believes Z-Man's Phase Three CYBERFLEXXX product line infringes AEI's patent and that AEI is entitled to royalties for sales of the Phase Three products.

ACCUSATIONS OF PATENT INFRINGEMENT AND PAYMENT OF ROYALTIES

82.     Z-Man paid, and Mr. Chen accepted without protest, royalties under the License Agreement through December 31, 2003.  Z-Man made all minimum royalty payments to AEI in accordance with the royalty schedule agreed to by the parties as part of the License Agreement in 2001 (Ex. B.).

83.     On June 2, 2004, AEI wrote a letter to Z-Man seeking additional royalties under the License Agreement for Z-Man's Phase Three CYBERFLEXXX line.

84.     On June 8, 2004, Z-Man responded to this correspondence and denied that the Phase Three CYBERFLEXXX products infringed on any of AEI's patents covered by the License Agreement.

85.     Z-Man assured AEI by separate letter dated June 11, 2004, that the Phase Three products did not infringe AEI's patents.

86.     On August 24, 2004, Z-Man responded to additional correspondence from AEI in June and July 2004, alleging patent infringement and requesting additional royalty payments under the License Agreement, and explained that the minimum royalty payments were not required to be paid since the Phase Three CYBERFLEXXX product line did not infringe on AEI's Patents.  This letter also notified AEI, pursuant to § 8.3 of the License Agreement, of Z-Man's intent to terminate the minimum royalty provisions of the License Agreement.

87.     After Z-Man terminated the License Agreement, AEI suddenly demanded minimum royalties in excess of those agreed upon by AEI and Z-Man as set forth in Exhibit B, and sent several invoices indicating AEI's excessive royalty demands

88.     AEI's change in position concerning the schedule used to calculate the amount of minimum royalty payments due only arose after Z-Man terminated the License Agreement.  For approximately two years prior to that point, AEI engaged in a course of conduct – without complaint – accepting payment under the royalty payment schedule the parties agreed upon in

1    2001, attached to the License Agreement (Ex. B).

2          89.    Additionally, at various times, including November 2005 and April 2006, Mr. Chen

3    orally threatened to sue Z-Man for patent infringement and to recover royalties, alleging that Z-

4    Man's  Phase Three CYBERFLEXXX products infringed on his patents.  For example, Mr. Chen

5    stated that he had his "litigation attorneys" on stand-by to file suit against Z-Man.

6                        FOR A FIRST COUNTERCLAIM
                  (Breach of Covenant of Good Faith and Fair Dealing)
7

8          90.    Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

9          91.    The License Agreement, to the extent it existed, included an implied covenant of

10   good faith and fair dealing.

11         92.    To the extent a contract existed between the parties, which Z-Man disputes, and to

12   the extent that it includes the "Volkswagen" patent (Z-Man is informed and believes that AEI

13   disputes the events as alleged in paragraph 62 and contends that the License Agreement included

14   the "Volkswagen" patent), AEI breached the covenant of good faith and fair dealing implied into

15   any such contract by attempting to license to Z-Man at a cost of $10,000 a patent that AEI

16   contends was, in fact, already within the scope of the License Agreement.  In doing so, it

17   interfered with Z-Man's right to enjoy the benefits of any contract it may have entered into with Z-

18   Man to the extent that that contract did, in fact, include the "Volkswagen" patent.

19         93.    As a result of AEI's failure to honor its duty of good faith and fair dealing, Z-Man

20   has been and continues to be damaged, including but not limited to in the form of lost profits,

21   harm to reputation and good will, and payment of monies under the License Agreement without

22   receipt of the agreed-upon consideration for the same.

23                       FOR A SECOND COUNTERCLAIM
                    (Declaratory Judgment – Non-Infringement)
24

25         94.    Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

26         95.    This is an action in which Z-Man seeks a declaratory judgment under the Patent

27   laws of the United States, 35 USC § 1 et seq. and the Declaratory Judgment Act, 28 USC §§ 2201-

28   2202.

96.     An actual controversy exists between Plaintiff and Defendant with respect to infringement of these patents.

97.     Mr. Chen has asserted to Z-Man that Z-Man's Phase Two and Phase Three CYBERFLEXXX products infringe AEI's patents.  Specifically, Mr. Chen has accused Z-Man of patent infringement on multiple occasions from 2004 to 2006, including, for example, by letter dated June 15, 2004 (entitled "Reasons of Patent Infringement"), and in telephone conversations, for example, in November 2005 and April 2006.

98.     Accordingly, Z-Man has a reasonable apprehension of suit that AEI will file a patent infringement suit against Z-Man.

99.     Z-Man seeks a declaratory judgment that its making, using, selling, offering for sale, importing or exporting of its Phase Two and Phase Three product lines do not infringe, literally or under the doctrine of equivalents, any of the claims of AEI's patents.

100.     Z-Man seeks attorneys' fees and injunctive relief as provided for by law.

## FOR A THIRD COUNTERCLAIM
### (Declaratory Judgment – Invalidity)

101.     Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

102.     This is an action in which Z-Man seeks a declaratory judgment under the Patent laws of the United States, 35 USC § 1 et seq. and the Declaratory Judgment Act, 28 USC §§ 2201-2202.

103.     Z-Man seeks a declaration that AEI's Fishing Lure patents are invalid under one or more sections of 35 USC, including for lack of enablement, for deceptive inventorship under 35 USC § 256, and for invalidity over the prior art.

104.     Z-Man seeks attorneys' fees and injunctive relief as provided for by law.

## FOR A FOURTH COUNTERCLAIM
### (Declaratory Judgment – Co-Inventorship)

105.     Z-Man repeats and reiterates the preceding paragraphs as if fully set forth herein.

106.     This is an action in which Z-Man seeks a declaratory judgment under the Patent laws of the United States, 35 USC § 1 et seq. and the Declaratory Judgment Act, 28 USC §§ 2201-

1   2202.

2       107.    During the research and development process of the reformulation process, Z-

3   Man's employee, Mr. Shelton, shared with AEI certain proprietary information that he had

4   conceived and developed.

5       108.    On or about July 20, 2002, Mr. Chen on behalf of AEI filed four patent applications

6   (CIP Patent Applications Serial Nos. 10/199,361, 10/199,362, 10/199,363 and 10/199,364),

7   referred to herein previously as "AEI's Fishing Lure Patents," which included Mr. Shelton's

8   conceived-of information and materials.

9       109.    Currently, the United States Patent and Trademark Office (the "USPTO") has

10  issued three of the AEI Fishing Lure Patents to Mr. Chen on behalf of AEI:  U.S. Patent Nos.

11  6,794,440 (App. No. 10/199,364),  7,108,873 (App. No. 10/199,363), and 7,134,236 (10/199,362).

12  Additionally, the USPTO has mailed a Notice of Allowance to Mr. Chen on behalf of AEI,

13  informing him that it is about to issue a patent on App. No. 10/199,362, and Mr. Chen has paid the

14  issue fee for this application.  On information and belief, the USPTO is about to issue a patent

15  number for App. No. 10/199,362 forthwith.

16      110.    Z-Man stands to be injured if inventorship on the AEI Fishing Lure Patents is not

17  corrected to reflect co-inventorship between Mr. Shelton and Mr. Chen.

18      111.    As a joint inventor, AEI's Fishing Lure Patents cannot be asserted against Mr.

19  Shelton's assignee, Z-Man.

20      112.    Z-Man seeks a declaration that Mr. Shelton is a joint inventor of the AEI Fishing

21  Lure Patents.

22      113.    Z-Man seeks preliminary and permanent injunctive relief against enforcing the AEI

23  Fishing Lure Patents against Z-Man as to its fishing lure products and to force AEI to add Mr.

24  Shelton as a co-inventor on the AEI patents.

25      114.    Z-Man seeks attorneys' fees and injunctive relief as provided for by law.

26                          FOR A FIFTH COUNTERCLAIM
                                 (Constructive Trust)
27

28      115.    Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

116.     By virtue of its wrongful acts in failing to name Mr. Shelton as a co-inventor and in converting Z-Man's property to its own benefits, AEI should be designated as constructive trustee to hold AEI's Fishing Lure Patents in trust for the benefit of Z-Man.

117.     Z-Man seeks an order the AEI's Fishing Lure Patents be held in constructive trust and assigned to Z-Man.

FOR A SIXTH COUNTERCLAIM
(Conversion)

118.     Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

119.     During the collaboration with AEI on the Phase One development and the Phase Two re-formulation of the CYBERFLEXXX product line, Z-Man shared information with Mr. Chen regarding fishing lures and other proprietary information.

120.     Mr. Chen, acting on behalf of AEI, is using and has used such data, documents or other things for AEI's own purposes by submitting the data, documents or things in support of patent applications without naming anyone from Z-Man, such as Mike Shelton, as inventor on the patent applications.

121.     Such aforementioned data, documents or things shared by Z-Man belong to Z-Man, and not to solely AEI.

122.     AEI converted such data, documents or things to its own use and benefit without consent or authorization from Z-Man.

123.     Z-Man has demanded that it be properly identified as the rightful owner of all data, documents or other items and things belonging to Z-Man, and AEI has not returned any data, documents or other items or things to Z-Man or otherwise properly accredited such data, documents or other items and things as belonging to Z-Man in the patent applications.

124.     AEI's actions in converting such data, documents or other items or things was willful, reckless and/or committed with conscious indifference to the rights of others, including Z-Man.

125.     As a result of AEI's acts of conversion, Z-Man has suffered and continues to suffer damage.  Z-Man is entitled to recover damages, including punitive damages, from AEI for such

1   conversion.

2                    FOR AN SEVENTH COUNTERCLAIM
                       (Restitution – Unjust Enrichment)
3

4        126.    Z-Man repeats and reiterates all preceding paragraphs as if fully stated herein.

5        127.    AEI has converted and misused Z-Man's resources and proprietary information.

6        128.    Permitting AEI to retain the monies paid under the License Agreement if it cannot

7   establish the existence of a contract and/or the benefit of the use of Z-Man's resources and

8   proprietary information would be inequitable.

9        129.    AEI has been unjustly enriched and should pay restitution such that Z-Man is

10  returned to the status quo.

11                              PRAYER

12       WHEREFORE, Z-Man prays judgment against AEI as follows:

13       1.      That AEI takes nothing by way of the Complaint;

14       2.      That Z-Man be restored to the status quo;

15       3.      That an order issue that AEI's Fishing Lure Patents be held in constructive trust

16  and assigned to Z-Man;

17       4.      For compensatory and punitive damages on the counterclaims as applicable;

18       5.      For declaratory relief that AEI's patents are invalid and non-infringed, and that

19  Mike Shelton is a co-inventor on the AEI Fishing Lure Patents;

20       6.      For costs of suit;

21       7.      For attorneys' fees on the Third, Fourth, and Fifth Counterclaims as provided by

22  statute; and

23       8.      For such other and further relief as the Court deems proper and just.

24  Dated: March 15, 2007                    DILLINGHAM & MURPHY, LLP

25

26                              By:    /S/_____
                                       MARK J. ROGERS
27                                     Attorneys for Defendant and Counter-Complainant
                                       Z-Man Fishing Products, Inc.
28