1   JENNIFER LEE TAYLOR (CA SBN 161368)
    JTaylor@mofo.com
2   JILL NEIMAN (CA SBN 164702)
    JNeiman@mofo.com
3   GEOFFREY GRABER (CA SBN 211547)
    GGraber@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone:  (415) 268-7000
6   Facsimile:   (415) 268-7522

7   Attorneys for Plaintiff/Counter-Defendant
    APPLIED ELASTOMERICS, INCORPORATED
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      OAKLAND DIVISION

12

| | |
|---|---|
| 13  APPLIED ELASTOMERICS, INCORPORATED, a California corporation, | Case No.      C06-02469 CW |
| 14 | |
| 15                    Plaintiff/Counter-Defendant, | **APPLIED ELASTOMERICS, INCORPORATED'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 16            v. | |
| 17  Z-MAN FISHING PRODUCTS, INCORPORATED, a South Carolina corporation, | |
| 18 | Date:       September 6, 2007 |
| 19                    Defendant/Counter-Complainant. | Time:       10:00 a.m.<br>Ctrm:       2 |
| 20 | Judge:      Hon. Claudia Wilken |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ II

I.     STATEMENT OF THE ISSUE TO BE DECIDED ........................................... 2

II.    INTRODUCTION ............................................................................................... 2

III.   STATEMENT OF FACTS .................................................................................. 4

       A.    The License Agreement ........................................................................... 5

       B.    The Causes of Action and Defenses at Issue .......................................... 7

       C.    Shelton's Testimony Regarding His Purported "Inventions" in the AEI
             Patents .................................................................................................... 8

IV.    LEGAL STANDARD ......................................................................................... 9

V.     ARGUMENT ..................................................................................................... 10

       A.    All Issues Must Be Tried to the Court .................................................. 10

       B.    Z-Man Cannot, as a Matter of Law, Recoup Running Royalties on the
             Grounds of Invalidity or Non-Infringement ......................................... 12

       C.    Z-Man Offers No Evidence to Establish a Cause of Action for
             Co-Inventorship Under Section 256 ...................................................... 12

             1.    Background Information Regarding the Fishing Lure Industry ............... 14

             2.    Adding Scents or Flavors to Fishing Lures Made of TPE ....................... 14

             3.    Drawing of Fishing Lures ........................................................................ 15

             4.    Education Regarding the Desirability of Buoyancy, Tear
                   Resistance, High Set-to-Catch Ratio, Elongation, and Softness .............. 16

             5.    Using TPE to Make Fishing Bait ............................................................. 17

             6.    Using Two Oils in a TPE ......................................................................... 17

       D.    Z-Man's Counterclaim for Unjust Enrichment Fails as a Matter of Law ............. 17

       E.    The Facts Establish that the Minimum Royalties Contained in the License
             Agreement Apply ................................................................................... 20

VI.    CONCLUSION ................................................................................................. 21

1

## TABLE OF AUTHORITIES

2

**Page(s)**

### CASES

3

4

*A. Kemp Fisheries, Inc. v. Castle & Cook, Inc.*,
   852 F.2d 493 (9th Cir. 1988) ................................................................................................... 21

5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................................. 10

6

*Bristol Locknut Co. v. SPS Technologies, Inc.*,
   677 F.2d 1277 (9th Cir. 1982) ................................................................................................. 12

7

8

*Burroughs Wellcome Co. v. Barr Lab., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) ........................................................................................... 13, 16

9

*C.R. Bard v. M3 Systems*,
   157 F.3d 1340 (Fed. Cir. 1998) ............................................................................................... 13

10

11

*Casa Herrera v. Beydoun*,
   32 Cal. 4th 336 (2004) ............................................................................................................. 21

12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................................. 10

13

14

*Dahl v. HEM Pharm. Corp.*,
   7 F.3d 1399 (9th Cir. 1993) ..................................................................................................... 18

15

*Dobler v. Story*,
   268 F.2d 274 (9th Cir. 1959) ................................................................................................... 18

16

17

*Efficient Solutions, Inc. v. Meiners' Country Mart, Inc.*,
   56 F. Supp. 2d 982 (W.D. Tenn. 1999) .................................................................................. 10

18

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004) ............................................................................................... 15

19

20

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998) ......................................................................................... 13, 14

21

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   921 F. Supp. 901 (D. Conn. 1995) .......................................................................................... 11

22

23

*Feary v. Aaron Burglar Alarm, Inc.*,
   32 Cal. App. 3d 553 (1973) ..................................................................................................... 18

24

*Genentech, Inc. v. Chiron Corp.*,
   No. C 94-03334 CW, 1999 U.S. Dist. LEXIS 22840 (N.D. Cal. 1999) .................................. 13

25

26

*Gurfein v. Sovereign Group*,
   826 F. Supp. 890 (E.D. Pa. 1993) ........................................................................................... 11

27

28

*Hess v. Advanced Cardiovascular Sys.*,
   106 F.3d 976, 981 (Fed. Cir. 1997) ............................................................. 13, 14, 16

*Hopkins v. Andaya*,
   958 F.2d 881 (9th Cir. 1992) ........................................................................ 10

*Huey v. Honeywell, Inc.*,
   82 F.3d 327 (9th Cir. 1996) .......................................................................... 19

*In re DaimlerChrysler AG Sec. Litig.*,
   No. 00-993-JJF, 2003 U.S. Dist. LEXIS 21130 (D. Del. 2003)............................. 10

*Jefferson v. Cal. Dept. of Youth Auth.*,
   28 Cal. 4th 299 (2002) ................................................................................. 18

*Leasing Serv. Corp. v. Crane*,
   804 F.2d 828 (4th Cir. 1996) ........................................................................ 10

*Lyon v. Goss*,
   19 Cal. 2d 659 (1942) .................................................................................. 18

*Marketel Int'l, Inc. v. Priceline.com*,
   138 F. Supp. 2d 1210 (N.D. Cal. 2001)........................................................... 11

*Morris v. McFarland Clinic P.C.*,
   No. 4:03-CV-30439, 2004 U.S. Dist. LEXIS 26639 (S.D. Iowa 2004) .................... 11

*Okura & Co. v. Careau Group*,
   783 F. Supp. 482 (C.D. Cal. 1991) ................................................................ 10

*Rite-Nail Packaging Corp., v. Berryfast, Inc.*,
   706 F.2d 933 (9th Cir. 1983)........................................................................ 12

*Russell-Stanley Holdings, Inc. v. Buonanno*,
   327 F. Supp. 2d 252 (S.D.N.Y. 2002) ............................................................ 11

*Seligson v. Plum Tree, Inc.*,
   361 F. Supp. 748 (E.D. Pa. 1973)................................................................. 11

*Sewall v. Walters*,
   21 F.3d 411 (Fed. Cir. 1994) ...................................................................... 13, 15

*Simler v. Conner*,
   372 U.S. 221 (1963) .................................................................................. 10

*St. Regis Paper Co. v. Royal Indus.*,
   552 F.2d 309 (9th Cir. 1977) ....................................................................... 12

*Telum, Inc. v. E.F. Hutton Credit Corp.*,
   859 F.2d 835 (10th Cir. 1988) ..................................................................... 10, 11

*Trovan, Ltd. v. Sokymat Sa*,
   299 F.3d 1292 (Fed. Cir. 2002) .............................................................. 11, 13, 15

*Valdiviezo v. Phelps Doge Hidalgo Smelter, Inc.*,
 995 F. Supp. 1060 (D. Ariz. 1997) ............................................................................................ 19

*Wang Labs., Inc. v. Ma Labs., Inc.*,
 No. C 95-2274 SC, 1995 U.S. Dist. LEXIS 18054 (N.D. Cal. 1995) (6th Cir. 1972) ............. 12

**STATUTES**

35 U.S.C.
 § 256 ....................................................................................................................... 13, 17, 18

Federal Rules of Civil Procedure
 Rule 11 ............................................................................................................................ 3
 Rule 56(c) ......................................................................................................................... 9

California Civil Code
 § 1584 ........................................................................................................................... 18

California Civil Procedure Code
 § 1856(a) ....................................................................................................................... 20

**TO DEFENDANT AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, on September 6, 2007, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court for the Northern District of California located at 1301 Clay Street, Oakland, California, the Honorable Claudia Wilken presiding, Plaintiff Applied Elastomerics, Incorporated ("AEI"), shall and hereby does move the Court pursuant to Federal Rule of Civil Procedure 56 for an Order (a) finding that all causes of action must be tried to the Court; (b) barring Defendant and Cross-Complainant Z-Man Fishing Products, Incorporated ("Z-Man") from seeking an off-set for royalties paid under the License Agreement on the grounds of invalidity and/or non-infringement; (c) granting summary judgment in favor of AEI on Z-Man's counterclaim for co-inventorship; (d) granting summary judgment in favor of AEI on Z-Man's counterclaim for unjust enrichment; and (e) finding that Z-Man's attempt to replace the minimum royalty schedule in the patent license agreement with an alternative minimum royalty schedule fails as a matter of law.  This motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities set forth below; the Reply Brief to be filed; all pleadings and papers on file in this action; and such other written or oral argument as may be presented before this Motion is taken under submission by the Court.

1

<strong>MEMORANDUM OF POINTS AND AUTHORITIES</strong>

2    Plaintiff and Cross-Defendant Applied Elastomerics, Incorporated ("AEI") hereby moves

3 for partial summary judgment against Defendant and Cross-Complainant Z-Man Fishing

4 Products, Incorporated ("Z-Man"), as set forth below.

5 **I.  STATEMENT OF THE ISSUE TO BE DECIDED**

6    A.  Whether all causes of action must be tried to the Court;

7    B.  Whether Z-Man is barred, as a matter of law, from seeking an off-set for royalties

8 paid under the patent license agreement on the grounds of invalidity and/or non-infringement;

9    C.  Whether Z-Man's counterclaim for co-inventorship fails as a matter of law

10 because Z-Man has failed to offer any evidence that could establish such a cause of action;

11    D.  Whether Z-Man's counterclaim for unjust enrichment, premised on no contract

12 formation, fails as a matter of law because the facts establish that the parties entered into a

13 contract, namely the patent license agreement; and

14    E.  Whether Z-Man's attempt to replace the minimum royalty schedule in the patent

15 license agreement with an alternative minimum royalty schedule fails as a matter of law.

16 **II.  INTRODUCTION**

17    This is a straightforward breach of contract action to recover minimum royalties owed

18 under a patent license agreement.  As this Court knows, for the last year, Z-Man has made every

19 effort to expand and confuse the issues in this matter by filing dozens of counterclaims, multiple

20 pleadings, a mirror-image action in South Carolina, and a separate lawsuit in this District.  Over

21 the last year, and at great expense, AEI has largely narrowed this case back to the straightforward

22 breach of contract action that was originally filed.  AEI now moves for summary judgment on the

23 following issues in a further effort to streamline this case for trial.

24    First, pursuant to the Court's directive at the November 3, 2006 hearing, AEI moves for

25 an order directing that all issues be tried to the Court.  Except for Z-Man's counterclaim for

26 co-inventorship, all the remaining causes of action are contract-based.  Under the broad jury

27 waiver clause in the parties' patent license agreement ("License Agreement"), all of these causes

28

1    of action must be tried to the Court.  Moreover, under clear federal precedent, Z-Man's

2    counterclaim for co-inventorship must also be tried to the Court.

3        Second, AEI moves for summary judgment on Z-Man's Tenth Affirmative Defense for

4    Off-Set.  Z-Man pursues this defense to recover (as an off-set) running royalties paid to AEI in

5    2003 on the ground that the patents in the License Agreement were invalid and/or not infringed.

6    But, this theory is barred as a matter of law because it is well-settled that a licensee cannot

7    recover previously paid royalties on the grounds of invalidity or non-infringement.

8        Third, AEI moves for summary judgment on Z-Man's counterclaim for co-inventorship.

9    According to Z-Man, four patents held by AEI erroneously fail to name Michael Shelton (of

10   Z-Man) as an inventor.  Shelton, however, testified that his inventions consist largely of educating

11   AEI founder and president, John Chen, about the fishing industry and the desirable attributes of a

12   fishing lure.  Shelton also testified that he is an inventor because he told Mr. Chen about well-

13   known ideas, *i.e.*, adding scents to fishing bait.  Moreover, many of the "ideas" that Shelton

14   purportedly gave Mr. Chen were, in fact, contained in patents that Mr. Chen filed long before he

15   ever met Shelton.  At his deposition, Shelton repeatedly testified that AEI was supposed to file

16   patents that listed him and Mr. Chen as inventors.  But, when asked exactly what patent

17   applications AEI was supposed to file, Shelton responded, "I have no idea."  (*See* Declaration of

18   Geoffrey Graber in Support of AEI's Motion for Partial Summary Judgment ("Graber Decl.") at

19   ¶ 2, Ex. A (Deposition of Michael Shelton ("Shelton Depo") at 95:10-25).)

20       Put simply, Z-Man's counterclaim for co-inventorship is frivolous.  As of the date of this

21   filing, AEI has separately served Z-Man with a Motion for Sanctions pursuant to Rule 11 for

22   failure to withdraw this counterclaim.  AEI will file that motion on August 15, 2007 in the event

23   that Z-Man does not withdraw its counterclaim prior to that date.

24       Fourth, AEI moves for summary judgment on Z-Man's counterclaim for unjust

25   enrichment.  Z-Man bases this counterclaim on the theory that no contract was ever formed

26   between the parties.  This theory, however, is contradicted by the facts.  Z-Man signed the

27   License Agreement.  Z-Man also performed under the License Agreement for years and,

28   therefore, as a matter of law, accepted the contract.  Z-Man previously admitted that it entered

1  into the License Agreement in its original answer.  Finally, Z-Man repeatedly acknowledged in

2  writing the fact that the parties entered into the License Agreement, including in a proposed

3  written amendment to the License Agreement.  Given these facts, Z-Man cannot now claim that

4  the parties never entered into the License Agreement.

5      Fifth, AEI moves for an order finding that Section 4.6 of the License Agreement is the

6  applicable minimum royalty schedule.  As this Court has previously found, the License

7  Agreement, which was executed by Z-Man, is fully integrated.  Z-Man, however, attempts to

8  replace the minimum royalty schedule in the License Agreement with an alternative, lower

9  minimum royalty schedule based on an alleged prior or contemporaneous conversation between

10  Shelton and Mr. Chen.  This contention is barred under California law, which prohibits the use of

11  parol evidence to vary the terms of an integrated contract.  Accordingly, Z-Man cannot introduce

12  its self-serving, purported side agreement to modify the terms of the License Agreement.

13  **III.    STATEMENT OF FACTS**

14      AEI invents and patents certain chemical compositions, composites, and articles made

15  from these compositions and composites.  (Z-Man's Third Amended Answer and Counter-

16  Complaint ("TAC"), filed March 15, 2007, at ¶ 2.)  In particular, AEI holds various patents

17  covering the formulation of thermoplastic elastomer ("TPE") gels.  AEI commercializes its

18  technology by licensing its patents and proprietary technology and know-how to third parties.

19  John Chen is the founder and president of AEI, and he is the named inventor of all of AEI's

20  patents.  (TAC at ¶ 5.)

21      Z-Man is a manufacturer of fishing lures based in South Carolina.  (TAC at ¶ 1.)  Michael

22  Shelton is the Vice President of Marketing and Sales, Director of Technology for Z-Man.  (TAC

23  at ¶ 3.)  Shelton holds a bachelor's degree in business, but he does not hold any scientific degrees,

24  and he did not study chemistry beyond high school.  (Shelton Depo at 6:9-7:12.)  Myrna Wahoup

25  was formerly the Vice President and Secretary of Z-Man.  (TAC at ¶ 12; Graber Decl. ¶ 3, Ex. B

26  (Deposition of Myrna Wahoup ("Wahoup Depo") at  38:1-6.)

27

28

1

### A.    The License Agreement

2    In April 2001, Shelton contacted Mr. Chen to request that AEI grant Z-Man a license to

3 AEI's patents and technology for the purposes of developing, manufacturing, and selling a new

4 fishing lure product.  (TAC at ¶¶ 5-7, 9.)  Prior to April 2001, Shelton and Mr. Chen had never

5 met.  (Shelton Depo at 38:21-25.)  In July 2001, following discussions between the parties,

6 Mr. Chen forwarded a copy of the License Agreement to Shelton for signature.  (TAC at ¶ 30.)

7 Mr. Chen had already signed the copy that was forwarded to Shelton.  (*Id*.)  On July 24, 2001,

8 Shelton signed the License Agreement.  (Shelton Depo at 72:3-17.)  Ms. Wahoup attested to the

9 signature as Z-Man's Secretary.  (*Id*.; Wahoup Depo at 85:1-86.5.)

10    Under the terms of the License Agreement, AEI grants Z-Man a license under certain AEI

11 patents and applications (the "Patent Rights") "to develop, make, have made, use, offer to sell,

12 sell, lease, export and import" certain fishing lure products.  (*See* License Agreement, attached as

13 Ex. N to the Graber Decl., at § 2.1(a).)[1]  Additionally, AEI grants Z-Man a license "to use AEI

14 Technology in connection with the manufacture, use and sale" of these fishing lure products.

15 (License Agreement § 2.1(b).)  AEI Technology is defined in relevant part to include "materials,

16 any information relating to manufacturing techniques, know-how, processes, developments,

17 experimental works, works in progress, trade secrets, or any other matter relating to the business

18 of AEI or developed by AEI" in the fishing lure field.  (License Agreement § 1.13.)

19    The License Agreement provides Z-Man an exclusive license to use the AEI patents

20 identified on Schedule A with respect to the products set forth on Schedule B.  (License

21 Agreement § 2.2.)  More specifically, in exchange for certain minimum royalties set forth in

22 Section 4.6, AEI agrees not to license the patents listed on Schedule A to any third party within

23 Z-Man's field, *i.e.*, for the purpose of manufacturing a fishing lure.  (License Agreement

24 § 2.2(a).)  Unless and until Z-Man terminates its obligations to pay minimum royalties under the

25 License Agreement, AEI is precluded from licensing any third parties within Z-Man's field.

26

27 [1]  A complete copy of the executed License Agreement is attached as Exhibit A to AEI's
Complaint.

28

1   (License Agreement §§ 2.2(a), 4.6(b).)  Z-Man had the right to terminate the exclusivity

2   provision, and therefore its obligation to pay minimum royalties, at any time upon 90 days'

3   written notice to AEI.  (License Agreement § 4.6(b).)

4        In addition, and as this Court has held, the License Agreement is fully integrated.  It

5   provides:

6              10.12  Entire Agreement.  Except for the Confidential Agreement
             referred to in § 1.11 and § 10.2, this Agreement constitutes the
7             entire agreement between the parties with respect to its subject
             matter and supersedes all prior agreements or understandings
8             between the parties relating to the subject matter.

9   (License Agreement § 10.12; *see also*, Nov. 8, 2006 Order ("Order").)

10        On July 25, 2001, Shelton sent the fully executed copy of the License Agreement back to

11   Mr. Chen.  (Shelton Depo at 73:20-23.)  Shelton also sent a cover memo, setting forth a different,

12   lower minimum royalty schedule than the one contained in the License Agreement.  (Shelton

13   Depo at 73:24-74:23.)  According to Shelton, the alternative royalty schedule contained in the

14   cover memo reflected a separate, oral agreement with Mr. Chen.  As Shelton put it, "[y]ou know,

15   I attached this [cover memo] to it [the License Agreement] and we had gone verbally over the

16   phone with this amount and he was in agreement.  And I sent them and he was to change this —

17   change this to that."  (*Id.*; Graber Decl. ¶ 5, Ex. C.)  Shelton testified that he did not talk to Mr.

18   Chen about the alternative minimum royalty schedule for several months thereafter.  (Shelton

19   75:12-77:16.)

20        After Shelton sent the executed License Agreement, Z-Man promptly moved forward in

21   developing a new fishing lure.  Z-Man requested, and received from AEI, formulations and other

22   AEI technology for the purpose of manufacturing a new fishing lure.  (TAC at ¶¶ 43 - 44.)  In

23   particular, Mr. Chen sent formulations to, and worked closely with, Don Rawlins, of Color

24   Technologies, Inc., a firm Z-Man used to manufacture its fishing lures.  (*Id.*; TAC at ¶ 14;

25   Shelton Depo at 59:1-19.)  According to Shelton, customers were initially very satisfied with Z-

26   Man's new fishing lure.  (Shelton Depo at 76:3-19.)

27        Months later, in March 2002, Z-Man sent AEI a proposed Amendment No. 1 to the

28   License Agreement (the "Proposed Amendment").  (*Id.* at 103:3-21.)  The Proposed Amendment,

1    drafted by Z-Man's in-house counsel, was dated "March __, 2002," but designated April 26, 2001

2    as the effective date — *i.e.*, the effective date of the License Agreement.  (*Id*.; *see also*, Graber

3    Decl. ¶ 5, Ex. D at 1.)  The Proposed Amendment requested to change the minimum royalty

4    schedule in the License Agreement to match the lower minimum royalty schedule in the cover

5    memo sent by Shelton the day after he signed the License Agreement in July 2001.  (*Id*.)

6    According to Shelton, Z-Man sent the Proposed Amendment because Mr. Chen "had not taken

7    any action on changing the original license agreement that I signed as we discussed on the phone

8    so at this point we started sending out [the Proposed Amendment] every time we would send a

9    check or correspond trying to get John to sign this — what he agreed to."  (Shelton Depo at

10   104:1-9.)  AEI never signed the Proposed Amendment.  (Shelton Depo at 107:4-9.)

11       From late 2002 through early 2004, Z-Man made numerous royalty payments to AEI

12   under the License Agreement.  (Z-Man's Amended Answer, filed March 15, 2007, at ¶ 12.)  But,

13   in 2004, Z-Man ceased paying minimum royalties under the License Agreement.  (*Id*.)  Z-Man

14   contends that on August 24, 2004, it terminated the minimum royalty provision of the License

15   Agreement pursuant to Section 8.3.  (TAC at ¶ 86.)

16       **B.    The Causes of Action and Defenses at Issue**

17       In April 2006, AEI brought this suit for breach of contract simply to recover minimum

18   royalties owed under the License Agreement.  Since then, Z-Man has asserted dozens of

19   counterclaims in multiple pleadings.  Z-Man also filed a mirror image suit in South Carolina and

20   a separate lawsuit in this District.  Ultimately, almost all of Z-Man's counterclaims were either

21   dismissed or withdrawn.  And, over Z-Man's objection, the South Carolina action was transferred

22   to this Court and consolidated with this action.

23       Z-Man's three remaining counterclaims are for (1) Breach of Covenant of Good Faith and

24   Fair Dealing, (2) Co-Inventorship and (3) Unjust Enrichment.  Z-Man's counterclaim for

25   co-inventorship alleges that the following four patents held by AEI erroneously fail to name

26   Shelton as a co-inventor:  U.S. Patent Nos. 6,794,440, 7,108,873, 7,134,236, and 7,208,184 (the

27   "AEI Patents").  (TAC at  ¶¶ 108-109; Complaint, ¶¶ 32-35; *see also*, Graber Decl. ¶¶ 8-11,

28

APPLIED ELASTOMERICS, INCORPORATED'S MOTION TO DISMISS COUNTERCLAIMS C06-
02469 CW                                                                              7
sf-2353377

Exs. G-J .)[2]  Z-Man's counterclaim for unjust enrichment is premised on the theory that no contract was ever formed between the parties.  (TAC at ¶ 128; Z-Man's Opposition to AEI's Motion to Dismiss TAC ("TAC Opp."), filed April 30, 2007, at 5:27-6:1.)  Z-Man also asserts 12 affirmative defenses to AEI's contract-based causes of action, including an affirmative defense to off-set the running royalties previously paid under the License Agreement.  (TAC ¶ 46; Graber Decl. ¶ 7, Ex. F.)

  **C. Shelton's Testimony Regarding His Purported "Inventions" in the AEI Patents**

  At his deposition, Shelton testified regarding his various alleged "inventions" and "contributions" to the inventions of the AEI Patents.  In particular, Shelton listed the following supposed "inventions" that purportedly give rise to Z-Man's counterclaim for correction of inventorship:

  1.  *Background information regarding the fishing industry*.  Shelton testified that the first reason he is co-inventor of the AEI Patents is because he "provided John Chen with knowledge and information about the fishing industry."  (Shelton Depo at 129:9-24; 166:6-15.)

  2.  *Adding scent or flavors to bait*.  According to Shelton, he is also a co-inventor of the AEI Patents because he told Mr. Chen about adding scent or flavors to a fishing lure made of TPE.  (Shelton Depo at 130:5-131:4; 166:6-15.)  Shelton, however, conceded to Mr. Chen that "scents have been very — very common knowledge to anybody in the fishing industry."  (Shelton Depo at 133:20-134:8.)  Shelton also explained how he told Mr. Chen about a prior patent — which has long expired — regarding adding salt to fishing lures.  (*Id*.)

  3.  *Drawings of fishing lures*.  Shelton testified that he provided Mr. Chen with various drawings of fishing lures.  (Shelton Depo at 131:5-133:19; 166:6-15.)  In particular, Shelton stated that he sent Mr. Chen drawings of common lure designs, such as a "Fluke" or a "Zulu," that were done by Shelton on his computer or were contained in his files.  (*Id*.)  These drawings

---

[2]  The '184 Patent was the subject of a separate suit filed by Z-Man (Case No. 07-3104).  The Court subsequently deemed that suit a related case and consolidated it with this action.  AEI moves for summary judgment with respect to all four patents covered by both Z-Man's counterclaim for co-inventorship and its separate lawsuit.

are purportedly reflected in the figures section of the patents; they are not in any of the claims. (Shelton Depo at 131:5-132:1; 132:11-133:19.)

    4. *Buoyancy, tear resistance, set-to-catch ratio, elongation and softness*.  At his deposition, Shelton repeatedly stressed that he was a co-inventor because he explained to Mr. Chen how and why buoyancy, tear resistance, set-to-catch ratio, elongation, and softness are desirable attributes in a fishing lure.  (Shelton Depo at 137:17-138:5; 165:6-166:15.)

    5. *Using TPE in a fishing lure*.  Shelton stated that he "[e]ducated Mr. Chen as to the superior attributes of TPE with respect to fishing lures."  (Shelton Depo at 166:21-167:9.)  In other words, Shelton asserts that he gave Mr. Chen the idea of using TPE (thermoplastic elastomer) in a fishing lure.  But, in a patent application filed on November 21, 2000, Mr. Chen claimed a TPE gel fishing lure.  (Graber Decl. ¶¶ 6, 12, Ex. E (U.S. Patent No. 6,867,253 ("'253 Patent")) at Claims 3,17; Ex. K (Deposition of Donald Rawlins ("Rawlins Depo")) at 81:2-21; 83:14-84:14.)

    6. *Using two oils in a TPE*.  Shelton also testified that he, and Mr. Rawlins, conceived the idea of using a two-oil combination to make a TPE gel.  (Shelton Depo at 152:24-153:19; 161:18-162:17; 176:8-14.)  Shelton stated that he and Mr. Rawlins came up with this idea in order to overcome a "heat set" problem that arose in early 2002 in Z-Man's new TPE  fishing lure products.  (Shelton Depo at 162:3-17.)  But, Mr. Chen's November 21, 2000 patent application includes claims that read on two-oil TPE formulations.  ('253 Patent, Claim 3, 17.)  Moreover, Mr. Rawlins, whom Shelton contends also conceived of the idea of using two oils, testified unequivocally that neither he nor Shelton conceived the idea of using two oils.  (Rawlins Depo at 46:9-48:14.)  Rather, Mr. Rawlins testified that in early 2002 Mr. Chen — not Shelton — provided the idea of using two oils to overcome the heat-set problem. (*Id.*)

## IV.   LEGAL STANDARD

    On a motion for summary judgment, the moving party bears the initial burden to show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the moving party is the defendant, the moving party may meet its burden by showing that no triable issue of fact exists as to each

1   element of whatever affirmative defenses it has asserted.  To do so, defendant need not disprove

2   plaintiff's claims, but rather must come forward with portions of the file and, where appropriate,

3   declarations that demonstrate the absence of any real issue of fact as to one or more elements

4   essential to support such claims.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57

5   (1986).  The burden then shifts to the non-moving party to go beyond pleadings and "designate

6   'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S.

7   317, 324 (1986); *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir. 1992) (citation omitted).

8   **V.      ARGUMENT**

9        **A.      All Issues Must Be Tried to the Court**

10       At the November 3, 2006 hearing, the Court directed the parties to address in their case

11  dispositive motions which causes of action should be tried to the Court or to a jury in the event

12  summary judgment is not granted.  (Nov. 3, 2006 Hearing Transcript at 33:16-19.)  Given the

13  remaining causes of action in this case, all issues must be tried to the Court.

14       The right to a jury trial in federal court is governed by federal law.  *See Simler v. Conner*,

15  372 U.S. 221, 221-22 (1963).  Under federal law, parties may contractually waive their right to a

16  jury trial.  *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837-38 (10th Cir. 1988).  Here,

17  the License Agreement contains a broad jury waiver provision:  "the parties expressly waive any

18  right to a jury trial in any legal proceeding."  (License Agreement § 9.3.)  The jury waiver clause

19  covers "any dispute arising out of or relating to" the License Agreement.  (License Agreement

20  § 9.1.)

21       "[C]ourts routinely enforce jury trial waivers."  *In re DaimlerChrysler AG Sec. Litig.*,

22  No. 00-993-JJF, 2003 U.S. Dist. LEXIS 21130, *5 (D. Del. 2003) (citing cases); *see also, e.g.*,

23  *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832-33 (4th Cir. 1996) (enforcing jury waiver

24  provision); *Telum, Inc.*, 859 F.2d at 837-38 (same); *Okura & Co. v. Careau Group*, 783 F. Supp.

25  482, 488-90 (C.D. Cal. 1991) (same).

26       Here, there is no question Shelton read the License Agreement before signing it, and that

27  the parties' contract-based causes of action and affirmative defenses fall within the broad scope of

28  the jury waiver clause.  *See*, *e.g.*, *Efficient Solutions, Inc. v. Meiners' Country Mart, Inc.*, 56 F.

APPLIED ELASTOMERICS, INCORPORATED'S MOTION TO DISMISS COUNTERCLAIMS C06-02469 CW                                                                    10
sf-2353377

Supp. 2d 982, 984 (W.D. Tenn. 1999) ("Because defendant's tort claims arise out of and relate to the contract and the negotiations which led to the contract, it is altogether appropriate to apply the contractual jury waiver clause."); *Seligson v. Plum Tree, Inc.*, 361 F. Supp. 748, 750 (E.D. Pa. 1973) (construing "arising out of" language in jury waiver clause as covering antitrust issues). AEI's causes of action for breach of contract and for breach of the implied covenant, as well as Z-Man's affirmative defenses to those causes of action and its counterclaims for breach of the implied covenant and for unjust enrichment (regarding contract formation) *all* fall within the jury waiver provision, because each directly arises out of and relates to the License Agreement. *See Efficient Solutions, Inc.*, 56 F. Supp. 2d at 984 (jury waiver provision covers issues of contract formation). Accordingly, all these causes of action must be tried to the Court.

Z-Man previously indicated that it expects to try its fraud defenses to a jury. (Joint Case Management Statement at 9.) This position is incorrect. Federal courts have consistently held that a party cannot escape a jury waiver clause simply by raising allegations of fraud. *See Telum, Inc.*, 859 F.2d at 837-38 (allegations of "material misrepresentations" insufficient to invalidate jury waiver clause); *Morris v. McFarland Clinic P.C.*, No. 4:03-CV-30439, 2004 U.S. Dist. LEXIS 26639, *6 (S.D. Iowa 2004) (Relying on *Telum* and noting that jury waiver clauses "would be practically unenforceable if they could be avoided simply by an allegation of fraud in the inducement."); *Russell-Stanley Holdings, Inc. v. Buonanno*, 327 F. Supp. 2d 252, 257-58 (S.D.N.Y. 2002) (same); *Gurfein v. Sovereign Group*, 826 F. Supp. 890, 921 (E.D. Pa. 1993) (same).

Z-Man's cause of action for correction of inventorship must also be tried to the Court. "Correction of inventorship under section 256 is resolved by bench trial and is not submitted to a jury." *Marketel Int'l, Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1213 (N.D. Cal. 2001); *see also Trovan, Ltd. v. Sokymat Sa*, 299 F.3d 1292, 1301 (Fed. Cir. 2002) ("[i]nventorship is a question of law."); *Ethicon, Inc. v. U.S. Surgical Corp.*, 921 F. Supp. 901, 904-05 (D. Conn. 1995), *aff'd by* 135 F.3d 1456 (Fed. Cir. 1998).

Accordingly, all issues in this case not resolved on summary judgment must be tried to the Court.

**B.      Z-Man Cannot, as a Matter of Law, Recoup Running Royalties on the Grounds of Invalidity or Non-Infringement**

Under its Tenth Affirmative Defense, Z-Man seeks an off-set for running royalties on the basis of invalidity and/or non-infringement.  (TAC ¶ 46; Graber Decl. ¶ 7, Ex. F.)  In particular, Z-Man contends that it is entitled to recover running royalties paid under the License Agreement on the ground that the licensed patents are invalid and/or that the products Z-Man sold did not infringe the licensed patents.  (*Id.*)  Z-Man's off-set argument is barred, as a matter of law.

"It is well settled law that a determination that a patent which is the subject matter of a License Agreement is invalid does not entitle the licensee to recoup royalties already paid." *Wang Labs., Inc. v. Ma Labs., Inc.*, No. C 95-2274 SC, 1995 U.S. Dist. LEXIS 18054, *30-31 (N.D. Cal. 1995) (no right to set-off or refund of royalties paid on the grounds of invalidity) (citing *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253, 1258) (6th Cir. 1972);  *Rite-Nail Packaging Corp., v. Berryfast, Inc.*, 706 F.2d 933, 936-37 (9th Cir. 1983) (same); *Bristol Locknut Co. v. SPS Technologies, Inc.*, 677 F.2d 1277, 1282 (9th Cir. 1982) (same); *St. Regis Paper Co. v. Royal Indus.*, 552 F.2d 309 (9th Cir. 1977) (same).  The rule "is equally applicable when the subject matter of the license agreement is later determined to be noninfringing."  *Wang Labs, Inc.*, 1995 U.S. Dist. LEXIS 18054 at *31.

This is precisely what Z-Man is trying to do here.  In pursuing its "off-set" defense, Z-Man seeks to recoup running royalty payments made to AEI in 2003 on the ground that the patents in the License Agreement were invalid and/or were not infringed.  This theory is strictly barred under federal law.  *See Rite-Nail Packaging Corp.*, 706 F.2d at 936 (no recovery of royalties already paid on grounds of invalidity); *Wang Labs, Inc.*, 1995 U.S. Dist. LEXIS 18054 at *31-32 (no recovery of royalties already paid on grounds of non-infringement or invalidity).

Accordingly, Z-Man cannot pursue its "off-set" defense on the basis of invalidity or non-infringement, and the Court should grant AEI summary judgment on this issue.

**C.      Z-Man Offers No Evidence to Establish a Cause of Action for Co-Inventorship Under Section 256**

Z-Man asserts a counterclaim under 35 U.S.C. Section 256 for co-inventorship. According to Z-Man, the AEI Patents erroneously fail to name Shelton as an inventor.  Z-Man,

1   however, offers *absolutely no evidence* that could establish a cause of action under Section 256.

2   Accordingly, Z-Man's counterclaim for co-inventorship fails as a matter of law.

3       The 'inventor,' in patent law, is the person or persons who conceived the patented

4   invention.  *C.R. Bard v. M3 Systems*, 157 F.3d 1340, 1352 (Fed. Cir. 1998).  Under Section 256,

5   a co-inventor must make a contribution to the conception of the subject matter of a claim:

6   "[d]etermining 'inventorship' is nothing more than determining who conceived the subject matter

7   at issue, whether that subject matter is recited in a claim in a [patent] application."  *Sewall v.*

8   *Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994).  "[I]nventorship is determined on a claim-by-claim

9   basis."  *Trovan*, 299 F.3d at 1302.

10       "Because 'conception is the touchstone of inventorship,' each joint inventor must

11   generally contribute to the conception of the invention."  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135

12   F.3d 1456, 1460 (Fed. Cir. 1998) (quoting *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d

13   1223, 1227-28 (Fed. Cir. 1994)).  "One who simply provides the inventor with well-known

14   principles or explains the state of the art without ever having 'a firm and definite idea' of the

15   claimed combination as a whole does not qualify as a joint inventor."  *Id*. (quoting *Hess v.*

16   *Advanced Cardiovascular Sys.*, 106 F.3d 976, 981 (Fed. Cir. 1997)).  A "description that

17   'represents a wish, or arguably a plan' for obtaining an invention does not constitute complete

18   conception."  *Genentech, Inc. v. Chiron Corp.*, No. C 94-03334 CW, 1999 U.S. Dist. LEXIS

19   22840, *27 (N.D. Cal. 1999) (Wilken, J.) (quoting *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir.

20   1993)).  Moreover, the inventor must have a "specific, settled idea, a particular solution to the

21   problem at hand, not just a general goal or research plan he hopes to pursue."  *Burroughs*

22   *Wellcome Co.,* 40 F.3d at 1228.

23       The burden of proving co-invention rests solely and squarely on the party seeking

24   correction of inventorship.  "The inventors as named in an issued patent are presumed correct."

25   *Hess*, 106 F.3d at 980 (quoting *Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (Ct.

26   Cl. 1975)).  "[T]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and

27   must be proved by clear and convincing evidence."  *Hess*, 106 F.3d at 980.  The testimony of an

28   alleged co-inventor "cannot, standing alone, rise to the level of clear and convincing proof."

1    *Ethicon, Inc.*, 135 F.3d at 1461 (citing *Hess*, 106 F.3d at 980).  There is a "strong temptation"

2    even for honest witnesses "to reconstruct, so as to further their own position, the extent of their

3    contribution to the conception of the invention."  *Hess*, 106 F.3d at 980.  Therefore, "an alleged

4    co-inventor must supply evidence to corroborate his testimony."  *Ethicon, Inc.*, 135 F.3d at 1461.

5           Here, most of Shelton's purported "inventions" do not rise to the level of contributions to

6    the conception of actual inventions, but rather constitute the provision of well-known information

7    or information from the prior art.  Several of Shelton's alleged "inventions" were actually claimed

8    or disclosed by Mr. Chen in patents he filed before he ever met Mr. Shelton.  Moreover, Z-Man

9    has not, and cannot, offer any evidence corroborating any of Mr. Shelton's alleged inventions.

10   Indeed, although Shelton stated that Mr. Rawlins would corroborate some of his "inventions," in

11   fact, Mr. Rawlins' testimony only makes it clear that Shelton's assertions of co-inventorship are

12   pure fantasy.  (*Cf.* Shelton Depo at 173:6-175:9 with Rawlins Depo at 46:9-48:14.)

### 1.      Background Information Regarding the Fishing Lure Industry

14          Shelton testified that he is a co-inventor of the AEI Patents because he informed Mr. Chen

15   regarding the fishing industry.  (Shelton Depo at 129:9-24; 166:6-15.)  As Shelton put it:

16          I gave him a complete education to the point where I believe Myrna
            [Wahoup] sent him out books that he could read and study and
17          understand all the language that we used as bass fishermen or the
            fishing tackle industry because, as I said, he had no -- absolutely no
18          idea of what we were doing.

19   (Shelton Depo at 94:5-10.)

20          It is well-settled that "[o]ne who simply provides the inventor with well-known principles

21   or explains the state of the art . . . does not qualify as a joint inventor."  *Ethicon, Inc.*, 135 F.3d at

22   1460.  Shelton does not qualify as co-inventor merely because he allegedly provided Mr. Chen

23   with information that is equally accessible in a bookstore.  (*See* Shelton Depo at 94:5-10.)  As

24   Mr. Rawlins aptly put it, this argument is "ridiculous."  (Rawlins Depo at 76:18-77:1.)

### 2.      Adding Scents or Flavors to Fishing Lures Made of TPE

26          Shelton testified that he is a co-inventor because he told Mr. Chen about adding scents to

27   fishing lures made of TPE.  (Shelton Depo at 130:5-131:4; 166:6-15.)  This contention is

28   similarly preposterous, because — as Shelton himself admitted — the idea of adding scents to

1  fishing lures was "very — very common knowledge to anybody in the fishing industry . . .

2  [T]his is nothing new.  It's been around for a very long time."  (Shelton Depo at 133:24-134:8;

3  180:13-14.)  "A contribution of information in the prior art cannot give rise to joint inventorship

4  because it is not a contribution to conception."  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352,

5  1362 (Fed. Cir. 2004).

6         Moreover, Mr. Chen's November 21, 2000 patent application, filed six months before

7  Mr. Chen first met Shelton, discloses that flavors or scents could be added to a TPE gel, as do at

8  least five earlier patents filed by Mr. Chen between 1996 and 1999.  ('253 Patent, 25:9-12 ("the

9  invention gels can also contain useful amounts of conventionally employed additives such as . . .

10  fragrances, . . . flavors."); U.S. Patent Nos. 6,552,109 ("'109 Patent") at 7:66-8:2; 6,148,830

11  ("'830 Patent") at 13:14-20; 5,884,639 ("'639 Patent") at 10:4-9; 6,117,176 ("'176 Patent") at

12  15:31-36; 6,420,475 ("'475 Patent") at 21:30-33.)  Each of these six patents further teaches using

13  a TPE gel for fishing bait, with Claims 3 and 17 of the '253 patent and Claim 7 of the '176 patent

14  covering a gel fishing bait.  ('109 Patent at 10:47; '830 Patent at 16:8; '639 Patent at 12:64; '176

15  Patent at 18:22, Claim 7; '475 Patent at 24:22, '253 Patent at 34:65, Claims 3 & 17.)  Any

16  information concerning the use of scents and flavors provided by Shelton after the filing of these

17  patents is irrelevant.  *See Sewall*, 21 F.3d at 416-17 (person cannot qualify as a joint inventor

18  merely by assisting the actual inventor after conception of the claimed invention.)

19              **3.    Drawing of Fishing Lures**

20         Shelton alleged that he is a co-inventor because he allegedly provided Mr. Chen with

21  various drawings of fishing lures.  (Shelton Depo at 131:5-133:19; 166:6-15.)  These drawings

22  are purportedly reflected in the drawing section of the patents, but they are not contained in any

23  of the claims.  (Shelton Depo at 131:5-132:1; 132:11-133:19.)  This allegation is similarly

24  baseless because neither the drawings nor the specific designs are claimed in the AEI Patents.

25  *See Trovan, Ltd.*, 299 F.3d at 1302 (inventorship determined by reference to the claims); *Sewall*,

26  21 F.3d at 415 (same).  Moreover, fishing lure designs, such a  "Fluke" or a "Zulu," are common

27  knowledge.  As Mr. Rawlins aptly put it:  "[a]nyone can go out there and get pictures of fishing

28

lures.  You walk in the store and see 2,000 designs of fishing lures.  It's irrelevant."  (Rawlins Depo at 77:22-78:9.)

### 4.      Education Regarding the Desirability of Buoyancy, Tear Resistance, High Set-to-Catch Ratio, Elongation, and Softness

Shelton asserted that he is a co-inventor because he educated Mr. Chen about the desirability of buoyancy, tear resistance, high set-to-catch ratio, elongation, and softness in a fishing lure.  (Shelton Depo at 137:17-138:5; 165:3-166:15.)  This assertion is similarly incomprehensible.  Shelton is not a co-inventor on the AEI Patents simply because he (allegedly) told Mr. Chen that buoyancy, tear resistance, elongation, and softness are desirable attributes in a fishing lure.  "[A] general goal or research plan" is not an invention.  *Burroughs Wellcome Co.*, 40 F.3d at 1228.   Indeed, under Z-Man's theory, a person could purport to be the co-inventor of a fishing lure patent because he informed the inventor that it is desirable for fishing lures to be durable and attractive to fish.

Mr. Rawlins explained the absurdity of this theory at deposition.  When Mr. Rawlins was asked about the new fishing lure Z-Man was trying to develop, he responded:

> A.      Well, the first step was everyone has always wanted a stretchy indestructible fishing worm.  That's something everyone has always wanted for the fishing market.
>
> Q.      That's not a new idea, right?
>
> A.      No.  Everybody wants a car that goes a hundred miles per gallon on gas too.  . . .

(Rawlins Depo at 20:5-20.)  Shelton himself seemed to acknowledge that he only conveyed well-known goals when he testified that his "contributions" could be corroborated because Ms. Wahoup sent *books* to Mr. Chen about the fishing industry.  (Shelton Depo at 94:5-10.)  *See Hess*, 106 F.3d 976, 981 (no claim for co-invention where the alleged contributor explained principles "were well known and found in text books.")

Section 256 requires more.

### 5.   Using TPE to Make Fishing Bait

Shelton also contends that he is a co-inventor because he allegedly first gave Mr. Chen the idea of using TPE to make a fishing bait.  Shelton stated that he educated Mr. Chen as to the superior attributes of TPE with respect to fishing lures.  (Shelton Depo at 166:21-167:9.)   This assertion is provably false.  In fact, Mr. Chen included claims directed to a TPE gel fishing bait in several prior patent applications, including the '253 patent application filed on November 21, 2000 — months *before* he ever met Shelton.  ('253 Patent, Claims 3 at 56:16-28 ("A composite according to Claim 1, wherein, said composite being formed into . . . a gel fishing bait . . ." ), and Claim 17); s*ee also* Rawlins Depo at 81:2-21; 83:14-84:14.)

### 6.   Using Two Oils in a TPE

Shelton contends that in early 2002, he and Mr. Rawlins conceived the idea of using two oils in a TPE.  (Shelton Depo at 152:24-153:19; 161:18-162:17; 176:8-14.)  But, this contention is similarly meritless.  Mr. Chen's November 21, 2000 patent application taught the combination of multiple oils in TPE.  ('253 Patent, Claim 1.)  In addition, Mr. Rawlins — the supposed co-inventor of this idea, and the person identified by Shelton as the one who could corroborate the invention — testified unequivocally that the two-oil combination came from Mr. Chen, *not* Shelton.  (Rawlins Depo at  46:9-48:14.)  When asked whether Shelton took any part in coming up with a two-oil idea, Mr. Rawlins responded, "no."  (Rawlins Depo at 44:21-45:13.)  Moreover, Mr. Rawlins testified that neither he nor Shelton had anything to do with inventing a two-oil combination.  (*Id*.)

In sum, none of Shelton's purported "inventions" qualify him as a co-inventor. Accordingly, the Court should grant summary judgment in favor of AEI on Z-Man's counterclaim for co-inventorship under 35 U.S.C. Section 256.

### D.   Z-Man's Counterclaim for Unjust Enrichment Fails as a Matter of Law

Z-Man's counterclaim for unjust enrichment is premised on the theory that no contract was ever formed between the parties.  (TAC at ¶ 128; TAC Opp. at 5:27-6:1.)  In particular, Z-Man contends that the "License Agreement did not constitute a contract at all between [the parties]," because Z-Man purportedly did not accept the License Agreement.  (Z-Man's

1  Opposition to AEI's Motion to Dismiss Z-Man's Second Amended Counter-Complaint ("SAC

2  Opp.") at 7-9.)  Rather, according to Z-Man, Shelton's July 25, 2001 cover memo was a counter-

3  offer that was never accepted by AEI.  (*Id.*)

4      Z-Man's theory fails as a matter of law, because the facts unequivocally establish that the

5  parties entered into the License Agreement.

6      First, Z-Man concedes that the Agreement was executed by Z-Man and AEI.  This ends

7  the inquiry.  Under California law, "[t]he general rule is that when a person with the capacity of

8  reading and understanding an instrument signs it, he is, in the absence of fraud and imposition,

9  bound by its contents, and is estopped from saying that its provisions are contrary to his

10  intentions or understanding."  *Jefferson v. Cal. Dept. of Youth Auth.*, 28 Cal. 4th 299, 303 (2002);

11  *Dobler v. Story*, 268 F.2d 274, 277 (9th Cir. 1959) (same).  Z-Man does not allege that Shelton

12  lacked capacity to read and understand the License Agreement.  Indeed, Shelton admitted that he

13  read the License Agreement before signing it.  (Shelton Depo at 72:3-17.)

14      Second, Z-Man admits, as it must, that it performed under the License Agreement.  For

15  instance, Z-Man admits that it accepted AEI's assistance in developing a product, and that it made

16  payments under the License Agreement.  (TAC ¶¶ 43-44; Shelton Depo at 80:1-8.) This is fatal

17  to Z-Man's new-fangled theory that no contract ever existed.  It is black-letter law in California

18  that "[p]erformance of the conditions of a proposal, or the acceptance of the consideration offered

19  with a proposal, is an acceptance of the proposal."  Cal. Civ. Code § 1584; *see also Dahl v. HEM

20  Pharm. Corp.*, 7 F.3d 1399, 1405 (9th Cir. 1993) (offer accepted through performance); *Lyon v.

21  Goss*, 19 Cal. 2d 659, 672 (1942) (agreement valid upon performance by defendant); *Feary v.

22  Aaron Burglar Alarm, Inc.*, 32 Cal. App. 3d 553, 559 (1973) ("Regardless of whether

23  Chamberlain's signature is sufficient, the agreement has been performed by both parties for more

24  than six years.  Appellant is clearly bound by the agreement.").  Thus, Z-Man cannot claim that

25  no contract existed after having performed under the License Agreement for years.

26      Third, Z-Man has *admitted* that it entered into the Agreement:  "Responding to

27  paragraph 27 of the Complaint, Z-Man admits that the parties entered into the License

28  Agreement, which is attached as Exhibit A to the Complaint.  The License Agreement was

1   subsequently modified, and Z-Man therefore denies that Exhibit A is a true and correct copy of

2   the parties' Agreement."  (*See* Defendant Z-Man Fishing Products, Incorporated's Answer,

3   Counter-Complaint, and Jury Demand, dated August 21, 2006 at ¶ 27.)

4          Z-Man amended its original Answer in an eleventh-hour effort to avoid this admission.

5   Nevertheless, Z-Man's statement constitutes an evidentiary admission.  *See Huey v. Honeywell,*

6   *Inc.*, 82 F.3d 327, 333 (9th Cir. 1996).  Although Z-Man has the right to explain its amendment,

7   to date, Z-Man has simply stated that the initial pleading was a mistake.  (SAC Opp. at fn. 6.)

8   Because Z-Man's amendment contradicts rather than clarifies its initial pleading, it does not

9   negate the force of the admission.  *See Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995 F.

10  Supp. 1060, 1064-66 (D. Ariz. 1997) (insufficient to claim that earlier judicial admission was

11  simply an error and holding admission still precluded plaintiff from asserting that the handbook at

12  issue did not create a contract despite plaintiff's withdrawal of the admission).[3]  Z-Man is simply

13  trying to avoid the consequences of its admission.

14         Fourth, Shelton's "cover memo" and Z-Man's Proposed Amendment further establish that

15  the parties entered into the License Agreement.  Shelton's cover memo, containing the lower

16  minimum royalty schedule, dated the day after Shelton executed the License Agreement, refers to

17  an alleged agreement to amend "the original agreement," namely the signed License Agreement.

18  (TAC, Ex. B.)

19         The Proposed Amendment, prepared by Z-Man's in-house counsel in March 2002, also

20  acknowledges the parties' earlier agreement:

21              WHEREAS, AEI and Company entered into that certain Patent
               License Agreement with an effective date of April 26, 2001
22             regarding the patent rights to certain compositions, composites and
               articles more fully described therein ('Patent License
23             Agreement'). . . .

24

25

---

26  [3]  As the Court will recall, Z-Man initially asserted counterclaims for breach of the License
    Agreement.  Only after those counterclaims were dismissed did Z-Man attempt to repudiate the
27  License Agreement on grounds of no contract formation.  Z-Man's admission was not a mistake,
    and the amendment reflects a change in litigation strategy.

28

APPLIED ELASTOMERICS, INCORPORATED'S MOTION TO DISMISS COUNTERCLAIMS C06-
02469 CW                                                                              19
sf-2353377

(Proposed Amendment at 1.)  The Proposed Amendment further explains that the parties sought to amend the License Agreement as permitted by its terms:

> WHEREAS, AEI and Company now, *as allowed under the terms of the Patent License Agreement with each being in compliance with the existing terms*, desire to modify the Patent License Agreement as set forth below.

(Proposed Amendment at 1) (emphasis added).  Finally, and most tellingly, the proposed amendment provides:  "Except to the extent the Patent License Agreement is amended as expressly noted in this Amendment, *the Patent License Agreement shall remain in full force and effect*."  (Proposed Amendment at 2) (emphasis added).  In light of this Proposed Amendment drafted by Z-Man's in-house counsel,  Z-Man should not be heard to contend that there was no contract between the parties.

According, the Court should grant summary judgment in AEI's favor on Z-Man's counterclaim for unjust enrichment.

### E.   The Facts Establish that the Minimum Royalties Contained in the License Agreement Apply

Z-Man has also asserted that if the parties did enter into the License Agreement, then it contains the (lower) minimum royalty schedule sent by Shelton on July 25, 2001 and embodied in the Proposed Amendment, which was never signed by AEI.  (SAC Opp. at 7-9.)   As explained below, this theory also fails as a matter of law.

Section 4.6 of the License Agreement unambiguously sets forth the applicable minimum royalties.  (License Agreement § 4.6.)  As noted above, the License Agreement was executed by Shelton and attested to by Z-Man's Secretary, Ms. Wahoup.  (Shelton Depo at 72:3-17.)  The License Agreement is fully integrated.  (License Agreement § 10.12.)

Nevertheless, Z-Man attempts to replace Section 4.6 with its alternative, lower minimum royalty schedule that was purportedly based on a separate conversation between Shelton and Mr. Chen.  (Shelton Depo. at 72:15-73:12; 103:17-104:9.)  Z-Man's self-serving attempt to change the parties' agreement based on an alleged prior or contemporaneous oral agreement flies in the face of black-letter California law.  An integrated agreement "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  Cal. Civ. Proc.

1   § 1856(a); *Casa Herrera v. Beydoun*, 32 Cal. 4th 336, 344 (2004) (Parol evidence rule

2   "necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or

3   agreements at variance with the written agreement.") (internal quotes omitted); *A. Kemp*

4   *Fisheries, Inc. v. Castle & Cook, Inc.*, 852 F.2d 493, 495 (9th Cir. 1988) ("parol evidence cannot

5   be used to add to or vary [] terms" of integrated agreement) (quoting *Masterson v. Sine*, 68 Cal.

6   2d 222, 225 (1968)).

7         Thus, the alternative royalty schedule submitted by Z-Man, which contradicts the schedule

8   set forth in the parties' integrated contract, cannot change the parties' obligations under the

9   License Agreement.  As this Court has recognized, "Plaintiff and Defendant have expressed their

10  intent that the Agreement constitutes the entire agreement between the parties relating to its

11  subject matter."  (Order at 10; *see also* License Agreement § 10.12.)  The law establishes the

12  terms of the integrated License Agreement as "incontrovertible."  *See Casa Herrera*, 32 Cal. 4th

13  at 344.

14        Z-Man's attempt to insert its own self-serving minimum royalty schedule fails as a matter

15  of law.  Accordingly, the Court should issue an order finding that Section 4.6 of the License

16  Agreement is the applicable minimum royalty schedule in this action.

17  **VI.     CONCLUSION**

18        For the reasons set forth above, the Court should (a) direct that all remaining claims be

19  tried to the Court; (b) find that Z-Man cannot recoup running royalties under its Tenth affirmative

20  defense for off-set on the grounds of invalidity or non-infringement; (c) enter summary judgment

21  in AEI's favor on Z-Man's counterclaim for Co-Inventorship; (d) enter summary judgment in

22  AEI's favor on Z-Man's counterclaim for Unjust Enrichment; and (e) find that section 4.6 of the

23  License Agreement is the applicable minimum royalty schedule.

24  Dated: July 26, 2007                    MORRISON & FOERSTER LLP

25

26                                          By:    /s/ Jennifer Lee Taylor
                                                   Jennifer Lee Taylor
27                                          Attorneys for Plaintiff/Counter-Defendant
                                            APPLIED ELASTOMERICS, INC.
28

APPLIED ELASTOMERICS, INCORPORATED'S MOTION TO DISMISS COUNTERCLAIMS C06-
02469 CW                                                                              21
sf-2353377