DILLINGHAM & MURPHY, LLP
PATRICK J. HAGAN (SBN 68264)
MARK J. ROGERS (SBN 173005)
225 Bush Street, 6th Floor
San Francisco, California 94104-4207
Telephone:      (415) 397-2700
Facsimile:      (415) 397-3300

    Attorneys for Defendant
    Z-MAN FISHING PRODUCTS, INC.


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| APPLIED ELASTOMERICS, INCORPORATED, a California corporation <br><br> Plaintiff, <br><br> v. <br><br> Z-MAN FISHING PRODUCTS, INCORPORATED, a South Carolina corporation <br><br> Defendants. | Case No. C062469 CW <br><br> **NOTICE OF MOTION AND BRIEF IN SUPPORT OF Z-MAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO AEI'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: September 6, 2007 <br> Time: 2 PM <br> Courtroom 2, 4th Floor <br> Honorable Claudia Wilken <br> Trial Date: November 13, 2007 |

1

**TABLE OF CONTENTS**

2
Page (s)

3      TABLE OF AUTHORITIES.................................................................................iii

4      NOTICE OF MOTION ................................................................................... 1

5      MEMORANDUM OF POINTS AND AUTHORITIES.......................................... 1

6      I.     INTRODUCTION............................................................................... 1

7      II.    CONTRACT FORMATION ISSUES ....................................................... 2

8      III.   JURY TRIAL ISSUES ........................................................................7

9      IV.    Z-MAN's MOTION FOR PARTIAL SUMMARY JUDGMENT ............................ 8

10            A.    Introduction ............................................................................ 8

11            B.    Argument................................................................................ 10

12                  1.    The Penalty Provision of § 5.7 of the "License Agreement" is
                         Unenforceable Under California Law ................................. 10

13
                    2.    The Unenforceable Penalty Provisions of § 5.7 Do Not Apply to
14                        AEI's Claims ...................................................................... 11

15            C.    Conclusion ............................................................................. 13

16     V.     OPPOSITION TO PLAINTIFF's MOTION FOR PARTIAL SUMMARY
              JUDGMENT   ......................................................................................... 13

17
              A.    AEI's Motion on Z-Man's Set-Off Defense Should be Denied.................. 13
18
              B.    AEI's Motion on Z-Man's Unjust Enrichment Claim Should be Denied..... 14
19
              C.    For Reasons Set Forth in Sec. II, *infra*, Questions of Material Fact Exist
20                  Regarding Whether a Contract Existed and, if so, Under What Terms;
                    AEI's Motion Regarding § 4.6 of Exhibit A Should be Denied.................. 14
21
              D.    AEI's Motion For Summary Judgment on the Issue of Co-Inventorship
22                  Should be Denied .......................................................................... 14

23                  1.    An Inventor is Someone Who Contributes to the Conception of a
                         Properly Construed Claimed "Invention" ......................................... 15
24
                    2.    The Claims of the AEI Fishing Lure Patents, As Legally
25                        Construed, Encompass Subject Matter Related to Certain Claimed
                         Characteristics of Fishing Lures........................................................ 16
26
                    3.    Mr. Shelton Contributed to the Conception of the AEI Fishing
27                        Lure Patents By Conceiving of Material Claim Limitations in the
                         Patents and Communicating Them to Mr. Chen. ............................. 19

28

4.    Mr. Chen's Lack of Knowledge of the Claimed Fishing Lure
Characteristics Indicates That the Conception of That Claimed
Subject Matter Must Have Been Contributed by Mr. Shelton .......... 20

VI.    CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Page (s)**

**Cases**

American General Life and Acc. Ins. Co. v. Wood
(2005) 4th Cir., 429 F.3d 83 .................................................................. 7

Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)
(1998) 62 Cal.App.4th 348 .................................................................. 7

Bramah v. Hardcastle
(1789) K.B., 1 Carp. P. C. 168. .......................................................... 8

Bristol Locknut Co. v. SPS Technologies, Inc.
(1982) 9th Cir., 677 F.2d 1277 ............................................. 17, 18, 19

Checkpoint Systems, Inc. v. All-Tag Security S.A.
(2005) Fed.Cir., 412 F.3d 1331 ...................................................... 8, 16

Eli Lilly & Co. v. Aradigm Corp.
(2004) Fed.Cir., 376 F.3d 1352 ................................................. 8, 15, 17

Ethicon, Inc. v. U.S. Surgical Corp.
(1998) Fed.Cir., 135 F.3d 1456 ....................................................... 15, 23

Grafton Partners L.P. v. Superior Court
(2005) 36 Cal.4th 944 ......................................................................... 8

Harbor Island Holdings v. Kim
(2003) 107 Cal.App.4th 790 ............................................................ 11

Hybritech Inc. v. Monoclonal Antibodies, Inc.
(1986) 802 F.2d 1367 ...................................................................... 15

ICU Med., Inc. v. Alaris Med. Sys.
(Jan. 22, 2007) C.D. Cal., No. SA CV 04-00689, 2007 U.S. Dist. LEXIS 13156 ............. 17

In re Lonardo
(1997) Fed.Cir., 119 F.3d 960 ........................................................ 17

In re Pago Pago Aircrash of January 30, 1974
(1981) 9th Cir., 637 F.2d 704 ........................................................... 3

Landberg v. Landberg
(1972) 24 Cal.App.3d 742 ................................................................. 3

Marketel Int'l v. Priceline.com
(2001) N.D.Cal., 138 F.Supp.2d ........................................................ 8

Markman v. Westview Instruments
(1996) 517 U.S. 370 ......................................................................... 8

Morello v. Growers Grape Products Ass'n
  (1947) 82 Cal.App.2d 365 ........................................................................ 4

Panagatos v. Bank of America
  (1998) 60 Cal.App.4th 851 ....................................................................... 4

PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.
  (2000) 225 F.3d 1315 ............................................................................. 16

PMC, Inc. v. Porthole Yachts, Ltd.
  (1998) 65 Cal.App.4th 882 ....................................................................... 4

Pickholtz v. Rainbow Techs.
  (2000) N.D.Cal., 125 F.Supp.2d 1156 ..................................................... 8

Playtex Prods., Inc. v. Procter & Gamble Co.
  (2005) Fed.Cir., 400 F.3d 901 ............................................................... 22

Ridgley v. Topa Thrift and Loan Association
  (1998) 17 Cal.4th 970 ................................................................... 9, 10, 11

Rite-Nail Packaging Corp. v. Berryfast, Inc.
  (1983) 9th Cir., 706 F.2d 933 ................................................................ 14

SmithKline Diagnostics, Inc. v. Helena Lab. Corp.
  (1988) Fed.Cirl, 859 F.2d 878 ................................................................. 8

Soldau v. Organon Inc.
  (1988) 9th Cir., 860 F.2d 355 ................................................................... 4

St. Regis Paper Co. v. Royal Indus.
  (1977) 9th Cir., 552 F.2d 309 ................................................................ 14

Synopsys, Inc. v. Magma Design Automation
  (Jan. 31, 2007) No. C-04-3923, 2007 U.S. Dist. LEXIS 6814 ............... 15

Trovan, Ltd. V. Sokyumat SA, Irori
  (2002) Fed. Cir., 299 F.3d 1292 ........................................................ 8, 15

Wang Laboratories, Inc. v. Ma Laboratories, Inc.
  (1995) N.D.Cal. , 1995 WL 729298 ....................................................... 13

Zoran Corp. v. Mediatek, Inc.
  (2005) N.D.Cal., C-04-02619, 2005 U.S. Dist. LEXIS 40457, 14 ...... 8, 15


**Statutes**

  Federal Rule of Civil Procedure, Rule 56 .............................................. 2

  35 U.S.C. § 1011 ................................................................................... 18

  35 U.S.C. § 112 ..................................................................................... 15

  35 U.S.C. § 116 ..................................................................................... 16
  California Civil Code §1671 ................................................................ 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**NOTICE OF MOTION**</u>

**TO PLAINTIFF AND COUNTER-DEFENDANT AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on September 6, 2007, at 2 p.m. in Courtroom 2 of the United States District Court, Northern District of California, located at 1301 Clay Street, Fourth Floor, Oakland, California, Defendant and Counter-Claimant Z-MAN FISHING PRODUCTS, INCORPORATED ("Z-Man") will move, pursuant to Fed. R. Civ. Proc., Rule 56, for partial summary judgment in its favor with respect to Plaintiff and Counter-Defendant APPLIED ELASTOMERICS, INC. ("AEI")'s claim for contractual penalties.

Z-Man's motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities that follows and upon the papers, records and pleadings on file herein of which the Court may take judicial notice for purposes of this motion.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>INTRODUCTION</u>**

The Court has requested that the parties (1) identify those claims which are to be tried to a jury and those to be tried to the Court and (2) brief issues which are proper for summary judgment adjudication.

Z-Man moves for partial summary judgment on AEI's claim to enforce a contractual penalty provision and opposes AEI's motion for partial summary judgment on Z-Man's unjust enrichment claim, Z-Man's off-set defense, Z-Man's patent co-inventorship claims, and to establish that § 4.6 of Exhibit A to AEI's Complaint ("License Agreement") contains "the applicable minimum royalty schedule", all of which depend on the resolution of questions of disputed material fact.

The only issue which can be resolved by motion without reference to questions of disputed material fact is AEI's claim for contractual penalties under § 5.7 of Exhibit A.  Assuming Exhibit A governs the parties, AEI's claim under the penalty provision of § 5.7 therein must fail because that provision is unenforceable under California law and, moreover, because AEI has not alleged, nor can it prove, that Z-Man did anything to trigger the penalty provision.

1    Because Z-Man's claim for unjust enrichment, AEI's motion respecting § 4.6 of Exhibit A,

2    and the enforceability of the jury waiver clause in the alleged contract all involve disputed

3    questions of fact concerning contract formation, Z-Man addresses the factual and legal issues

4    relating to contract formation first.

5    **II.    CONTRACT FORMATION ISSUES**

6    AEI styles its Complaint as a simple one to collect on an alleged breach of the patent

7    license contract attached to its Complaint as Exhibit A (the "License Agreement").  Exhibit A,

8    however, is incomplete.  Prior to filing, AEI peeled off two critical pages (a cover letter and a

9    revised royalty schedule), in which Z-Man made clear it was not assenting to the *essential*

10   minimum royalty term in Exhibit A and that it expected AEI, as agreed, to revise Exhibit A to

11   reflect the lower royalty numbers agreed upon by both parties.  AEI complains that Z-Man did not

12   raise the cover letter and revised royalty schedule in its Answer to the Complaint.  But that

13   argument is diversionary.  Indeed, AEI *never* explains why *it* did not attach the letter and revised

14   schedule (a mere two pages) to its Complaint along with Exhibit A (12 pages) even though it now

15   admits to having received all of them in a <u>single</u> envelope from Z-Man (Deposition of John Chen,

16   attached to Creason Decl. ¶ 7 as Exhibit F (hereinafter "Chen Depo.") pp. 179:23-180:25).  In

17   light of its failure to attach the document in its entirety to the Complaint, AEI hardly stands on

18   solid ground in criticizing Z-Man.[1]

19   Around the time Exhibit A was signed, but not yet transmitted to plaintiff, Mike Shelton,

20   Z-Man's Vice President, called John Chen, AEI's President, to communicate that, although the

21   ───────────────────────

22   [1] AEI can hardly claim to have been prejudiced by Z-Man's amended pleading incorporating the
cover letter and revised royalty schedule.  Z-Man brought that correspondence and its effect to the
parties' attention promptly upon trial counsel becoming aware of the document, whose

23   authenticity is uncontested.  Moreover, AEI admits it had (and later produced copies of) those two
additional pages, which it received with Exhibit A from Z-Man in a single envelope.  It knew

24   about them, but chose to omit them from its Complaint.  AEI, moreover, cannot claim that it has
somehow relied on an admission by Z-Man in its original Answer that Z-Man was otherwise

25   bound by the terms set forth in Exhibit A (Z-Man's original Answer ¶ 27 ["The License
Agreement was subsequently modified, and Z-Man therefore denies that Exhibit A is a true and

26   correct copy of the parties' Agreement"]).  While ¶ 27 of Z-Man's original Answer represents the
good faith legal conclusion of Z-Man's counsel based on the incomplete Exhibit A, in light of the

27   subsequently discovered July 25 cover letter and revised royalty schedule, that conclusion was
incorrect (Creason Decl. ¶ 3).  The cover letter speaks for itself as a rejection of the terms stated in

28   Exhibit A and that conclusion is only strengthened by the circumstances occurring at the time of
that correspondence.

1   proposal was generally agreeable, it would be accepted only on the condition that the royalty

2   numbers in Exhibit A be replaced with the more realistic royalty numbers set forth with the cover

3   letter, telling Mr. Chen he "didn't have a problem signing [Exhibit A] as long as we were under the

4   understanding that we would change the royalty amounts, you know, to the royalty amounts that

5   actually -- we had been discussing." (Deposition of Michael T. Shelton, attached to Creason Decl.

6   ¶ 8 as Exhibit G (hereinafter "Shelton Depo.") p. 73:1-19).   This constituted a rejection,

7   terminating plaintiff's offer (Landberg v. Landberg (1972) 24 Cal.App.3d 742, 756-757 ["Since

8   defendant's letter of September 11 did not accept plaintiff's offer of August 17 unconditionally or

9   on the terms in which it was made, there was no acceptance of the offer. Moreover, defendant's

10  letter of September 11 was a rejection of plaintiff's offer."]; In re Pago Pago Aircrash of January

11  30, 1974 (9th Cir. 1981) 637 F.2d 704, 706 [if acceptance contains conditions not in the offer or

12  new terms, "there is no meeting of the minds and no acceptance"]).   It also constituted a counter-

13  offer, which Mr. Shelton understood Mr. Chen to have agreed with (Shelton Depo. p. 73:1-19; id.

14  pp. 73:25-74:23 ["I attached this to it and we had gone verbally over the phone with this amount

15  and he was in agreement."]; Shelton Decl. ¶ 4).

16         Mr. Chen does not deny this telephone call occurred (Chen Depo. p. 176:2-15; id. p. 179:1-

17  7).   However, he claims to have little memory of the details and, in fact, claims not to recall

18  whether or not Mr. Shelton stated he wanted to change the minimum royalty numbers in Exhibit A

19  (id. p. 179:1-7).[2]   Mr. Chen recalled only that Mr. Shelton indicated he wished to make some

20  "modifications" to Exhibit A, to the sales forecasts, based on some "numbers from a sheet of

21  paper" Mr. Shelton was reciting (id.).   Mr. Chen, nevertheless, advances the unlikely story that

22  Mr. Shelton agreed to forward the signed Exhibit A relying solely on Mr. Chen's spoken

23  assurance that he would receive and, perhaps, consider Shelton's "modifications" and "numbers"

24  and then, perhaps, make changes to "numbers" in Exhibit A (Chen Depo. pp. 178:1-179:18).   Not

25  so.  Mr. Shelton secured Mr. Chen's agreement to the revised sales and royalty numbers before

26  ────────────────
    [2]   Q     Do you recall him saying anything about wanting to change the minimum royalty numbers
    when he phoned you on that day?
27  A     It's hard to recall, because he was reciting numbers from a sheet of paper that I don't have
    in front of me, he had, and he wanted to make modifications to the agreement.  And I said, Fine,
28  send it to me. (id.)

1    proceeding.

2        Mr. Shelton, moreover, did not rely solely on Mr. Chen's oral agreement to the more

3    realistic minimum royalty numbers.  In that portion of Z-Man's July 25 communication to plaintiff

4    which plaintiff stripped from Exhibit A to the Complaint, Mr. Shelton reiterated the minimum

5    royalty terms to which Z-Man was agreeable, as well as memorializing plaintiff's agreement to

6    revise the minimum royalty terms in Exhibit A:

7

8            Enclosed you will find the signed "License Agreement." **Attached are the
             changes in the sales forecast and royalty numbers.  As we agreed you lists [sic]**
9            **the changes as amendments to the original agreement.**  We did not discuss "B"
             but it is my understanding that the way it is written, this covers any and all fishing
10           lures made from your patented formula.  If I am incorrect in my assumption please
             advise and we will discuss. (Chen Depo. pp. 179:23-180:25; Creason Decl. ¶ 3,
11           Exh. B).

12       The cover letter, with the revised royalty schedule and Exhibit A, which together are a

13   *single* communication to plaintiff, was at the very least a rejection of the terms proposed by

14   plaintiff, and a counter-offer (PMC, Inc. v. Porthole Yachts, Ltd. (1998) 65 Cal.App.4th 882, 888-

15   889 [signed "agreement" and cover letter containing a varying term interpreted as single

16   communication of non-acceptance]; Panagatos v. Bank of America (1998) 60 Cal.App.4th 851

17   853-56 [same]). [3]

18       Mr. Chen testified that immediately upon receipt of this cover letter, he called Mike

19   Shelton, supposedly to reject Z-Man's counter-offer.  Mr. Shelton never received such a call

20   (Shelton Depo. 75:12-79:25; Chen Depo. pp. 181:1-183:8).  Mr. Chen's account is particularly

21   unbelievable given that five days after sending the July 25 cover letter, Mr. Shelton wrote to a

22   _____

23   [3] The fact that Z-Man signed the License Agreement on July 24, 2001, whereas the cover letter
     was signed July 25, 2001, is not significant – the "signed 'License Agreement'" and the cover
     letter were a single communication to AEI. (PMC, Inc., supra, 65 Cal.App.4th 888-889 [signed
24   "agreement" and cover letter containing a varying term interpreted as single communication of
     non-acceptance]; Panagatos, supra, 60 Cal.App.4th 853-56 [same].)   This communication was of
25   no legal effect until actually transmitted to AEI.  No contract was formed on July 24, 2001, by the
     mere signature on the "License Agreement", as nothing was mailed until July 25, 2001 and Mr.
26   Shelton informed Mr. Chen that he was agreeable only if the lower royalty numbers became part
     of the contract.  (See generally Morello v. Growers Grape Products Ass'n (1947) 82 Cal.App.2d
27   365, 370-371 [timeliness of acceptance is date of mailing]; Soldau v. Organon Inc. (9th Cir.1988)
     860 F.2d 355, 356 ["Under federal as well as California law, Soldau's acceptance was effective
28   when it was mailed"]; Rest 2nd Contracts §63.)

1    major prospective customer to report the agreed-upon <u>lower</u> minimum royalty and sales figures

2    reflected in the July 25 cover letter (Shelton Depo. 80:16-83:13, Creason Decl. ¶ 5, Exh. D [July

3    30 fax]).  At the time, Z-Man was marketing the "superworm" idea to a small set of other

4    manufacturers which marketed lures under their own brands.  Z-Man did not sell directly to

5    consumers or retailers for whom Z-Man's minimum royalty obligations would have had little

6    meaning.  On the other hand, Z-Man's small set of manufacturer customers, would have cared

7    about the minimum royalties because Z-Man, in turn, was expecting minimum order commitments

8    from the manufacturers sufficient to cover Z-Man's minimum royalty obligations to plaintiff

9    (Shelton Depo. p. 62:15-63:8; <u>id</u>. pp. 66:20-69:7).  Mr. Shelton, therefore, would have had <u>no</u>

10   reason to report to a prospective customer minimum royalties which were *lower* than the royalty

11   numbers actually agreed upon between Z-Man and plaintiff.

12        Mr. Chen's account of the details of this supposed conversation is also unlikely and further

13   confirms that the call was never made.  Mr. Chen claims to have told Mr. Shelton, in reference to

14   the revised sales and royalty figures, "well, this is a hypothetical forecast, and I'm not going to go

15   along with any changes based on a forecast" and "…I said these are just forecasts, they are

16   hypothetical, not based on any sales." (Chen Depo. p. 183:19-184:6; <u>id</u>. 185:20-186:2; <u>see</u> <u>also</u> <u>id</u>.

17   pp. 183:19-188:2;).  Mr. Chen, however, testified that he was unaware of the origin of the royalty

18   and sales figures in <u>Exhibit A</u>, i.e. the numbers AEI claims govern the parties, other than that they

19   came from someone at Z-Man, from whom he is not certain, and that he either entered them

20   directly into his computer while talking on the phone with Z-Man or transferred numbers from

21   yellow post-its that he had taken down over the phone (Chen Depo. pp. 171:19-175:16).  His

22   supposed objection that the numbers sent with the July 25 cover letter were "hypothetical" and not

23   based on sales is both inconsistent with the source of the numbers in Exhibit A and a strange

24   ground for objecting, given that he knew that Z-Man had never sold this product before  and did

25   not have firm commitments from its prospective customers at that point.[4]

---

26   [4] It was obvious, moreover, from all of the conversations and correspondence up to this time that
     the minimum sales numbers (§ 3.1) would be based on sales projections.  This was expressed for

27   the first time in writing in a May 29, 2001 memorandum from Mike Shelton to John Chen
     (Creason Decl. ¶ 12, Exh. K) and again in a May 30, 2001 letter to Mike Shelton from John Chen

28   (Chen Depo. pp. 140:18-141:4; Creason Decl. ¶ 7, Exhibit J ["….§3.1(c )(d) and § 4.6(a) which

1    No contract could have been formed on the terms set forth in Exhibit A by the subsequent

2    conduct of the parties.[5]  To argue that a contract was so formed, plaintiff relies on three factual

3    assertions, none of which support the argument.  First, plaintiff's argument that Z-Man's

4    acceptance of AEI's "assistance" in developing a product constituted acceptance by performance

5    directly contradicts its earlier position that Exhibit A did not require plaintiff to provide any

6    assistance to Z-Man (AEI's First Motion to Dismiss Counterclaims, Docket No. 40, pp. 8:24-9:7;

7    November 8, 2006 Order re Motion to Dismiss, Docket No. 67, pp. 8:18-9:8).  Acceptance of Mr.

8    Chen's "assistance" therefore is not evidence of the contract alleged by AEI.

9    Second, the fact that Z-Man made royalty payments to plaintiff is also not evidence of

10   acceptance of the terms of Exhibit A.  The payments made by Z-Man following July 25, 2001

11   were, in fact, equally consistent with the agreed upon *lower* minimum royalty schedule included

12   with Mr. Shelton's July 25 cover letter (compare Creason Decl. ¶ 2, Exh A [Complaint Exh. A §

13   4.6 quarterly minimum royalty of $12,500 for Year 2002] and Creason Decl. ¶ 3, Exh. B [July 25

14   correspondence showing agreed upon quarterly minimum royalty of $12,500 for Year 2002] with

15   Shelton Depo.  pp. 107:18-110:24 and Creason Decl. ¶ 4, Exh. C [royalty checks paid by Z-Man]).

16   Furthermore, as was its goal in negotiating with Mr. Chen and with its prospective customers, and

17   consistent with Z-Man's July 30, 2001 fax to its prospective customer (Creason Decl. ¶ 5, Exh.

18   D), the contracts Z-Man eventually entered into with its customers after July 25, 2001, included

19   minimum purchase requirements from the customers which approximated (but were somewhat

20   lower than) the *lower* minimum royalty figures sent with the July 25 cover letter (Shelton Decl, ¶¶

21   4, 5, Exhs. B, C, D; Shelton Depo. pp. 67:9-72:2).  In short, Z-Man's subsequent actions were

22   consistent with the terms of the *lower* minimum royalty schedule sent with the July 25 cover

23   letter.

24   Third, AEI points to a March 2002 document labeled an "Amendment" as evidence of

25   assent to the terms earlier proposed in Exhibit A.  AEI's argument ignores that the terms contained

26   will be determined by sales projections and customer's response to your product showings.  The
     event we are unable to agree to projected sales and royalty minimums by June 30, 2001 the
27   deposit will be returned….").

28   [5] AEI does not plead this alternate theory of contract by performance and by virtue of its
     unrelenting insistence on "Exhibit A" should not be heard to do so at this late date.

in Exhibit A had, in fact, already been rejected.  Z-Man sought only to have Mr. Chen to sign a document containing the Z-Man sales and royalty terms to which AEI had earlier agreed (Shelton Depo. 102:20-104:9; Creason Decl. Exh. E).  That Z-Man put the label "amendment" on the document could not possibly have had the unintended and retroactive effect of signaling assent to the previously rejected terms, particularly in light of the parties prior correspondence and discussions.  AEI, moreover, draws the wrong inference from the fact that the numbers contained in Z-Man's March 2002 document were precisely the <u>same</u> sales and royalty numbers contained in Z-Man's July 25 cover letter.  If Z-Man intended to modify the parties' agreement in March 2002 – as opposed to merely formalizing it – Z-Man might have tried negotiate the numbers <u>downward</u> as the minimum order requirements it obtained from its customers were somewhat below the schedule included in the July 25 cover letter (Shelton Decl., ¶¶ 5-6, Exhs. B, C, D).

Here, at a minimum, major and material questions of fact exist as to whether a contract was formed and, if so, on what terms, precluding summary resolution of those issues in favor of AEI.  "[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract."  (<u>Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)</u>  (1998) 62 Cal.App.4th 348, 359 [citing *Grove v. Grove Valve & Regulator Co. (1970) 4 Cal.App.3d 299, 311-312; Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d at pp. 404-405; *Apablasa v. Merritt & Co. 176 Cal.App.2d at p. 730; Kessinger v. Organic Fertilizers, Inc. 151 Cal.App.2d at pp. 749-750*]).

## III.    <u>JURY TRIAL ISSUES</u>

AEI argues that one of the terms of the "License Agreement" is a jury trial waiver clause and, therefore, all issues related to the alleged contract must be tried to the Court only.  Before that, or any other provision of a contract, may be enforced, however, Exhibit "A" must be proven as the contract.  To meet its burden of proof on the question of contract formation, <u>AEI</u> must rely on suspect testimony which is contradicted by contemporaneous documents and the testimony of others.  AEI cannot rely on a jury trial waiver provision in an alleged contract to deprive Z-Man of its right to a jury trial on questions of disputed fact about the formation of that very alleged

1    contract. (see American General Life and Acc. Ins. Co. v. Wood  (4th Cir.2005) 429 F.3d 83, 87

2    [contract formation must be adjudicated before arbitration clause applied]).[6]

3        Z-Man is entitled to a jury trial on its co-inventorship claims.  Although AEI accurately

4    quotes the earlier Marketel Int'l v. Priceline.com, (N.D.Cal.2001) 138 F.Supp.2d 1210, and

5    Trovan, Ltd. v. Sokymat SA, Irori, (Fed. Cir. 2002) 299 F.3d 1292, decisions, more recent

6    Federal Circuit and Northern District of California cases say that "inventorship is a question of

7    law with underlying factual issues." (Zoran Corp. v. Mediatek, Inc., No. (N.D.Cal.2005) C-04-

8    02619, 2005 U.S. Dist. LEXIS 40457, at *14-*15 ; Checkpoint Systems, Inc., v. All-Tag Security

9    S.A., (Fed.Cir.2005) 412 F.3d 1331, 1338); see also Eli Lilly & Co. v. Aradigm Corp.

10   (Fed.Cir.2004) 376 F.3d 1352, 1356-57 & 1365 [reviewing inventorship issues that had been put

11   to a jury in the form of special verdict forms]).

12       Finally, patent infringement issues will be tried in this case because, as explained below,

13   they must necessarily be decided in determining whether AEI is entitled to an off-set under §

14   4.2(c) of the agreement or to justify a finding of unjust enrichment.  There is no doubt under

15   relevant patent law jurisprudence that issues of whether a patent is infringed or whether a patent

16   covers a product are for a jury (Markman v. Westview Instruments (1996) 517 U.S. 370, 377

17   ["Equally familiar is the descent of today's patent infringement action from the infringement

18   actions tried at law in the 18th century, and there is no dispute that infringement cases today must

19   be tried to a jury, as their predecessors were more than two centuries ago. See, e.g., Bramah v.

20   Hardcastle, 1 Carp. P. C. 168 (K. B. 1789)."]; Pickholtz v. Rainbow Techs. (N.D.Cal.2000) 125 F.

21   Supp. 2d 1156, 1159 ["Whether an accused product infringes is ordinarily an issue of fact for the

22   jury." (citing Southwall Techs., Inc.)]).

23   **IV.    Z-MAN's MOTION FOR PARTIAL SUMMARY JUDGMENT**

24        **A.    Introduction**

25        Z-Man's motion for partial summary judgment addresses AEI's claim to recover a

26   _____

27   [6] Furthermore, Exhibit A contains a California choice of law provision.  The choice of California
     law to govern disputes precludes the use of a pre-dispute jury waiver provision (Grafton Partners
28   L.P. v. Superior Court (2005) 36 Cal.4th 944).  Plaintiff cannot defeat its own choice of law
     provision by choosing a federal forum for its Complaint.

1   contractual "penalty" under § 5.7 of the "License Agreement".  AEI seeks damages from Z-Man

2   for Z-Man's alleged failure to make minimum royalty payments to plaintiff under the "License

3   Agreement".  As it must, this motion assumes that if a contract embodying the terms of Exhibit A

4   is found, that "License Agreement" requires Z-Man to make one of two types of royalty payment

5   to AEI on a quarterly basis: (1) "running royalties" based on Z-Man's sales of licensed or

6   "infringing" products *or*, if Z-Man did not achieve a minimum amount of sales for the quarter, (2)

7   a pre-determined "minimum royalty".  Even assuming, however, that AEI can prove to a trier of

8   fact that a contract was formed under the terms set forth in Exhibit A, its claim for the trebling

9   penalty and attorney's fees under § 5.7 must fail for two reasons.

10          Uppermost, under California Civil Code § 1671 and under clear California Supreme

11  Court authority, Ridgley v. Topa Thrift and Loan Association (1998) 17 Cal.4th 970, contractual

12  penalties are unenforceable under California law.  Although parties may contract for liquidated

13  damages, § 5.7 – which is expressly identified as a "penalty" in the "License Agreement" – is not

14  a valid provision for liquidated damages because under no set of circumstances, much less those

15  alleged by AEI here, would § 5.7 approximate the licensor's actual damages or loss.  Instead, § 5.7

16  simply trebles the amount of actual damages, which, in this case, is the unpaid amount of

17  allegedly owing minimum royalties, and provides attorney's fees.  Under controlling authority,

18  this is necessarily disproportionate and unenforceable as a matter of law.

19          AEI's claim for the trebling penalty and attorney's fees must also fail because AEI cannot

20  show that the triggering conditions under the "License Agreement" for application of the trebling

21  penalty ever occurred.  The "License Agreement" purports to impose a penalty for fraudulent or

22  false statements by the licensee to the licensor regarding the licensee's sales of licensed products

23  upon which the calculation of "running royalties" owed by the licensee is based.[7]  The trebling

24  _____

[7] AEI provides no definition of the phrase "false statements" and did not plead fraud in this action
25  under the standards of FRCP, Rule 9(b) [pleading special matters – fraud], or otherwise.  Its
    Complaint cannot be construed as giving notice of a fraud claim.  Nor does AEI have any
26  evidence that there was any "underpayment due to fraud or false statements" (§ 5.7).  Instead, AEI
    merely alleges that Z-Man provided a rationale (in written correspondence) for stopping royalty
27  payments with which AEI did not agree and that Z-Man interpreted a letter it wrote to AEI
    differently than AEI did (Z-Man interpreted it as a cancellation letter; AEI asserted that it did not
28  qualify as such under the "License Agreement"):

1   penalty only applies to the amount of running royalties which were unpaid if the licensee

2   fraudulently misreports its sales.  Critically, AEI does not allege that Z-Man fraudulently

3   misstated its sales, and therefore fails to establish that the conditions for imposing the

4   (unenforceable) penalty occurred.  In addition to not alleging that Z-Man fraudulently

5   underreported infringing sales, AEI has disavowed **any** claim for sales-based *"running royalties"*,

6   which is the only type of royalty under the "License Agreement" to which the trebling "penalty"

7   applies.[8]  With no claim for "running royalties", there is nothing to "treble" or to serve as a basis

8   for attorney's fees.

9         **B.**     **Argument**

10            1.     The Penalty Provision of § 5.7 of the "License Agreement" is Unenforceable
11                 Under California Law

12       Controlling California authority prohibits enforcement of contractual penalties (<u>Ridgley v.

13  Topa Thrift and Loan Association</u> (1998) 17 Cal.4[th] 970, 977).  Even where contractual penalties

14  are presented as liquidated damages, courts scrutinize them to determine if they are proportionate

15  to reasonably anticipated damages as of the time of contracting (<u>id</u>. at 979).  If not, they qualify as

16  penalties and are unenforceable (<u>id</u>. at 977 ["'[a]n amount disproportionate to the anticipated

17  damages is termed a 'penalty.'  A contractual provision imposing a 'penalty' is ineffective, and

18  the wronged party can collect only the actual damages sustained'" (citation omitted)]).[9]

19       Here, the "License Agreement" plainly states that § 5.7 is intended as a "penalty" (<u>id</u>. § 5.7

20  ["the following shall be the penalty due to…"]).  Section 5.7, moreover, is in no way reasonably

21  related to any anticipated damages AEI might suffer under the "License Agreement".  As set forth

22  above, the "License Agreement" provides for the payment of minimum or running royalties to

---

24        "In addition, pursuant to Section 5.7 of the Agreement, because Z-Man's failure to pay the
          minimum royalties was based on its false statements that it did not owe the minimum
25        royalties under the Agreement and that it provided notice on August 26, 2004 to terminate
          the exclusivity and the accrual of minimum royalties, the amount is subject to trebling".
26        (Complaint ¶ 25 [emphasis supplied]).

27  [8] See e.g., AEI's Motion to Dismiss Counterclaims, pp.15-16, n.3, Docket No. 78 ["…AEI is not
    seeking and has not sought the payment of any past due running royalties…"].
28  [9] Section 10.8 of the "License Agreement" provides that the agreement shall be interpreted under
    California law.

1   AEI.  AEI argues that Section 5.7 of the "License Agreement" entitles AEI to a trebling of any

2   unpaid royalty ("minimum" or "running") owing under the contract if Z-Man makes a "false

3   statement".  At best, the amount by which an owing royalty is unpaid would constitute the

4   measure of AEI's loss.  Under no circumstance would trebling this clearly discernable amount of

5   actual loss, *plus* attorney's fees, *approximate* the damages AEI might have *anticipated* at the time

6   of contracting.  For example, trebling underpaid minimum royalties (measured by simply

7   subtracting amounts paid from the amount owed under a schedule) can not approximate an

8   already-known sum (Ridgley 17 Cal.4th at 977).  Its obvious purpose is only to penalize.

9   Likewise, trebling underpaid running royalties (which AEI does not allege) is not intended to

10  *approximate* a loss as liquidated damages.  Instead, the "penalty" is "three (3) times the amount of

11  royalty underpayment due to fraud or false statements".  In other words, the actual damages or

12  loss, i.e., the underpayment "*due to*" fraud or false statements, is first determined -- *not*

13  approximated – and, *then,* trebled -- again, for the express purpose of penalizing.

14       Neither one of these scenarios can support the penalty provision of § 5.7 under California

15  law (Harbor Island Holdings v. Kim (2003) 107 Cal.App.4th 790, 796  ["We are at an absolute

16  loss to imagine how [doubling the amount due as rent] for the period in question, could have

17  represented "the result of a reasonable endeavor by the parties to estimate a fair average

18  compensation for any loss that may be sustained" for the failure to provide copies of maintenance

19  contracts."]; Ridgley v. Topa Thrift & Loan Assn., supra, 17 Cal.4th at p. 981 ["If the sum

20  extracted from the [obligor] is designed to exceed substantially the damages suffered by the

21  [obligee], the provision for the additional sum, whatever its label, is an invalid attempt to impose a

22  penalty inasmuch as its primary purpose is to compel prompt payment through the threat of

23  imposition of charges bearing little or no relationship to the amount of the actual loss

24  incurred...."]).  As such, judgment in Z-Man's favor should be granted on AEI's claim for this

25  penalty, including trebling and attorney's fees.

26       2.   The Unenforceable Penalty Provisions of § 5.7 Do Not Apply to AEI's
             Claims

27

28       AEI cannot recover on its claim for its trebling "penalty" plus fees under § 5.7 of the

1    "License Agreement" for the additional reason that the "License Agreement" does not provide for

2    a "penalty" in the circumstances alleged by AEI.  The "fraud or false statements" trigger for the

3    "penalty" provision in Section 5.7 applies <u>only</u> to "fraud or false statements" by the licensee

4    regarding "running" or sales-based royalties due under the License Agreement, something which

5    AEI does not allege occurred here.

6    
7    
8        In addition to the interest provision of this Section as to late royalty payments, the
        following shall be the penalty due to fraud or false statements in connection with any
        unpaid royalties for which AEI has provided Company with notification and which
        remain uncorrected or unpaid (with interest) under this Section for more than thirty
        (30) days from the date of such notification: A penalty of three (3) times the amount
        of royalty underpayment due to fraud or false statements which are unreported and
9        unpaid falling within the term of this Agreement *which penalty shall be considered
        as the sole compensation and damages for the unreported infringing sales and such
10        sales shall be treated as infringing sales in accordance with 35 U S C 284.*

11    (Complaint, Exh. A, § 5.7 [emphasis supplied]).

12        The "unreported infringing sales" in that clause can only refer to a false or fraudulent

13    calculation by the licensee of the "running royalty" obligation, which is not pleaded, because

14    "sales" (whether "infringing" or not) are simply not relevant to the calculation of "minimum

15    royalties" (Stipulation Regarding Minimum Royalties, Docket No. 77).

16        AEI has singled out the phrase "the following shall be the penalty due to fraud or false

17    statements in connection with any unpaid royalties…:" to argue that the "penalty" provision was

18    intended to apply to both minimum and running royalties.  When the penalty is actually defined

19    after the colon, however, it is necessarily contingent upon misreported or fraudulently reported

20    sales: the "penalty of three (3) times the amount of royalty underpayment" is the "sole

21    compensation" for "**the** unreported infringing sales" (Complaint, Exh. A, § 5.7).  Thus, the

22    application of the "penalty" provision clearly presupposes the existence of "unreported infringing

23    sales (because the phrase is definite: "**the** unreported infringing sales", <u>not</u> "unreported infringing

24    sales" or "any unreported infringing sales).  AEI cannot re-write § 5.7 to provide for a trebling

25    "penalty" that applies whether or not the licensee fraudulently unreported infringing sales.  Read,

26    as it must be, in connection with the rest of the sentence in which it is placed, the phrase "false

27    statements in connection with any unpaid royalties" must refer only to one or more running

28    royalty payments which are unpaid or underpaid because of a false report of sales of "infringing"

1    or "licensed" products by the licensee.  It cannot be changed retroactively to read "in connection

2    with *any running royalties **or** any minimum royalties"*, as AEI urges.

3          AEI apparently successfully argued in response to Z-Man's motion for judgment on the

4    pleadings on this issue that it should be permitted to introduce extrinsic evidence supporting its

5    interpretation of § 5.7.  No such evidence has materialized.  Mr. Chen, for example, testified to

6    having explained § 5.7 at the May 19, 2001 meeting including Mike Shelton, but was unable to

7    testify to having explained how that penalty provision – in contradiction of its express language –

8    was, in fact, intended to apply to *minimum* royalty payments (Chen Depo. pp. 101:24-102:21).

9          **C.      Conclusion**

10          For the foregoing reasons, Z-Man respectfully requests that the Court enter partial

11   judgment on the pleadings denying AEI's penalty claim.

12   **V.      OPPOSITION TO PLAINTIFF's MOTION FOR PARTIAL SUMMARY**

13           **JUDGMENT**

14          AEI moves for partial summary judgment on Z-Man's set-off defense, Z-Man's claim for

15   unjust enrichment, Z-Man's co-inventorship claims, and to establish § 4.6 of Exhibit A as the

16   "applicable minimum royalty schedule".

17          **A.      AEI's Motion on Z-Man's Set-Off Defense Should be Denied**

18          Plaintiff moves for partial summary judgment on Z-Man's off-set claim for royalties paid

19   for sales of goods which did not infringe on any valid licensed patents on the sole legal ground that

20   recoupment of past royalties is not generally permitted by federal law.[10]  Assuming the parties are

21   governed by the "License Agreement", however, Z-Man's off-set claim is not barred by federal

22   law because § 4.2(c) of the "License Agreement" itself specifically provides for a lower running

23   royalty for sales of products which do not infringe on a valid patent of AEI: "[i]n the event any

24   Licensed Product is manufactured, directly or indirectly, solely using AEI Technology, but *without*

25   *the protection of any valid* Licensed Patents…the royalty rate shall be Three percent (3%) for

26   _____

27   [10] Assuming Exhibit A governs, Z-Man also seeks a set-off under § 4.2 which sets running
     royalties based on "Net Revenues" which are defined in § 1.6 as "…Licensed Products actually
28   sold during the subject accounting period, less the following:…*(ii) amounts repaid or credited by*
     *reason of rejection or return*…"

1   Licensed Product." (emphasis added) (<u>Wang Laboratories, Inc. v. Ma Laboratories, Inc.</u>

2   (N.D.Cal.1995) 1995 WL 729298, *12 [recognizing contractual exception to general rule of

3   barring recoupment of royalties]).  Z-Man seeks a set-off based on the terms of Exhibit A itself

4   (assuming it binds the parties).  As such, plaintiff's motion must be denied.[11]

5       **B.    AEI's Motion on Z-Man's Unjust Enrichment Claim Should be Denied**

6       AEI moves for summary judgment on Z-Man's unjust enrichment claim on the sole ground

7   that the existence of a contract precludes this claim.  Whether there was a contract, however, is in

8   factual and legal dispute.  AEI's motion, therefore, should be denied.

9       **C.    For the Reasons Set Forth in Sec. II, *infra*, Questions of Material Fact Exist
           Regarding Whether a Contract Existed and, if so, Under What Terms; AEI's
10          Motion Regarding § 4.6 of Exhibit A Should be Denied.[12]**

11      **D.    AEI's Motion for Summary Judgment on the Issue of Co-Inventorship Should
12          be Denied.**

13      AEI's motion for summary judgment on the issue of inventorship should be denied because

14  genuine issues of material fact exist, at least, with respect to (1) whether Mike Shelton contributed

15  to the conception of at least one claim[13] of each of the AEI Fishing Lure Patents[14] and (2) whether

16  John Chen conceived of all the aspects of the AEI Fishing Lure Patents.  The question here is

17  _____

18  [11] The cases relied on by plaintiff, involving contracts which did not provide for varying royalty
    rates depending on whether or not the licensor's patents were valid and infringed, are not on point
19  (see  <u>Rite-Nail Packaging Corp. v. Berryfast, Inc.</u>  (9th Cir.1983) 706 F.2d 933, 936 ["licensing
    agreement provided that royalties would be paid until a final and unappealable declaration of
20  invalidity"]; <u>Bristol Locknut Co. v. SPS Technologies, Inc.</u> (9th Cir.1982) 677 F.2d 1277, 1281
    ["Under the licensing agreement, Bristol Locknut agreed to pay SPS a royalty based on a
21  percentage of the sales of Skidmore locknuts and locknuts manufactured by the Burt tool."]; <u>St.</u>
    <u>Regis Paper Co. v. Royal Indus.</u> (9th Cir.1977) 552 F.2d 309, 312 ["Under the license agreement,
22  Royal licensed St. Regis to manufacture plastic tie strips using the Bower patent and Royal's
    know-how. In return, St. Regis agreed to pay Royal 10 per cent of net dollar sales in royalties."]).
23  [12] In support of its motion to establish § 4.6 of Exhibit A as Z-Man's minimum royalty obligation,
    AEI refers to the parol evidence rule.  The argument fails because there is a dispute of fact
24  regarding whether there is a contract at all and the terms of the contract, if any.
    [13] Patents are comprised of "claims", which are the numbered paragraphs at the end of a patent,
25  and each "claim" sets forth a separate invention (see 35 U.S.C. § 112 [stating that a patent's
    specification must include "one or more claims particularly pointing out and distinctly claiming
26  the subject matter which the applicant regards as his invention"]).
    [14] The term "AEI Fishing Lure Patents" refers to the four patents at issue in Z-Man's claim of co-
27  inventorship – U.S. Patent Nos. 6,794,440; 7,108,873; 7,134,236; and 7,208,184 and which are
    referred to herein as the '440, '873, '236, and '184 patents, respectively.
28

1   whether there is <u>any</u> evidence, or even <u>any</u> justifiable inference, when viewed most favorably to

2   Z-Man and which must be believed as true as required by summary judgment jurisprudence, that

3   supports Z-Man's position of Mr. Shelton being a joint inventor of at least one claim in each of the

4   AEI Fishing Lure Patents.  The answer to that question here is an overwhelming "yes".

5           1.      <u>An Inventor is Someone Who Contributes to the Conception of a Properly</u>

6                   <u>Construed Claimed "Invention".</u>

7           A person is a joint inventor of a patent if he or she contributes to the "conception" of an

8   invention set forth in just one claim of a patent (see <u>SmithKline Diagnostics, Inc. v. Helena Lab.</u>

9   <u>Corp.</u> (Fed. Cir. 1988) 859 F.2d 878, 888 [citing 35 U.S.C. § 116 and stating that "inventors may

10  apply for a patent jointly even though . . . each did not make a contribution to the subject matter of

11  every claim of the patent"]; <u>Synopsys, Inc. v. Magma Design Automation</u> (N.D. Cal.  Jan. 31,

12  2007) No. C-04-3923, 2007 U.S. Dist. LEXIS 6814, at *81 [citing <u>Ethicon, Inc. v. U.S. Surgical</u>

13  <u>Corp.</u>, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (explaining that "contribution to [even] one claim is

14  enough to establish joint inventorship for the entire patent")]).

15          The first step in an inventorship analysis begins with a construction of each patent claim at

16  issue to determine the subject matter it encompasses (see <u>Trovan, Ltd. v. Sokyumat SA, Irori</u> (Fed.

17  Cir. 2002) 299 F.3d 1292, 1302; <u>Synopsys</u>, 2007 U.S. Dist. LEXIS 6814, at *81).  The second step

18  of the analysis compares the contributions of each asserted co-inventor with the subject matter of

19  the properly construed claim (<u>Trovan</u>, 299 F.3d at 1302; <u>Synopsys</u>, 2007 U.S. Dist. LEXIS 6814,

20  at *82).

21          For a patent to be the work of joint inventors, the alleged joint inventors must collaborate

22  or exhibit concerted effort related to conception of the invention (see <u>Eli Lilly & Co. v. Aradigm</u>

23  <u>Corp.</u> (Fed. Cir. 2004) 376 F.3d 1352, 1359).  "Conception" is "the formation in the mind of an

24  inventor, of a definite and permanent idea of the complete and operative invention, as it is

25  <u>hereafter to be applied in practice</u>." (<u>Hybritech Inc. v. Monoclonal Antibodies, Inc.</u> (Fed. Cir.

26  1986) 802 F.2d 1367, 1376 (emphasis added)).  But, for a jointly conceived invention, each of the

27  joint inventors need not make the same type or amount of contribution to the invention; rather,

28  "each needs to provide only a part of the task which produces the invention." (<u>Ethicon</u>, 135 F.3d at

1460; <u>Zoran Corp. v. Mediatek, Inc.</u> (N.D. Cal. Dec. 12, 2005) No. C-04-02619, 2005 U.S. Dist.

LEXIS 40457, at *14).  If persons contribute to the joint formation of a "definite and permanent

idea of the invention as it will be used in practice," then those persons are joint inventors

(<u>PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.</u> (Fed. Cir. 2000) 225 F.3d 1315, 1324.

Therefore, the relevant claims of the AEI Fishing Lure Patents at issue must first be

properly construed, the subject matter encompassed by the claims and as used in practice must

then be determined, and, finally, Mr. Shelton's contributions to that subject matter must be

analyzed.  While inventorship "is a question of law", it is necessarily based on "underlying factual

issues." (<u>Checkpoint</u>, 412 F.3d at 1338).  Thus, after legally construing the claim(s) and

determining the subject matter encompassed by the claim(s), a number of relevant factual issues

here could, and will be, in dispute including:  1) identification of the contributions to the

inventions contributed by Mr. Shelton; 2) whether Mr. Shelton communicated those contributions

to Mr. Chen; 3) whether Mr. Chen took those contributions and made them part of the claims in

the AEI Fishing Lure Patents; and 4) whether, before collaborating with Mr. Shelton, Mr. Chen

had sufficient the requisite knowledge and expertise to conceive of all the aspects of the properly

construed claims in the AEI Fishing Lure Patents.

        2.    <u>The Claims of the AEI Fishing Lure Patents, As Legally Construed,
Encompass Subject Matter Related to Certain Claimed Characteristics of
Fishing Lures.</u>

Before even addressing the above factual inquiries, AEI's misconstruction of its own

patents must be recognized.  In its motion and in this case, AEI ignores several material claim

limitations which, unsurprisingly, are the very elements that Mr. Shelton provided to Mr. Chen

and are the very elements that make the inventions patentable.  AEI's position regarding

inventorship is fatally flawed because of a basic misconception that the AEI Fishing Lure Patents

only claim fishing lures made of "thermoplastic elastomer ("TPE") gels".  The motion is replete

with instances where AEI says that it "holds various patents <u>covering</u> the formulation of

thermoplastic elastomer ("TPE") gels" (AEI Motion for Summary Judgment ("AEI Motion"), p. 4

(emphasis added)), and where it relies on earlier-filed patent applications claiming "a TPE gel

fishing lure" and "teach[ing] using a TPE gel for fishing bait."  (AEI Motion, pp. 9 & 15).  After

1   admitting that its current patents are also directed to fishing lures made of TPE gels, AEI very

2   importantly and most astonishingly, says that its earlier '253 and '176 patents "cover[ ] a gel

3   fishing bait" and that several of Mr. Chen's prior patent applications "included claims directed to a

4   TPE gel fishing bait."  (AEI Motion, pp. 15 & 17).

5          These statements, however, legally conflict and cannot support AEI's underlying premise

6   that the AEI Fishing Lure Patents at issue now claim a "fishing bait made with TPE."  It is settled

7   patent law that an inventor cannot claim the same invention twice because that would violate the

8   rule against "double patenting" (see ICU Med., Inc. v. Alaris Med. Sys. (C.D. Cal. Jan. 22, 2007)

9   No. SA CV 04-00689, 2007 U.S. Dist. LEXIS 13156 [citing 35 U.S.C. § 101; In re Lonardo, 119

10  F.3d 960, 965 (Fed. Cir. 1997)]).  Therefore, the later-filed AEI Fishing Lure Patents cannot

11  simply claim and cover a "fishing bait" made from Mr. Chen's TPE gels like the earlier-filed

12  patents, because then AEI would be "double patenting".  In order to avoid "double patenting," the

13  later AEI Fishing Lure Patents must be construed as claiming something more than just fishing

14  lures made from Chen's TPE gels which are, admittedly, claimed in the earlier Chen patents.

15         AEI's downfall with respect to claim construction is that it fails to read all of the

16  limitations of the relevant patent claims.  Unlike Chen's earlier-filed applications directed to

17  "fishing bait made from TPE gels," the later-filed AEI Fishing Lure Patents claim a certain kind

18  and type of fishing bait made with TPE and which have certain characteristics that, in and of

19  themselves, make the claims of the AEI Fishing Lure Patents patentable.  Proper construction of

20  the AEI Fishing Lure Patents is confirmed by testimony from Dalbert U. Shefte, a noted patent

21  law expert.  Mr. Shefte has practiced patent law for more than fifty-two years and certainly knows

22  how to construe patent claims.  AEI apparently agrees with Mr. Shefte's position because it did not

23  bother to take his deposition and did not provide an expert to support a contrary position.[15]  To the

24  extent that AEI disagrees with the claim construction set forth herein by Z-Man, Z-Man hereby

25  requests the Court to set a date for a claim construction (i.e., "Markman") hearing in order to

26  _____

27  [15] AEI attempts to cite the testimony of Don Rawlins to support its contentions regarding Shelton's contributions and inventorship, but Rawlins has not been identified as a patent law expert and, to Z-Man's knowledge, is certainly not one.  Thus, Rawlins's opinions on who qualifies, legally, as

28  an inventor or co-inventor are irrelevant and unfounded.

1   properly construe the claims pursuant to Eli Lilly (376 F.3d at 1360).  As the Federal Circuit has

2   suggested, requesting the Court to construe the disputed claims is required when the meaning or

3   scope of claims are disputed and unclear in inventorship cases (id.).

4          As set forth in Mr. Shefte's expert report, various elements that define the invention

5   beyond a fishing lure made of TPE "are material claim limitations" and "the contributor of [such

6   limitations] qualifies as an inventor or co-inventor of the identified claim and patent." (Creason

7   Decl., ¶ 9  Exh. H [Expert Report of Dalbert U. Shefte (hereinafter "Shefte Report")]).  Beginning

8   at page 5 of his report, Mr. Shefte recites a litany of material characteristics and limitations recited

9   in the claims of the AEI Fishing Lure Patents.  The following characteristics were among those

10  identified by Mr. Shefte as being "material claim limitations":

> 1) fishing bait being life like, soft, flexible, capable of exhibiting buoyancy in water;
> 2) said fishing bait being rupture resistant to dynamic stretching, shearing, resistant to ball-up during casting, resistant to tearing encountered during hook penetration, casting, and presentation;
> 3) said fishing bait capable of exhibiting a success hook to catch ratio greater than 5;
> 4) said fishing bait having greater elongation, greater tear resistance, or greater fatigue resistance than a conventional plastisol polyvinyl chloride of corresponding rigidity;
> 5) said fishing bait having resistant in tearing encountered during hook penetration followed by elongation to 200% as compared to a conventional plastisol polyvinyl chloride fishing bait of corresponding rigidity; and
> 6) one or more foodstuff[sic] selected from animal foodstuff, vegetable foodstuff and microbiological foodstuff.[16]

19         Mr. Shefte concludes that many of the recited limitations were "added to provide a

20  distinction between" the various claims of the AEI Fishing Lure Patents (Shefte Report, pp. 6 – 7)

21  in order to avoid double patenting, and that many of them formed the crux of Chen's arguments in

22  the patent office as to why the AEI Fishing Lure Patents were patentable (see, e.g., Shefte Report,

23  pp. 10 – 11, 12 & 14).  Therefore, as Mr. Shefte concludes, the contributor of the "material

24  characteristic limitations identified above is an inventor or co-inventor of the claim or claims in

25  which those limitations appear." (Shefte Report, p. 17).

---

26  [16] Mr. Shefte has not yet analyzed the claims of U.S. Patent No. 7,208,184, which was only

27  recently added to this lawsuit.  However, it is expected that when asked about this patent at trial, Mr. Shefte will at least identify the characteristic of "said fishing bait having a selected shape for

28  presentation and use with a hook and a line," which is a limitation in each of the sixteen claims of the '184 patent, as being a "material claim limitation" of the '184 patent.

3.   Mr. Shelton Contributed to the Conception of the AEI Fishing Lure Patents
By Conceiving of Material Claim Limitations in the Patents and
Communicating Them to Mr. Chen.

AEI desperately tries to minimize Mr. Shelton's contributions to the conception of the patents but, in so doing, fails to recognize that Shelton testified, without contradiction and several times, during his deposition that all of the above-identified characteristic limitations relating to fishing lures were wholly his contributions to the claimed inventions (see, e.g., Shelton Depo. pp. 137:23-138:5 [stating that "the only way that you can come up with that type of [hook-to-catch ratio] is to physically do it yourself"], 136:3-137:9 [indicating that "said fishing bait being rupture resistant to ball up during casting, resistant to tearing encountered during hook penetration, casting and presentation" was something he invented], 138:15-139:19 [testifying that "fishing bait being lifelike, soft, flexible, capable of buoyancy in water" were parts of his contribution], 142:18-143:13 [explaining that he provided Chen with the aspects of "tear strength," "hook-to-set ratio," "flotation," "elongation"], 150:9-151:5 [testifying that he provided Mr. Chen with "rupture resistance, the buoyancy, the stretching, the tearing, the catch – fish-to-catch ratio, greater tear resistance, greater fatigue resistance"], 179:17-180:2 [explaining how he advised Mr. Chen to put "food particles" and the like into the fishing lures being developed jointly by Chen and Shelton]).

Contrary to AEI's assertions, Mr. Shelton provided Mr. Chen with much more than a "general goal or research plan." (see AEI Motion, p.16).  Instead, Mr. Shelton offered tangible, workable ideas that, in many instances, formed the basis for allowance of the patents by the patent office.  In fact, Mr. Chen told the patent office that the reason one of the inventions was patentable is because the prior art "did not appreciate, which they did not disclose and which they were completely blind to for the need of, the purpose of, the property of, the advantages of, and which they all ignored completely:

. . .

g.      buoyancy in water

h.      resistant to tearing encountered during hook penetration, casting, and presentation; said fishing bait having greater elongation, greater tear resistance, or greater fatigue resistance than a conventional plastisol polyvinyl chloride fishing bait

. . .

j.      greater resistant [sic] to tearing encountered during hook penetration [to – sic] a conventional plastisol polyvinyl chloride fishing bait

. . .

l.      greater elongation, greater tear resistance, or greater fatigue resistance than a conventional plastisol polyvinyl chloride fishing bait

. . .

n.      greater resistant [sic] to tearing encountered during hook penetration followed by elongation to 200% as compared to a convention plastisol polyvinyl chloride fishing bait . . . ."

(Creason Decl. Exh. I [John Chen Response to Non-Final Office Action at pp. 16 – 17]).  These limitations that Mr. Chen says are the "differences" from the prior art are the <u>very</u> limitations that Mr. Shelton indisputably contributed to the inventions and communicated to Mr. Chen and then which were incorporated into the patent claims by Mr. Chen.  There is no better evidence as to what constitutes a "definite and permanent idea of the complete and operative invention" than Mr. Shelton's contributions appearing nearly verbatim in the Chen patent claims and then being argued to the Patent Office as being the basis of patentability.

4.      <u>Mr. Chen's Lack of Knowledge of the Claimed Fishing Lure Characteristics Indicates That the Conception of That Claimed Subject Matter Must Have Been Contributed by Mr. Shelton.</u>

AEI spends much of its motion discussing the issues of fishing lure background information, general goals and research plans, burden of proof and corroboration, and the education that Mr. Shelton provided to Mr. Chen regarding fishing lures.  The facts, however, clearly indicate that Mr. Chen knew absolutely nothing about the fishing industry and certainly did not understand any of the material limitations relating to fishing lures that he ultimately incorporated into the AEI Fishing Lure Patents.  Additionally, ample testimony can corroborate Mr. Shelton's understanding of the material limitations and his contributions of those material limitations to the claimed inventions.

As Mr. Shelton said, and as Mr. Chen admitted, Mr. Chen had practically never fished and certainly had not fished for bass, the primary fish intended to be caught by the soft lures being developed by Z-Man (<u>see</u> Shelton Depo. at 137:23-138:5; Chen Depo. p. 69:18-71:4).  Mr. Chen even admitted that, except for catching the fish out of his goldfish bowl for cleaning, he had not fished for any type of fish in the last 30 years (<u>id</u>. [saying that he had fished for salmon in the '70s]).  Mr. Chen demonstrated his lack of understanding and expertise in fishing lures when he

1  was asked to identify several commonly-known fishing products, including a baitcast reel, an

2  Ugly Stik, and a Fluke.  (Chen Depo. pp. 279:8-9; 282:2-4; 282:8-10).  It is implausible for

3  credibility purposes that Mr. Chen knew nothing of this type of basic fishing information, but was

4  then able to develop the material limitations of the claimed fishing lures set forth in the AEI

5  Fishing Lure Patents.  Further, if conceiving of the fishing lures with all of the material limitations

6  set forth above would have been as simple as being able to "walk in the store and see 2,000

7  designs of fishing lures" as AEI contends (AEI Motion, p. 15), it is unclear why Mr. Chen did not

8  do that.  Instead, he collaborated with, and relied on, Mr. Shelton's contributions to arrive at those

9  inventions jointly with Mr. Shelton.

10        The material limitations of the AEI Fishing Lure Patents had to come from somewhere

11  because Mr. Chen was certainly unable to invent them.  The bottom line is that the fishing lure

12  features identified above could <u>only</u> have been developed by someone with real world experience

13  in the fishing industry.  In fact, a prominent third party manufacturer of soft fishing lures said that:

14      Q.    Is it true that the only way you can determine if a fishing bait will actually
         work to catch fish is to go fishing?

15      A.    Yes.  We've been in instances where we've had lures and the hook was in

16           the wrong spot, and we didn't catch any fish.  And we moved the hook
         around to another position and it does.  The only way to find that out is to

17           try it.

18      Q.    So, is it fair to say that sometimes you develop lures at your office and you
         try them out fishing and they don't work?

19      A.    That's true.
    Q.    And is that because sometimes those lures don't have some of the

20           characteristics that we've talked about today?
    A.    Yes.

21

22  (Creason Decl. ¶ 14, Exh. M [Deposition of Harry M. Ehlers, pp. 52:23 – 53:17]).  Thus, as

23  explained by Mr. Ehlers, the only way that one can determine if a fishing bait invention really

24  works for its intended purpose of catching fish (i.e., "success hook to catch ratio greater than 5" as

25  claimed), not balling up upon casting (i.e., "resistant to ball-up during casting" as claimed),

26  resisting tearing during use (i.e, "resistant to tearing encountered during hook penetration, casting,

27  and presentation" as claimed) and the like, is to actually conceive of the lure, reduce it to practice,

28

1    and test the lure pursuant to its intended purpose of catching fish.  Mr. Chen did none of that, but

2    Mr. Shelton did.

3          Likewise, Mr. Shelton's contributions of fishing lure designs and drawings clearly support

4    Mr. Shelton's status as a co-inventor.  While the specific designs in Mr. Shelton's drawings are not

5    claimed literally in all of the AEI Fishing Lure Patents, many are specifically claimed in the

6    recently-issued '184 patent which has now been added to this litigation.  Every claim of the '184

7    patent requires:  "said fishing bait having a selected shape for presentation and use with a hook

8    and a line" (Graber Declaration in Support of AEI's Motion for Partial Summary Judgment, ¶ 11,

9    Exh. J ['184 Patent], at column 81, line 11 – column 86, line 17).  Again, Mr. Chen had no idea

10   about "selected shapes" for presentation and use of those shapes with a hook and a line.  Mr. Chen

11   admits that Mr. Shelton provided the drawings of fishing lures, obviously in the claimed "selected

12   shapes," for inclusion in the patents (Creason Decl. ¶ 15 Exh. N [AEI 30(b)(6) Depo pp. 202:15-

13   203:16]) (see Playtex Prods., Inc. v. Procter & Gamble Co. (Fed. Cir. 2005) 400 F.3d 901, 909

14   [explaining that patent illustrations support the construction of a claim term]).  Therefore, any

15   "selected shapes" as claimed in the '184 patent originated from someone other than Mr. Chen and

16   that someone was obviously Mr. Chen's collaborator, Mr. Shelton.

17         Finally, any allegation by AEI that Shelton's co-inventorship is not corroborated is simply

18   unsupported.  Mr. Shelton clearly testified that Myrna Wahoup, Mr. Shelton's officemate and co-

19   Vice President at Z-Man could provide any corroboration necessary to support Mr. Shelton's

20   inventorship (Shelton Depo. at 153:24-154:13, 184:25-185:11).  The fact that AEI never

21   questioned Ms. Wahoup during her deposition about corroboration or Mr. Shelton's inventorship

22   does not mean that she cannot corroborate that inventorship.  In fact, Ms. Wahoup can, and will,

23   corroborate many of Mr. Shelton's conversations with Mr. Chen, several of which included

24   transfer to Chen of the essential limitations of the AEI Fishing Lure Patents (Creason Decl. ¶ 13,

25   Exh. L [Declaration of Myrna Wauhop, ¶¶1-4]).  Moreover, with respect to at least the '184 patent,

26   Mr. Shelton actually has documentation – the drawings of the "selected shapes" that were

27   including in the patent applications – to corroborate his inventive contributions.

28

1    The frailty of AEI's position becomes obvious when Mr. Chen's background, including his

2    lack of any experience with bass fishing, and a clear assessment of the facts are considered.  Mr.

3    Chen needed a person with specific knowledge of the fishing industry, including a particular

4    understanding of fishing lures and soft baits in order to arrive at the types and kinds of fishing

5    lures that were patented in the AEI Fishing Lure Patents.  Because Mr. Shelton provided these

6    things, he should rightfully be added as a co-inventor to those patents (see, e.g., Ethicon, 135 F.3d

7    at 1460 [correcting inventorship because the named inventor did not possess the knowledge of

8    engineering concepts required to conceive of the material depicted in the patent drawings]).  Mr.

9    Shelton's level of expertise regarding these types of inventions so overwhelmingly overshadows

10   Mr. Chen's expertise that any reasonable juror must believe that Mr. Shelton is a co-inventor.

11   However, at this stage, it is absolutely clear that at the very least, genuine issues of material fact

12   exist for the fact-finder to determine so that AEI's summary judgment motion regarding

13   inventorship cannot be granted.

14   **VI.    <u>CONCLUSION</u>**

15   For the foregoing reasons, Z-Man respectfully requests that its motion for partial summary

16   judgment on AEI's claim for contractual penalties be GRANTED and that AEI's motion for

17   partial summary judgment be DENIED.

18   Dated: August 9, 2007                          DILLINGHAM & MURPHY

19

20                                                   By: _____/S/_____

21                                                   J. CROSS CREASON
                                                     Attorneys for Defendant Z-Man Fishing Products,
22                                                   Incorporated

23

24

25

26

27

28