**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

APPLIED ELASTOMERICS, INCORPORATED, a
California corporation,

        Plaintiff,

    v.

Z-MAN FISHING PRODUCTS, INCORPORATED,
a South Carolina corporation,

        Defendant.

_____/

AND RELATED COUNTERCLAIMS.

_____/

No. C 06-2469 CW

ORDER GRANTING IN
PART PLAINTIFF'S
MOTION FOR
SUMMARY JUDGMENT
AND GRANTING
DEFENDANT'S
CROSS-MOTION FOR
PARTIAL SUMMARY
JUDGMENT

    Plaintiff Applied Elastomerics, Inc. moves for summary
judgment on several issues.  Defendant Z-Man Fishing Products, Inc.
opposes Plaintiff's motion and cross-moves for partial summary
judgment.  Plaintiff opposes Defendant's cross-motion.  The matter
was heard on September 20, 2007.  Having considered all of the
parties' papers and oral argument, the Court grants Plaintiff's
motion in part and grants Defendant's motion.

BACKGROUND

    Plaintiff invents and patents certain chemical compositions,
composites and articles made from these compositions and
composites.  In particular, it holds various patents covering the
formulation of thermoplastic elastomer (TPE) gels.  Plaintiff
commercializes its technology by licensing its patents, proprietary

technology and know-how to third parties.  Plaintiff's president, John Chen, handles all of the business aspects of commercializing the technology he invents and develops.

Defendant develops and manufactures fishing lure components and fishing lures for major lure manufacturers.

In April, 2001, Mike Shelton, Defendant's Vice President of Marketing and Sales and Director of Technology, contacted Mr. Chen concerning a fishing lure product that he was trying to develop, the "superworm."  In July, 2001, Mr. Chen forwarded a copy of a license agreement to Mr. Shelton.

The license agreement is governed by California law.  Under the agreement, Defendant must make one of two types of royalty payments on a quarterly basis: either a "running royalty," which is calculated as a percentage of Defendant's net revenues from sales of products using Plaintiff's technology or patents, or a "minimum royalty."  In exchange for these royalties, Plaintiff agreed not to license the patents listed on Schedule A to any third party for the purpose of manufacturing a fishing lure.  Defendant had the right to terminate the exclusivity provision, and its obligation to pay minimum royalties, at any time upon ninety days' written notice to Plaintiff.

The license agreement that Mr. Chen provided is fully integrated.  See Creason Dec., Ex. A, §10.12 ("this Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements or understandings between the parties relating to the subject matter.").  Section 5.7 of the agreement further provides:

2

United States District Court
For the Northern District of California

1   In addition to the interest provision of this Section as to
2   late royalty payments, the following shall be the penalty due
    to fraud or false statements in connection with any unpaid
3   royalties for which AEI has provided Company with notification
    and which remain uncorrected or unpaid (with interest) under
4   this Section for more than thirty (30) days from the date of
    such notification: A penalty of three (3) times the amount of
5   royalty underpayment due to fraud or false statements which are
    unreported and unpaid falling within the term of this Agreement
6   which penalty shall be considered as the sole compensation and
    damages for the unreported infringing sales and such sales
7   shall be treated as infringing sales in accordance with 35
    U.S.C. § 284.  Company shall also pay any reasonable attorney
8   fees and expenses incurred by AEI as a result of such fraud or
    false statements and misrepresentations.

9   Creason Dec., Ex. A.

10      Also relevant to Plaintiff's motion is section 9.2(a), which

11  provides: "If the parties fail to resolve the dispute through

12  mediation, or if neither party elects to initiate mediation, each

13  party shall have the right to pursue any other remedies legally

14  available to resolve the dispute, provided, however, that the

15  parties expressly waive any right to a jury trial."  Id.

16      On July 24, 2001, Mr. Shelton signed the agreement.  In

17  addition, Myrna Wahoup, formerly Defendant's Vice President and

18  Secretary, signed the agreement.  According to Mr. Shelton, either

19  the day he signed the agreement or the next day, he called Mr.

20  Chen.  Mr. Shelton told Mr. Chen that he did not have a problem

21  signing the agreement "as long as [they] were under the

22  understanding that [they] would change the royalty amount" to

23  reflect amounts that they had been discussing.  Creason Dec., Ex. G

24  at 73:3-7.  Mr. Shelton states that Mr. Chen responded, "No

25  problem."  Id. at 73:7-12.  Mr. Chen acknowledges that Mr. Shelton

26  called him on July 24, 2001 or the day after.  According to Mr.

27  Chen, Mr. Shelton told him that the agreement was signed and

28                                  3

United States District Court
For the Northern District of California

executed, but that he wanted to talk about making a modification to the agreement; however, Mr. Chen could not recall whether it was the minimum royalty numbers that Mr. Shelton wanted to modify.  Mr. Chen states that he told Mr. Shelton that "it's not difficult to make modification to the agreement" and that "we'll execute an amendment and make the changes."  Cleason Dec., Ex. F at 179:11-14.

On July 25, 2001, Mr. Shelton mailed the signed agreement back to Mr. Chen.  Along with the agreement was a memorandum regarding "License Agreement & Changes" and a page containing sales projections and royalties.  The memorandum stated:

> Enclosed you will find the signed "License Agreement." Attached are the changes in the sales forecast and royalty numbers.  As we agreed you lists [sic] the changes as amendments to the original agreement.  We did not discuss "B" but it is my understanding that the way it is written this covers any and all fishing lures made from your patented formula.  If I am incorrect in my assumption please advise and we will discuss.

Creason Dec., Ex. B.

Mr. Chen states that he called Mr. Shelton on the day he received the signed agreement, memorandum and its attachment. Mr. Chen informed Mr. Shelton that the attachment was a hypothetical forecast and that he was "not going to go along with making any changes based on a forecast"; Mr. Chen refused to make a modification to the agreement.  Cleason Dec., Ex. F at 194:14-6. Mr. Shelton denies that this conversation took place.

After Mr. Shelton signed the agreement, Defendant moved forward in developing a new fishing lure.  Plaintiff provided formulations to Defendant to assist in the development of the lure. In particular, Mr. Chen sent formulations to, and worked closely

4

**United States District Court**
For the Northern District of California

with, Don Rawlins, of Color Technologies, a firm Defendant used to manufacture its fishing lures.  According to Mr. Shelton, "Everything was going good" and the new lure "performed extremely well during a test."  Cleason Dec., Ex. G at 76:15-20.

In March, 2002, Defendant sent Plaintiff a document entitled "Amendment Number 1 to Patent License Agreement."  See Graber Dec. Ex. D.  Although the amendment was dated "March __, 2002," it designated April 26, 2001 as the effective date; April 26, 2001 was the effective date of the license agreement.  The amendment would change the minimum royalty schedule in the license agreement to match the lower minimum royalty schedule contained in the memorandum that Mr. Shelton sent with the license agreement.  Mr. Shelton states that he sent the amendment because he and Mr. Chen had agreed on these numbers, but Mr. Chen had not taken any action on changing the original license agreement as they had discussed. Plaintiff never signed the amendment.

In July, 2002, Plaintiff filed four patent applications for technology relating to fishing lures.  The applications were approved and the Patent and Trademark Office issued four patents, listing Mr. Chen as the inventor and Plaintiff as the assignee. See U.S. Patent Nos. 6,794,440 (the '440 patent); 7,108,873 (the '873 patent); 7,134,236 (the '236 patent); and 7,208,184 (the '184 patent) (AEI fishing lure patents).

According to Defendant's expert, Dalbert U. Shefte, the material claim limitations recited in AEI fishing lure patents include (1) fishing lure being life-like, soft, flexible and capable of exhibiting buoyancy in water; (2) fishing lure being

United States District Court
For the Northern District of California

rupture resistant to dynamic stretching and shearing, resistant to ball-up during casting, and resistant to tearing encountered during hook penetration, casting, and presentation; (3) fishing lure capable of exhibiting a hook-to-catch ratio greater than five; (4) fishing lure having greater elongation, greater tear resistance, or greater fatigue resistance than a conventional plastisol polyvinyl chloride of corresponding rigidity; (5) fishing lure resistant to tearing encountered during hook penetration followed by elongation to 200% as compared to a conventional plastisol polyvinyl chloride fishing bait of corresponding rigidity; and (6) one or more foodstuffs selected from animal foodstuff, vegetable foodstuff and microbiological foodstuff.

Defendant contends that Mr. Shelton contributed to the conception of the AEI fishing lure patents by conceiving of material claim limitations in the patents and communicating them to Mr. Chin. It claims that Mr. Shelton is thus a co-inventor and should be listed as such on the patents. In particular, Mr. Shelton states that he provided Mr. Chen:

> with knowledge and information about the fishing industry, also about the product line, about how--how flotation is an advantage, how elongation is an advantage, how tear strength is an advantage, how hook-to-set ratio is an advantage, how the durability of the product is an advantage where the customer will buy, you know, a bag of TPE products and catch 30, 40 fish per bag where he'd buy a bag of plastic products and catch five to six fish a bag.

Graber Dec., Ex. A at 129:16-24. In addition, Mr. Sheldon claims that he recommended that scent or flavors and oil be added to bait and that he provided Mr. Chen with drawings of various fishing lures. In addition, Mr. Sheldon claims to have tested the various

United States District Court

For the Northern District of California

1    inventions; Mr. Chen has not fished for thirty years.

2        From late 2002 through early 2004, Defendant made royalty

3    payments to Plaintiff.  In 2004, Defendant stopped paying

4    royalties.  Defendant contends that, on August 24, 2004, it

5    terminated the minimum royalty provision.

6        In 2006, Plaintiff brought this suit for breach of contract

7    and breach of the covenant of good faith and fair dealing.

8    Plaintiff seeks to recover the minimum royalties it alleges it is

9    owed under the agreement; it does not seek to recover any running

10   royalties.  In addition, it alleges that, pursuant to section 5.7

11   of the agreement, the amount it is owed is subject to trebling

12   because Defendant's failure to pay the minimum royalties was based

13   on its false statements that it did not owe the minimum royalties.

14   Defendant filed numerous counterclaims and a suit against Plaintiff

15   in South Carolina.  Almost all of Defendant's counterclaims were

16   dismissed or withdrawn.  The South Carolina action was transferred

17   to this Court and consolidated with this action.  Defendant's

18   remaining counterclaims are for co-inventorship and unjust

19   enrichment.  Defendant also asserts twelve affirmative defenses,

20   including a breach of the covenant of good faith and fair dealing,

21   negligent misrepresentation and a request for offset of the

22   royalties previously paid under the license agreement.

23                          LEGAL STANDARD

24       Summary judgment is properly granted when no genuine and

25   disputed issues of material fact remain, and when, viewing the

26   evidence most favorably to the non-moving party, the movant is

27   clearly entitled to prevail as a matter of law.  Fed. R. Civ.

28                                  7

United States District Court
For the Northern District of California

P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);
<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.
1987).

The moving party bears the burden of showing that there is no
material factual dispute.  Therefore, the court must regard as true
the opposing party's evidence, if supported by affidavits or other
evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815
F.2d at 1289.  The court must draw all reasonable inferences in
favor of the party against whom summary judgment is sought.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d
1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment
are those which, under applicable substantive law, may affect the
outcome of the case.  The substantive law will identify which facts
are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).

Where the moving party does not bear the burden of proof on an
issue at trial, the moving party may discharge its burden of
production by either of two methods.  <u>Nissan Fire & Marine Ins.
Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir.
2000).

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

<u>Id.</u>

8

**United States District Court**
For the Northern District of California

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue.  UA Local 343 v.

Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991).  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id.  This standard does not change merely because resolution of the relevant issue is "highly fact specific."  Id.

DISCUSSION

I. Plaintiff's Motion

Plaintiff moves for summary judgment in its favor on several issues: Defendant's tenth affirmative defense for an offset of royalties Defendant paid to Plaintiff; Defendant's counterclaim for co-inventorship; and Defendant's counterclaim for unjust enrichment.  In addition, it moves for an adjudication that section 4.6 of the License Agreement is the applicable minimum royalty schedule and an order that all issues will be tried to the Court.

A.   Offset for royalties paid

In its tenth affirmative defense, Defendant contends that any award of damages to Plaintiff must be offset by sums received by Plaintiff.  Specifically, Defendant argues that it is entitled to recover the royalties it paid under the agreement because the licensed patents are invalid and the products Defendant sold were not covered by the licensed patents.  Plaintiff contends that Defendant's offset argument fails as a matter of law.

"It is well settled law that a determination that a patent which is the subject matter of a License Agreement is invalid does not entitle the licensee to recoup royalties already paid."  Wang Labs., Inc. v. Ma Labs., Inc., 1995 WL 729298, at *11 (N.D. Cal.); see also Bristol Locknut Co. v. SPS Techs., Inc., 677 F.2d 1277 (9th Cir. 1982).  As explained in St. Regis Paper Co. v. Royal Industries, 552 F.2d 309, 314 (9th Cir. 1977), this rule is founded upon policy considerations:

> The possibility of obtaining a refund of all royalties paid might induce a manufacturer to accept a license based on a patent of doubtful validity, derive the benefits of suppressed competition which the patent affords, and challenge validity only after the patent's expiration.  The licensee would have a chance to regain all the royalties paid while having enjoyed the fruits of the license agreement.

This rationale applies equally to a licensee's ability to recoup or offset past royalties if the products made under the license agreement are later determined to be non-infringing.  Wang, 1995 WL 729298 at *11.  This is especially true here, where Defendant held the exclusive right to market products it held out as covered by Plaintiff's patents.

Defendant acknowledges that recouping past royalties is generally not permitted by federal law.  It argues nonetheless that Plaintiff's motion attacking its offset defense should be denied because of certain language in the license agreement.

The license agreement provides, "In the event any Licensed Product is manufactured, directly or indirectly, solely using AEI Technology, but without the protection of any valid Licensed Patents in a given country covered by a license granted under this

United States District Court
For the Northern District of California

License Agreement, the royalty rate shall be Three percent (3%) for Licensed Product." Creason Dec., Ex. A at § 4.2(c). Defendant fails to explain why this language warrants an exception to the general prohibition against the recovery of previously paid royalties on the grounds of invalidity or non-infringement. Like the license agreement in Wang, the agreement here provides that there is no warranty or representation regarding the validity or scope of the patent rights. Thus, Defendant, like the defendant in Wang, "assumed the risk" that Plaintiff's patents "might, at some future date, be found not to include the licensed products" or might be found invalid. Wang, 1995 WL 729298 at *12.

The Court concludes that Defendant would not be entitled to offset its royalty payments if Plaintiff's patents were found to be invalid or if Defendant's products were found not to be covered by the patents. Plaintiff's motion for partial summary judgment on Defendant's tenth affirmative defense is granted.

B. Co-inventorship counterclaims

As noted above, Defendant asserts a counterclaim under 35 U.S.C. § 256 for co-inventorship, arguing that the AEI fishing lure patents erroneously fail to name Mr. Shelton as a co-inventor. Section 256 provides that a co-inventor omitted from an issued patent may be added to the patent; it provides a means for correcting inventorship. Plaintiff charges Defendant with failing to offer any evidence that could establish a cause of action under section 256 and, thus, it argues that Defendant's counterclaims for co-inventorship fail as a matter of law. Defendant responds that genuine issues of material fact exist, precluding summary judgment.

12

United States District Court
For the Northern District of California

The Federal Circuit has explained that a "patented invention may be the work of two or more joint inventors." _Ethicon, Inc. v. U.S. Surgical Corp._, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (citing 35 U.S.C. § 116). Each joint inventor, however, "must generally contribute to the conception of the invention," _id._, because inventorship "arises from conception, not development or reduction to practice." _PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc._, 225 F.3d 1315, 1324 (Fed. Cir. 2000); _Burroughs Wellcome Co. v. Barr Labs., Inc._, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is the touchstone of inventorship, the completion of the mental part of invention."). As explained in _Hybritech, Inc. v. Monoclonal Antibodies, Inc._, 802 F.2d 1367, 1376 (Fed. Cir. 1986), "Conception is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" "Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." _Sewall v. Walters_, 21 F.3d 411, 415 (Fed. Cir. 1994).

Each joint inventor need not "make the same type or amount of contribution" to the invention and co-inventors need not "physically work together or at the same time." 35 U.S.C. § 116; _Trovan Ltd. v. Sokymat Sa, Irori_, 299 F.3d 1292, 1302 (Fed. Cir. 2002). Nor need a co-inventor make a contribution to every claim of a patent; a "contribution to one claim is enough." _Ethicon_, 135 F.3d at 1461. But the co-inventor must perform at least "a part of the task which produces the invention" and must have "conceived, as

13

that term is used in the patent law, the subject matter of the claims at issue." Id. at 1460-61.  One does not qualify as a co-inventor by merely providing the inventor with well-known principles or by explaining "the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole." Id. at 1460 (quoting Hess v. Advanced Cardiovascular Systems, Inc., 106 F.3d 976, 981 (Fed. Cir. 1997)).  See also Trovan, 299 F.3d at 1302 (explaining that "the basic exercise of ordinary skill in the art, without an inventive act, does not make one a joint inventor").  Indeed, an inventor "may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent." Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed. Cir. 1985).

To establish co-inventorship, the alleged co-inventor must prove his or her contribution to the conception of the claims by clear and convincing evidence. Ethicon, 135 F.3d at 1461.  The alleged co-inventor's testimony "cannot, standing alone, rise to the level of clear and convincing proof." Price, 988 F.2d at 1194. Rather, an alleged co-inventor must provide evidence to corroborate his or her testimony. Ethicon, 135 F.3d at 1461.  Whether the alleged co-inventor's testimony has been sufficiently corroborated is evaluated under a "rule of reason" analysis, which requires that an "'evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the [alleged] inventor's story may be reached.'" Id. (quoting Price, 988 F.2d at 1195 (alterations in original)).  Corroborating evidence may take many forms, including contemporaneous documents prepared by a putative

United States District Court
For the Northern District of California

1    inventor, circumstantial evidence about the inventive process and

2    oral testimony of someone other than the alleged inventor.  Id.

3        The Federal Circuit instructs that "inventorship is determined

4    on a claim-by-claim basis."  Trovan, 299 F.3d at 1302.  An

5    inventorship analysis "begins as a first step with a construction

6    of each asserted claim to determine the subject matter encompassed

7    thereby."  Id.  The next step is "to compare the alleged

8    contributions of each asserted co-inventor with the subject matter

9    of the properly construed claim to then determine whether the

10   correct inventors were named."  Id.

11       In construing claims, the Court looks first to the words of

12   the claim.  Id. at 1305.  The words of the claims of AEI fishing

13   lure patents are clear and not subject to more than one meaning.

14   Indeed, the only term disputed by the parties is "selected shape,"

15   which is used in every claim of the '184 patent.  Plaintiff

16   contends that the term "selected shape" does not limit or relate

17   the claims to any drawings.  According to Plaintiff, "selected

18   shape" is any shape selected by a person skilled in the art who is

19   practicing the patent.  The '184 patent states that the drawings

20   "are representative of fishing bait shapes."  '184 patent at col.

21   11.

22       Defendant contends that "selected shape" means those shapes

23   shown in the drawings found in the patent specification, and

24   provided by Mr. Shelton.  See Playtex Products, Inc. v. Procter &

25   Gamble Co., 400 F.3d 901, 909 (Fed. Cir. 2005) (finding that, in

26   some circumstances, patent illustrations can support the

27   construction of a claim term).  It is correct that the term

28                                   15

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"selected" may have a specific meaning.  See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim.").  But the Court is not persuaded that "selected" refers to those shapes provided in the drawings in the specification.  Defendant correctly notes that "the specification is the single best guide to the meaning of a disputed term."  Phillips v. AWH Corp., 415 F.3d 1303, 1321 (Fed. Cir. 2005).  Here, the specification provides that the drawings are only "representations"; it does not provide that they are the selected shapes, nor are the claims limited to the shapes provided in the drawings.  Therefore, the Court concludes that Plaintiff's construction, i.e., "selected shape" is any shape selected by a person skilled in the art who is practicing the patent, is the proper construction.

Mr. Shelton claims that two contributions he made, in addition to the "selected shapes," concerned incorporating food particles into fishing lures and the characteristics of buoyancy, tear resistance, set-to-catch ratio, elongation and softness.  These contributions to the inventions do not constitute the conception necessary to establish co-inventorship.  Mr. Shelton contributed only "well-known principles."  He acknowledges that the idea of adding scents to fishing lures was "very common knowledge to anybody in the fishing industry."  Graber Dec., Ex. A at 133:25-34:1.  Further, it is not disputed that Mr. Chen could have learned about the desirability of buoyancy, tear resistance, high set-to-catch ration, elongation and softness "by just talking to someone

16

in the fishing industry."  Graber Supp. Dec., Ex. 1 at 70:12-25.
As noted above, an inventor does not lose his right to a patent
merely by using the service, ideas and aid of others in the process
of perfecting his invention.  Shatterproof Glass Corp., 758 F.2d at
624.

Defendant also fails to provide corroboration for Mr.
Shelton's testimony that he assisted in the conception of other
claims of AEI fishing lure patents.  The only evidence Defendant
presents to corroborate its co-inventorship claim is the
declaration of Ms. Wahoup.  She states only that, at various times,
including during 2002, she "witnessed conversations between Mike
Shelton and John Chen," including "communications from Mr. Shelton
describing and explaining essential characteristics of soft fishing
lures of the types utilized by Z-Man."  Creason Dec., Ex. L.  She
does not identify the claims to which Mr. Shelton allegedly
contributed.  Defendant argues that, at this point in the
litigation, it is not required to present all of the factual
evidence of corroboration that it will present at trial.  While
this may be true, Defendant is required to present enough evidence
to show that there is a material dispute of fact concerning whether
it can show by clear and convincing corroborated evidence that Mr.
Shelton is a co-inventor of AEI fishing lure patents.  It does not.

The Court grants summary judgment in favor of Plaintiff of
this issue as well.

C.   Unjust enrichment counterclaim

Defendant's counterclaim for unjust enrichment is premised on
the theory that no contract was ever formed between the parties.

17

United States District Court
For the Northern District of California

Defendant argues that Mr. Shelton's July 25, 2001 memo sent with the signed license agreement constituted a counter-offer that was never accepted.  Plaintiff, however, contends that the facts unequivocally establish that the parties entered into the license agreement.

Plaintiff argues that the fact that Defendant concedes that its representatives signed the agreement ends the inquiry.  The California Supreme Court instructs, "The general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding." Jefferson v. Cal. Dept. of Youth Authority, 28 Cal. 4th 299, 303 (2002) (citation and inner quotations omitted).  California law further provides that "performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal." Cal. Civ. Code § 1584.  Here, there is no dispute that Defendant accepted Plaintiff's assistance in developing its product and that it made payments under the license agreement.  Had Defendant believed there was no contract between it and Plaintiff, but only an unaccepted counter-offer, it would not have performed under the contract, nor expected Plaintiff to do so.

Plaintiff points out that Defendant also admitted that it entered into the agreement in its "Amendment Number 1 to Patent License Agreement." See Graber Dec. Ex. D.  The amendment states that "AEI and company entered into that certain Patent License

18

Agreement with an effective date of April 26, 2001."   Id.   In addition, Plaintiff notes that Defendant admitted in its Answer, Counter-Complaint and Jury Demand that it entered into the agreement.   This admission still carries weight, even though Defendant later amended its answer and revoked its admission.

Defendant concedes that it paid royalties, but it points out that its royalty payments were consistent with the license agreement and with the allegedly agreed upon lower minimum royalty schedule included with Mr. Shelton's July 25, 2001 memorandum to Mr. Chen.  Defendant contends that Amendment Number 1 was merely a document containing the terms to which AEI had earlier agreed and that nothing should be made of the fact that it is labeled an "amendment."   These arguments are not persuasive.

Because Defendant's representatives signed the license agreement and then sent the executed agreement back to Plaintiff, and virtually all of the other evidence indicates that a contract was formed between the parties, Defendant's counterclaim for unjust enrichment fails as a matter of law.   The Court grants summary judgment in favor of Plaintiff on this ground.

D.   Minimum royalty schedule

Defendant asserts that, if the parties did enter into a contract, the lower royalty schedule included in the July 25, 2001 memorandum is the applicable royalty schedule.  Plaintiff contends that this theory fails as a matter of law and that section 4.6 of the agreement sets forth the applicable minimum royalties.   It argues that the alternative royalty schedule provided in the July 25, 2001 memorandum contradicts the schedule set forth in the

parties' integrated contract.

As noted above, the agreement here is integrated. California law provides, "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Civ. Proc. § 1856. See also Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th 336, 344 (2004) ("The parol evidence rule therefore establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements. . . . the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement.").

Defendant does not argue that the parol evidence rule would not apply to the July 25, 2001 memorandum; it argues instead that Plaintiff's reliance on the parol evidence rule is misplaced because there is a dispute of fact regarding whether there is a contract and the terms of the contract, if any. Again, however, the Court has concluded that there is no genuine dispute of fact concerning whether there is a contract. The minimum royalty schedule contained in the July 25, 2001 memorandum was a contemporaneous communication that may not be used to contradict the terms of the integrated contract. Accordingly, those terms will govern the parties' contract-based claims.

E.  Court trial or jury trial

The right to a jury trial in federal court is governed by federal law and, under federal law, parties may contractually waive

20

United States District Court
For the Northern District of California

their right to a jury trial.  <u>Telum, Inc. v. E.F. Hutton Credit</u>
<u>Corp.</u>, 859 F.2d 835, 837 (10th Cir. 1988).  As explained in <u>Okura &</u>
<u>Co., Inc. v. Careau Group</u>, 783 F. Supp. 482, 488 (C.D. Cal. 1991),
"While the right to civil jury trial is a fundamental
constitutional right, it may be waived by a contract knowingly and
voluntarily executed."  Plaintiff contends that Defendant waived
its right to a jury.  As noted above, the agreement provides "that
the parties expressly waive any right to a jury trial."

Defendant contends that no contract with a jury waiver
provision was formed.  It argues that Plaintiff cannot rely on a
jury trial waiver when there are material questions of fact
concerning whether the contract containing that waiver was formed.
But as discussed above, the Court finds that no such material
questions of fact exist.  A contract was in fact formed, and the
parties' contract-based claims are therefore covered by the jury
waiver clause in the license agreement.  These claims will be tried
to the Court, not to a jury.

II.  Defendant's Motion

Defendant seeks partial summary judgment in its favor that
Plaintiff cannot recover a trebling penalty under the agreement.
Defendant argues that this is a contractual penalty, unenforceable
under California law, and further that it applies only to "running"
or sales-based royalties, which are not at issue here.

A.  Contractual Penalty

California law prohibits enforcement of contractual penalties.
<u>Ridgely v. Topa Thrift and Loan Assoc.</u>, 17 Cal. 4th 970, 977
(1998).  Liquidated damages clauses, however, are enforceable, as

United States District Court
For the Northern District of California

long as they are reasonable.  Cal. Civ. § 1671(b) ("a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made").  In Ridgley, the California Supreme Court instructed,

> A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach.  The amount set as liquidated damages must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.  In the absence of such relationship, a contractual clause purporting to predetermine damages must be construed as a penalty.

17 Cal. 4th at 977 (citations and inner quotations omitted).  Other factors to consider are "the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract."  Weber, Lipshie & Co. v. Christian, 52 Cal. App. 4th 645, 654-55 (1997).

Defendant first points out that the license agreement refers to a "penalty," not to liquidated damages.  Whether the contract uses the term "penalty" or "liquidated damages," however, is not determinative.  As explained in Weber, "A court will interpret a liquidated damages clause according to its substance, and if it is otherwise valid, will uphold it even if the parties have referred

22

United States District Court
For the Northern District of California

1  to it as a penalty." Id. at 656.

2      Defendant also contends that the trebling provision in section

3  5.7 does not represent the result of a reasonable endeavor by the

4  parties to estimate a fair compensation for any loss that may be

5  sustained.  Defendant points out that in Harbor Island Holdings v.

6  Kim, 107 Cal. App. 4th 790, 796 (2003), the court concluded that a

7  contract provision that, "in the event of breach, any breach, the

8  rent would more than triple," lacked the necessary proportional

9  relation to the damages which may actually flow from the failure to

10 perform under the contract; therefore, the provision was a penalty

11 and was not enforceable.  It argues that the only purpose of

12 section 5.7 is to penalize.  Indeed, section 5.7 first requires

13 that Plaintiff determine the "amount of royalty underpayment due to

14 fraud or false statement" and then triple that amount and add

15 attorneys' fees and expenses.

16     Plaintiff responds that Defendant has not met its burden to

17 demonstrate that section 5.7 is unreasonable.  It accuses Defendant

18 of presenting no evidence other than the agreement itself.  The

19 agreement itself, however, can be sufficient to show that it

20 contains contractual penalties and not liquidated damages.

21     Plaintiff also argues that section 5.7 is a permissible

22 liquidated damages clause.  It points out that Defendant was

23 represented by in-house counsel and that the contract was

24 negotiated by the parties and is not a form contract.  It argues

25 that the damages here are uncertain.  This argument, however, is

26 not persuasive.  As discussed above, the agreement requires that

27 the party compute the amount of royalty underpayment, which is the

28                                  23

damage, and then triple it.

Plaintiff's reliance on 35 U.S.C. § 284, the section of the patent code that allows a court to increase the damages up to three times the amount of the compensatory damages, is also misplaced. Treble damages and attorneys' fees are available in infringement cases; at issue is an agreement licensing Plaintiff's patents. Section 5.7 of the contract cites section 284 of title 55. But potential treble damages are not part of a parties' actual damages: "The purpose of an enhanced damages award is punitive, and is meant to punish behavior, such as willful infringement, that is properly characterized as 'reprehensible' or 'egregious.'" Applera Corp. v. MJ Research Inc., 372 F. Supp. 2d 233, 235 (D. Conn. 2005).

The Court concludes that the treble damages portion of section 5.7 does not represent the result of a reasonable endeavor by the parties to estimate a fair compensation for any loss that may be sustained; it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a royalty underpayment due to fraud or false statements.  It is a contractual penalty, not liquidated damages.  The Court grants partial summary judgment in favor of Defendant on this ground.

B. Running and Minimum Royalties

Defendant further argues that partial summary judgment should be granted in its favor on the ground that the portions of section 5.7 providing for trebling, attorneys' fees and expenses do not apply to minimum royalties, the only royalties at issue.  It argues, as it argued in its motion for judgment on the pleadings, that the "fraud or false statements" trigger for the trebling

24

provision applies only to fraud or false statements by the licensee regarding "running," or sales-based, royalties. Defendant contends that this is the only possible interpretation of the clause because sales, whether infringing or not, are not relevant to the calculation of minimum royalties: "A penalty of three (3) times the amount of royalty underpayment due to fraud or false statements which are unreported and unpaid falling within the term of this Agreement <u>which penalty shall be considered as the sole compensation and damages for the unreported infringing sales</u>."

Plaintiff, however, emphasizes the phrase "with any unpaid royalties." Plaintiff argues that the only way to interpret this section is to find that the trebling provision applies to any unpaid royalties, which includes both minimum and running royalties. The Court denied Defendant's motion for judgment on the pleadings, holding that, even if Defendant is correct that the language of the contract supports its interpretation, the Ninth Circuit requires that the Court give Plaintiff an opportunity to present extrinsic evidence as to the intention of the parties in drafting the contract. Plaintiff contends that the extrinsic evidence supports its interpretation. Mr. Chen did not tell Defendant that this provision only applied to sales. Mr. Chen testified that he "did not mention sales." Graber Supp. Dec., Ex. 4 at 100:15. He stated, "I was not specific as to sale versus any particular type of royalty. It was just cash, money . . . that's the reason we put it here, to cover all monies owed." <u>Id.</u> at 100:15-23. Mr. Chen further testified that he discussed with Defendant that it might have to pay three times the amount owed: "I

25

1   pointed it out to them because I don't want them to be surprised

2   not having seen this, and we discussed it at meeting."   Id. at

3   95:19-25.

4        Notwithstanding Mr. Chen's testimony, the wording of the

5   trebling portion of section 5.7 clearly contemplates the

6   possibility of the licensee fraudulently under-reporting sales, a

7   situation that would alter only the amount of running royalties

8   owed.   Even if Mr. Chen intended the trebling provision to apply to

9   underpayment of minimum royalties as well, he did not clearly

10  communicate this intention to Defendant.   His testimony about his

11  conversation with Defendant provides no indication that the parties

12  intended the provision to apply to both minimum and running

13  royalties.   Absent such an indication of the parties' intent, the

14  language of the contract governs.

15       Accordingly, the Court finds that the trebling provision does

16  not apply to underpayment of minimum royalties.   In addition, the

17  attorneys' fees and expenses provision in section 5.7 explicitly

18  covers only such fees and expenses incurred as a result of the

19  "fraud or false statements" that lead to under-reporting of sales.

20  Thus, the Court finds that this portion of section 5.7 also does

21  not apply to underpayment of minimum royalties.

22                              CONCLUSION

23       For the foregoing reasons, Plaintiff's motion for summary

24  judgment (Docket No. 150) is GRANTED IN PART and DENIED IN PART.

25  Specifically, Plaintiff's motion for partial summary judgment on

26  Defendant's tenth affirmative defense is granted: Defendant will

27  not be entitled to an offset for its running royalty payments if

28                                   26

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Plaintiff's patents are found to be invalid or if Defendant's

2   products are found not to be covered by the patents.  Summary

3   judgment in Plaintiff's favor is also granted as to Defendant's co-

4   inventorship counterclaims.  Because, as a matter of law, a

5   contract was formed between the parties, Defendant's counterclaim

6   for unjust enrichment fails and the Court also grants summary

7   judgment in favor of Plaintiff on this ground.  The parties'

8   contract-based claims will be governed by the minimum royalty

9   schedule contained in the integrated license agreement.  These

10   claims are also covered by the jury waiver clause in the license

11   agreement; thus, any contract-based claims not resolved on summary

12   judgment will be tried before the Court, not before a jury.

13   Defendant's cross-motion for partial summary judgment (Docket

14   No. 162) is GRANTED.  Because the trebling provision in section 5.7

15   is a contractual penalty, it is not enforceable.  Even if it were,

16   as a matter of contract interpretation, neither it nor the

17   provision concerning attorneys' fees and expenses applies to unpaid

18   minimum royalty payments.

19        IT IS SO ORDERED.

20

21   Dated: 9/25/07

22                                 CLAUDIA WILKEN

23                                 United States District Judge

24

25

26

27

28                           27